UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MICHAEL REESE MEDICAL | ) | |
| CENTER CORPORATION, | ) | Case No. 08 B 25811 |
| | ) | |
| Debtor. | ) | Hon. John H. Squires |
| | ) | |

**INTERIM ORDER: (1) APPROVING POST-PETITION FACTORING AGREEMENT; (2) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE TREATMENT; (3) APPROVING SUN CAPITAL HEALTHCARE, INC.'S FEES AND COSTS; AND (4) SETTING FINAL HEARING**

On October 7, 2008, a hearing (the "Hearing") was held before the undersigned United States Bankruptcy Judge to consider the *Emergency Motion For Interim Order (1) Approving Post-Petition Factoring Agreement; (2) Granting Security Interests And Superpriority Administrative Expense Treatment; (3) Approving Sun Capital Healthcare, Inc.'s Fees and Costs; And (4) Setting Final Hearing* (the "Factoring Motion"), filed by Michael Reese Medical Center Corporation, the debtor and debtor-in-possession in the above-captioned Chapter 11 case (the "Debtor"). Edward J. Green of Foley & Lardner LLP appeared on behalf of the Debtor. Mary H. Rose of Buchalter Nemer, a Professional Corporation, appeared on behalf of Sun Capital Healthcare, Inc. ("Sun Capital"). Other appearances are as noted on the record.

Having considered the Factoring Motion, any opposition to the Factoring Motion, all evidence and papers presented before or at the Hearing, and all argument at the Hearing,

**THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    <u>Petition</u>.

1.    On September 28, 2008 (the "Petition Date"), the Debtor filed a voluntary petition (the "Petition") for relief under Chapter 11 of Title 11 of the United States Code (the

"Bankruptcy Code"). The Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

**B.      Jurisdiction.**

2.      This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. The Factoring Motion is a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (D), (G), (K), (M) and (N).

**C.      Notice.**

3.      Copies of the Factoring Motion, notice of the Hearing, and a proposed order substantially similar to this Interim Order, were served on October 3, 2008, by facsimile or overnight delivery, on (i) the United States Trustee, (ii) the twenty (20) largest unsecured creditors identified on the Debtor's list filed pursuant to Rule 1007(d) of the Federal Rules of Bankruptcy Procedure, (iii) all known secured creditors and/or their counsel, and (iv) certain other parties (collectively, the "Noticed Parties").

4.      The Factoring Motion was filed with the Court on October 3, 2008, and was, therefore, available for public inspection.

5.      Based on the foregoing, the notice given relative to the Hearing and the relief requested in the Factoring Motion on an interim basis is adequate and sufficient and in accordance with all applicable law.

**D.      Pre-Petition Obligations.**

6.      As of the Petition Date, Debtor was indebted to Sun Capital in the aggregate sum of not less than approximately $10,325,736.13, plus attorneys' fees and costs, under that certain Master Purchase and Sale Agreement, dated as of March 6, 2008 (the "Factoring Agreement"). Sun Capital asserts that Debtor's obligations under the Factoring Agreement as of the Petition Date ("Pre-Petition Obligations") are secured by valid, enforceable, and perfected lines ("Pre-Petition Liens") in the following assets of the Debtor, as more fully described in the Factoring Agreement: all accounts and rights to payment, chattel paper, documents, instruments, letter of credit rights, supporting obligations, deposit accounts, general intangibles, and the proceeds,

CHIC_3542175.1

products and offspring thereof, including cash (the "Pre-Petition Collateral"). As of the Petition Date, Debtor believes the value of the Pre-Petition Collateral exceeded the outstanding Pre-Petition Obligations. The Factoring Agreement and the related agreements, instruments and documents that accomplish, effectuate, implement and/or evidence the pre-petition factoring are collectively referred to herein as the "Pre-Petition Factoring Documents." Copies of the principal Pre-Petition Factoring Documents were filed with the Court in support of the Factoring Motion and are incorporated herein by this reference.

**E.** **Need For Post-Petition Factoring.**

7. The Debtor is in serious need of a post-petition factoring facility in order to increase its liquidity. Without such a facility, the Debtor does not have sufficient cash flow to enable it to pay for such critical expenses as payroll, supplies and taxes.

8. The Debtor has an immediate need for factoring to minimize the disruption of its business and daily operations, manage and preserve the assets of its bankruptcy estate, provide patient care to existing and future patients and increase the likelihood of a successful reorganization or liquidation. In this regard, it is essential, in order to enable the Debtor to meet the day-to-day cash requirements for its post-petition business, that the Debtor be able to factor its pre-petition and post-petition accounts receivable and rights to payment.

9. Without the sale of these accounts receivable and rights to payment on an ongoing basis, the Debtor would not have an adequate source of funds with which to fund payroll and conduct ongoing operations. Thus, the factoring facility contemplated in the Factoring Motion and approved by this Interim Order ("Post-Petition Factoring") is necessary, essential, and appropriate to prevent immediate and irreparable harm to the Debtor, its estate, creditors, employees, and patients.

**F.** **Post-Petition Factoring Facility.**

10. The Debtor wishes to factor its accounts receivable and rights to payment with Sun Capital on the terms and conditions set forth in Factoring Agreement, as amended by the Post-Petition Chapter 11 Bankruptcy Rider to Sun Capital Healthcare, Inc.'s Master Purchase

- 3 -

and Sale Agreement (the "Post-Petition Factoring Amendment"), and all other agreements, instruments, documents and notes as Sun Capital may reasonably deem appropriate to accomplish, effectuate, implement and/or evidence the Post-Petition Factoring, as the same now exist or may hereafter be amended, modified, supplemented, ratified, assumed, extended, renewed, restated, or replaced (collectively with the Pre-Petition Factoring Documents, the "Factoring Documents"). A copy of the Post-Petition Factoring Amendment is attached hereto as Exhibit A and incorporated herein by this reference.

11.    Pursuant to the Factoring Documents, the Debtor will (a) sell to Sun Capital certain of its pre-petition and post-petition accounts receivable and rights to payment, and (b) in order to secure its obligations to Sun Capital under the Factoring Documents, grant to Sun Capital a superpriority lien on all of the Debtor's inventory, equipment, accounts and rights to payment, chattel paper, documents, instruments, letter of credit rights, supporting obligations, deposit accounts, general intangibles, and the proceeds, products and offspring thereof, including cash, subject only to any valid, perfected, and unavoidable security interests or liens existing as of the Petition Date and identified as Permitted Liens in the Post-Petition Factoring Amendment.

G.    **No Credit Available On Other Terms.**

12.    The Court finds that the Debtor is unable to procure other emergency financing, in sufficient amounts and on a timely enough basis, whether in the form of (a) unsecured credit allowable under § 503(b)(1) of the Bankruptcy Code as an administrative expense, or (b) in exchange for the grant of an administrative expense super-priority pursuant to § 364(c)(1) of the Bankruptcy Code.

13.    The type of specialized working capital required by the Debtor can only be obtained by providing Sun Capital with a first-priority lien in certain of the Debtor's assets, including accounts, general intangibles, inventory, equipment, documents and instruments. The Debtor would not be able to obtain timely financing or other funding from any other source in an amount sufficient to provide for the Debtor's current and anticipated needs without granting a first priority lien on such assets.

CHIC_3542175.1

14.     Sun Capital is unwilling to purchase the Debtor's accounts receivable and rights to payment pursuant to the terms of the Factoring Documents without being afforded the protections provided by §§ 364(c)(1)-(2) and § 364(d) of the Bankruptcy Code, and the entry of this Interim Order.

**H.     Good Cause For Entry Of Order.**

15.     Good and adequate cause has been shown for the post-petition factoring facility pursuant to the Factoring Documents and the entry of this Interim Order approving the Factoring Motion.  Entry of this Interim Order is in the best interests of the Debtor, its creditors, and its estate since it will (a) minimize the disruption to the Debtor's business and on-going operations, (b) increase the probability that the Debtor will achieve a successful reorganization or liquidation, (c) preserve the Debtor's assets, goodwill, and reputation, (d) preserve the value of the Debtor's accounts receivable and rights to payment, (e) avoid immediate and irreparable harm to the Debtor, its creditors, assets, business, goodwill, reputation and employees, and (f) prejudice no party in any demonstrable way, or in any way at all that is not clearly outweighed by significant benefits to the Debtor's estate, creditors, and parties in interest.

**I.     Good Faith True Sale And Fair Terms.**

16.     The terms and conditions of the Post-Petition Factoring pursuant to the Factoring Documents and this Interim Order are fair, just, and reasonable under the circumstances and reflect the exercise of the Debtor's prudent business judgment, consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The Debtor believes that the transfer of title from Debtor to Sun Capital of a Purchased Account (as defined in the Factoring Agreement) is a true sale and is not subject to recharacterization, and that Sun Capital owns all Purchased Accounts free and clear of all liens, claims, encumbrances and interests (other than the liens and security interests of Sun Capital).

17.     The Post-Petition Factoring, this Interim Order and the Factoring Documents have been negotiated in good faith and at arms-length by and between the parties, with all parties represented by counsel.  Accordingly, any factoring provided by Sun Capital pursuant to this

Interim Order shall be deemed to have been extended or provided in good faith under §§ 364(e) and 363(m) of the Bankruptcy Code.

Based on the foregoing findings of fact and conclusions of law, after due consideration, and good cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

**Section 1:  Authorization And Conditions To Factoring.**

1.1    **Motion Granted.**  The Factoring Motion is granted on an interim basis in accordance with the terms of this Interim Order.

1.2    **Authorization To Factor.**  The Debtor is authorized to enter into and perform under the Factoring Agreement as amended by the Post-Petition Factoring Amendment, including (a) the purchase by Sun Capital of pre-petition and post-petition accounts receivable and rights to payment (the "Ownership Interests") and (b) the borrowing and incurring of secured indebtedness to Sun Capital as provided under the terms of the Factoring Agreement as amended by the Post-Petition Factoring Amendment, on an interim basis through and until a hearing for "final" approval of the Factoring Motion as provided in Section 6.8 of this Interim Order.  The purchases, advances, and all other indebtedness and obligations incurred by the Debtor to Sun Capital, of every nature and however arising, absolute or contingent, direct or indirect, including, without limitation, (x) any obligations due to misconduct or breach of duty by the Debtor under the Factoring Documents including, without limitation any misdirected payments, and (y) all regular and default discount fees, interest, charges, costs, and expenses ("Fees And Costs"), are hereinafter referred to as the "Obligations."

1.3    **Authorization And Approval Of Factoring Documents.**  The Debtor is authorized, empowered, and directed to enter into, execute, deliver and perform the Factoring Agreement as amended by the Post-Petition Factoring Amendment and all other agreements, instruments, documents and notes as Sun Capital may reasonably deem appropriate to accomplish, effectuate, implement and/or evidence the factoring under the Factoring Agreement (collectively, the "Factoring Documents"), and each and every term contained therein, and all

Obligations incurred thereunder, including without limitation all Fees And Costs, are approved. Subject to Sections 3.1 through 3.3 of this Interim Order, the executed Factoring Documents shall constitute valid and binding obligations of the Debtor enforceable against the Debtor. The Debtor is authorized and directed to perform and comply with all acts that may required under the terms, intent, and purpose of the Factoring Documents.

**1.4    Authorization To Use Cash Collateral.** The Debtor is authorized under § 363(c)(2) of the Bankruptcy Code to use cash collateral as provided, permitted, or required under the Factoring Documents.

**1.5    Payments To Sun Capital And Application Of Payments.** The Debtor is authorized to and shall make all payments and transfers of property to Sun Capital or for the benefit of Sun Capital as provided, permitted, or required under the Factoring Documents. Subject to Sections 3.1 through 3.3 of this Interim Order, those payments and transfers shall not be subject to avoidance under Bankruptcy Code § 549.

**1.6    Continuation Of Pre-Petition Collection Procedures And Lockboxes.** The Debtor's cash management system that existed pre-petition, including all pre-petition payment practices and procedures for the collection of accounts receivable and rights to payment of the Debtor, turnover of cash, and delivery of property to Sun Capital, including without limitation, the lockboxes and lockbox accounts established at Sun Trust Bank pursuant to the "Wholesale Lockbox Deposit And Blocked Account Service Agreement With Provider" dated as of March 27, 2008 (the "Lockbox Agreement"), a copy of which is attached to the Post-Petition Factoring Amendment, or such other collection accounts as may be approved by Sun Capital, shall continue without interruption or break in continuity, with the same rights Sun Capital possesses or possessed prior to the Petition Date, and the Debtor is authorized to continue to perform under the Lockbox Agreement.

**Section 2:  Ownership Interests And Liens.**

**2.1    Ownership Interests.** Pursuant to § 363 of the Bankruptcy Code, the sale of the Debtor's pre-petition and post-petition accounts receivable and rights to payment pursuant to the

Post-Petition Factoring shall be a true sale free and clear of all liens, claims, encumbrances and interests, other than the liens and security interests of Sun Capital and is approved to avoid immediate and irreparable harm to the Debtor's estate pursuant to Rule 6003 of the Federal Rules of Bankruptcy Procedure.

2.2   **Post-Petition Liens.**   As security for the Debtor's payment and performance of the Obligations incurred post-petition (the "Post-Petition Obligations") pursuant to §§ 364(c)(2) and 364(d) of the Bankruptcy Code, Sun Capital is hereby granted first priority liens ("Post-Petition Liens") on all of the following assets, as more fully described in the Post-Petition Factoring Amendment, in which either the Debtor or its estate has an interest:   accounts receivable (whether offered for purchase or not), chattel paper, documents, instruments, letter of credit rights, supporting obligations, deposit accounts, general intangibles, inventory and equipment arising or existing as of or after the Petition Date, and all of the cash and non-cash proceeds, products, and offspring of the foregoing, subject only to Permitted Liens and the Carve-Out Expenses (as defined below); provided, however, that Sun Capital shall not be granted any lien on causes of action of the Debtor under chapter 5 of the Bankruptcy Code other than under § 549 of the Bankruptcy Code.   Sun Capital and holders of Permitted Liens are collectively referred to as "Secured Parties."   All assets subject to the Post-Petition Liens are collectively referred to herein as the "Post-Petition Collateral," and together with the Pre-Petition Collateral, as the "Collateral".

2.3   **Adequate Protection and Replacement Liens.**   As adequate protection of Sun Capital's interest in the Pre-Petition Collateral pursuant to § 361 of the Bankruptcy Code,  and in addition to the liens and security interests of Sun Capital pursuant to § 552(b) of the Bankruptcy Code, Sun Capital is hereby granted first priority liens in the Post-Petition Collateral to the extent of any diminution in value of the Pre-Petition Collateral after the Petition Date including, without limitation, any diminution in value resulting from (a) the Debtor's cessation of business operations, or (b) use of the Pre-Petition Collateral after the Petition Date, subject only to Permitted Liens and the Carve-Out Expenses (the "Adequate Protection Liens").

- 8 -

**2.4    Validity And Perfection Of Post-Petition Liens.**  The Post-Petition Liens and the Adequate Protection Liens shall be valid, enforceable, attached, and perfected as of the Petition Date (and time) without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording or possession of the Collateral or other act ("Perfection Act").  Notwithstanding the foregoing, if Sun Capital shall, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, Sun Capital is authorized to perform such act which shall be deemed to have been accomplished as of the Petition Date (and time), notwithstanding the date and time actually accomplished.  In lieu of or in addition to a Perfection Act, Sun Capital may file or record a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act.  Should Sun Capital so choose and attempt to file, record, or effectuate a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, or perfection of the Post-Petition Liens.

**2.5    Seniority Of Post-Petition Liens.**  The Post-Petition Liens and the Adequate Protection Liens shall be senior to, and shall not be subordinated or made equal to any lien, security interest, mortgage, or any other interest in favor of any party other than Secured Parties (according to their respective priorities) by any order of the Court or otherwise, including without limitation liens or interests (a) avoided and preserved for the benefit of the Debtor's estate under § 551 of the Bankruptcy Code; (b) authorized in connection with the use of cash collateral under § 363 of the Bankruptcy Code; (c) granted in connection with the obtaining of credit or incurring of indebtedness under § 364 of the Bankruptcy Code; (d) recognized as senior under § 510 of the Bankruptcy Code; or (e) provided pursuant to an order confirming a plan of reorganization; unless (x) Sun Capital shall have given its express prior written consent, which shall not be implied from any other action, inaction, or acquiescence by Sun Capital, or (y) the order providing for such lien, interest, or subordination is conditioned upon prior payment and satisfaction in full of the Obligations.

2.6     **Carve-Out Expenses.**  The following fees and expenses are hereinafter referred

to as "Carve-Out Expenses":  (a) statutory fees required to be paid to the United States Trustee

pursuant to 28 U.S.C. § 1930(a)(6); (b) allowed fees and expenses of counsel for the Debtor

(whose employment is approved by final order of the Court) that are approved by final order of

the Court in an aggregate amount not exceeding the sum of (i) $150,000 through a final hearing

on approval of the Post-Petition Factoring, with additional amounts to be added before such

hearing, plus (ii) any amounts remaining in the retainer received by counsel for the Debtor prior

to the Petition Date; (c) fees and expenses of counsel for any Official Committee of Unsecured

Creditors (whose employment is approved by final order of the Court) that are allowed by final

order of the Court in an aggregate amount not exceeding $25,000; and (d) fees and expenses of a

patient care ombudsman, if one is appointed under § 333 of the Bankruptcy Code, in an amount

not exceeding $10,000.  The Carve-Out Expenses shall be senior in priority to the Pre-Petition

Liens, the Post-Petition Liens, the Adequate Protection Liens and Sun Capital's superpriority

administrative expense claim.

2.7     **Superpriority Administrative Expense.**  All Post-Petition Obligations shall

have the superpriority in payment afforded by § 364(c)(1) of the Bankruptcy Code, subject only

to the Carve-Out Expenses.

**Section 3:  Pre-Petition Obligations And Liens.**

3.1     **Objections To Pre-Petition Obligations.**  Any claim or defense objecting to or

contesting the allowance of the Pre-Petition Obligations, or seeking any setoff, recoupment,

counterclaim, deduction, or claim of any kind against the Pre-Petition Obligations, including

without limitation any Pre-Petition Obligation arising from or relating to any discount or interest

rate in the Pre-Petition Factoring Documents ("Pre-Petition Obligation Objection") by any party

shall be filed with the Court no later than the earlier of (a) sixty (60) days after the first date of

appointment of an Official Committee of Unsecured Creditors (the "Committee") in this

bankruptcy case, or (b) ninety (90) days after the Petition Date.  If Pre-Petition Obligation

Objections are not timely filed or are timely filed but denied, the Pre-Petition Obligations shall

be deemed allowed in full and not subject to any setoff, recoupment, counterclaim, deduction, or claim of any kind, and the Pre-Petition Obligations shall continue to accrue discount fees and other charges as provided in the Factoring Agreement.

      3.2     **Objections To Pre-Petition Liens Or Ownership Interests.**  Any claim or defense objecting to or contesting the validity, perfection, or enforceability of the ownership or title of Sun Capital in the Purchased Accounts (as defined in the Factoring Agreement) or of the Pre-Petition Liens or ownership interests ("Pre-Petition Lien or Ownership Objection") by any party shall be filed with the Court no later than the earlier of (a) sixty (60) days after the first date of appointment of the Committee, or (b) ninety (90) days after the Petition Date. If Pre-Petition Lien or Ownership Objections are not timely filed or are timely filed but denied, the Pre-Petition Liens and Ownership Interests shall be deemed valid, perfected, enforceable, and unavoidable for all purposes.

      3.3     **Causes Of Action Against Sun Capital.**  Any claim or cause of action that could be asserted against Sun Capital or any of its officers, directors, employees, agents, attorneys, accountants, affiliates, successors or assigns by any party, including the Committee, on behalf of the Debtor's estate, whether under chapter 5 of the Bankruptcy Code or otherwise (a "Sun Cause of Action"), must be filed no later than the earlier of (a) sixty (60) days after the first date of appointment of the Committee, or (b) ninety (90) days after the Petition Date. If no Sun Cause of Action is timely filed or is timely filed but denied or dismissed, the Debtor's estate and the Committee shall be deemed to have forever released all Sun Causes of Action pursuant to Section 5.3 of this Interim Order.

**Section 4:  Default; Rights And Remedies; Relief From Stay.**

      4.1     **Events Of Default.**  An event of default under the Post-Petition Factoring ("Event of Default") shall include any of the following:

         (a)     The Occurrence of a Termination Event under the Factoring Agreement as amended by the Post-Petition Factoring Amendment;

         (b)     Debtor's failure to perform or satisfy any of the terms, conditions, or

covenants of this Interim Order;

(c)     Debtor's filing, support, or confirmation of a Chapter 11 plan of reorganization or liquidation in this bankruptcy case that does not provide for the prior payment and satisfaction in full of the Obligations on or before the "effective date" of the plan, unless otherwise agreed to in writing by Sun Capital;

(d)     The termination of the Post-Petition Factoring by its own terms or operation of law;

(e)     The foreclosure, liquidation, levy, or similar act by any party with respect to any material portion of the Collateral;

(f)     The dismissal of the Debtor's chapter 11 case;

(g)     The appointment of a trustee under § 1104 of the Bankruptcy Code in the Debtor's chapter 11 case;

(h)     The conversion of the Debtor's chapter 11 case to a case under another chapter of the Bankruptcy Code;

(i)     The stay, modification, amendment, vacating, or reversal of any term of this Interim Order or the Factoring Documents, or any of the rights and acknowledgments conferred thereunder, without the express prior written consent of Sun Capital; and

(j)     The commencement by the Debtor of any lawsuit or adversary proceeding against Sun Capital, or the filing of any other pleading by the Debtor, seeking to object to, contest or avoid the Obligations.

**4.2     Rights And Remedies Upon Event Of Default.**  Upon the occurrence of an Event of Default, Sun Capital shall provide Debtor and counsel for Debtor with a notice of such Event of Default via telephone and fax ("Default Notice").  If the Event of Default is not cured within five (5) business' days after the giving of the Default Notice, or (b) is incurable, then all of the following shall occur:  (a) all Obligations shall be immediately due and payable; (b) Sun Capital shall be under no obligation to purchase accounts, to advance money or extend credit to or for the benefit of Debtor; (c) the Post-Petition Factoring shall be terminated, which

termination shall have no effect on the Post-Petition Liens, the Adequate Protection Liens, the Ownership Interests or the Obligations; and (d) Debtor shall not have any use of any cash collateral without further order of the Court.   With respect to an Event of Default that is not cured within five (5) business' days after the giving of the Default Notice, and after an additional five (5) business' days notice to the Debtor, Sun Capital may, in addition to the other rights and remedies of Sun Capital recognized in this Section 4.2:  (x) take any and all acts to enforce its rights and remedies with respect to the Collateral; and/or (y) take any other action or exercise any or all rights and remedies available under this Interim Order, the Factoring Documents, or applicable law.

     **4.3**    **Relief From Stay And Injunction.**  Subject to the conditions set forth in Section 4.2 of this Interim Order, without further notice, motion, application, hearing, or order, all stays and injunctions, including without limitation the automatic stay of § 362 of the Bankruptcy Code, existing now or arising at any time in the future, are hereby lifted in favor of Sun Capital to permit Sun Capital:  (a) to implement the Post-Petition Factoring pursuant to the terms of this Interim Order and the Factoring Documents; (b) to create, validate, evidence, attach, or perfect the Post-Petition Liens and the Adequate Protection Liens; and (c) to assess, charge, collect, and receive payments and Fees And Costs, and apply such payments to the Obligations pursuant to the terms of the Factoring Documents and this Interim Order.

     Notwithstanding the foregoing, upon an Event of Default, Sun Capital shall be entitled to a hearing on an expedited basis after five (5) business days' notice to the Debtor and counsel for the Debtor, subject to the Court's calendar and availability, regarding immediate relief from the automatic stay of Bankruptcy Code § 362(a) in favor of Sun Capital to exercise any of its rights and remedies under the Factoring Documents, this Interim Order, or applicable law, including without limitation actions with respect to the Collateral including cash collateral.

     **4.4**    **No Modification Or Stay Of This Order.**  Unless expressly consented to in writing by Sun Capital, (a) this Interim Order, (b) the Factoring Documents, (c) the rights and remedies of Sun Capital under the Factoring Documents and this Interim Order, (d) the

Obligations, (e) the Post-Petition Liens, (f) the Adequate Protection Liens, and (g) the Ownership Interests shall not be subject to any stay, modification, alternation, amendment, vacating, or reversal in any respect whatsoever by any order of this Court.   Notwithstanding any stay, modification, alteration, amendment, vacation, or reversal of this Interim Order, the Factoring Documents, or any term thereunder, the failure to obtain a final order on the Factoring Motion, or the dismissal or conversion of this chapter 11 case ("Subject Event"), the acts taken by Sun Capital in accordance with this Interim Order; and the Obligations incurred or arising prior to Sun Capital's receipt of written notice of such Subject Event, shall be governed in all respects by the original provisions of this Interim Order, and the acts taken by Sun Capital in accordance with this Interim Order, and the Post-Petition Liens, the Adequate Protection Liens, Ownership Interests, and other rights and remedies in favor of Sun Capital pursuant to this Interim Order and the Factoring Documents, shall remain valid and in full force and effect, pursuant to §§ 364(e) and 363(m) of the Bankruptcy Code.   For purposes of §§ 364(e) and 363(m), the term "appeal" shall include any proceeding for reconsideration, rehearing, or re-evaluation of this Interim Order by this Court or any other tribunal.

      **4.5**    **Power To Waive Rights-Duties To Third Parties.**   Sun Capital shall have the right to waive any of the terms, rights, and remedies provided in this Interim Order or the Factoring Documents ("Sun Capital Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement of, or failure to exercise or enforce, any Sun Capital Rights.   Any waiver by Sun Capital of any Sun Capital Rights shall not be or constitute a continuing waiver.   Sun Capital's delay in or failure of exercising or enforcing any Sun Capital Rights shall neither constitute a waiver of such Sun Capital Rights, subject Sun Capital to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert as a defense to any Obligations.

      **4.6**    **Reservation Of Rights.**   Subject to the terms of this Interim Order, this Interim Order is without prejudice to the rights of Sun Capital to pursue any and all rights and remedies under the Bankruptcy Code, the Factoring Agreement as amended by the Post-Petition Factoring

Amendment, the Factoring Documents, and any other applicable agreement or law, including

without limitation rights to additional adequate protection, to seek relief from the automatic stay,

to seek an injunction, to object to applications for allowance and/or payment of compensation of

professionals employed by the Debtor or its estate or under the Bankruptcy Code, to object to

any employee or management retention program, and to object to any sale of assets or plan of

reorganization.

   **4.7 Right To Factor On Other Terms.** Sun Capital has not waived the right to

provide factoring and related services to the Debtor on any other, different, or additional terms

than in this Interim Order.

**Section 5:  Representations And Covenants.**

   **5.1 Limitation Of Use Of Proceeds.** Notwithstanding any other provision of this

Interim Order, neither the factoring under the Factoring Documents nor the Collateral, including

without limitation, cash collateral, shall be used either:  (a) in connection with the assertion,

commencement, or continuation of any action or claim against Sun Capital or its officers,

directors, employees, agents, attorneys, accountants, affiliates, successors or assigns, or (b) to

object to or contest, or raise any defenses to the validity, perfection, priority, or enforceability of

the Pre-Petition Obligations, the Post-Petition Obligations, the Pre-Petition Liens, the Post-

Petition Liens, the Adequate Protection Liens or the Ownership Interests; provided, however,

that no more than $10,000 in the aggregate may be used by the Committee to investigate the

validity, priority and amount of the Pre-Petition Obligations, the Pre-Petition Liens and the Pre-

Petition Ownership Interests.

   **5.2 Debtor's Acknowledgment.** Subject to Sections 3.1 through 3.3 of this Interim

Order, this Interim Order approves the Debtor's acknowledgment and agreement that the

Factoring Agreement, as amended by the Post-Petition Factoring Amendment, the Factoring

Documents, the Pre-Petition Obligations, the Post-Petition Obligations, the Pre-Petition Liens,

the Post-Petition Liens, the Adequate Protections Liens, and the Ownership Interests are valid,

enforceable, perfected, and unavoidable under the Bankruptcy Code or any other applicable law,

in accordance with their terms.

**5.3    Releases.**  Subject to Sections 3.1 through Section 3.3 of this Interim Order with respect to parties other than the Debtor, notwithstanding any other provision of this Interim Order, in consideration of Sun Capital's agreement to provide Post-Petition Factoring as provided in this Interim Order and other valuable consideration, the Debtor assigns, releases and forever discharges all claims, rights, defenses, demands, damages, actions, causes of action, costs, expenses, and suits at law or in equity, whether known or unknown (collectively, "Claims"), which Debtor has held or now holds against Sun Capital and its officers, directors, employees, agents, attorneys, accountants, affiliates, successors and assigns, with respect to or in connection with the Pre-Petition Obligations, the Pre-Petition Collateral and Ownership Interests, and the Pre-Petition Factoring Documents, and any act by Sun Capital of any right or remedy thereunder, including without limitation, the application of the Collateral, and all claims under the Bankruptcy Code, including without limitation §§ 506, 544, 547, 548, 550, 552 and 553 of the Bankruptcy Code, or other law relating to acts arising or existing before the Petition Date.

**5.4    Reporting.**  In addition to all reporting requirements under the Factoring Documents, subject to appropriate confidentiality, the Debtor shall timely provide Sun Capital with copies of all reports, pleadings and other documents filed or submitted to the Court or the United States Trustee by the Debtor.

**Section 6:  Other Rights And Obligations.**

**6.1    Binding Effect.**  The provisions of this Interim Order shall be binding upon the Debtor, all parties in interest in this bankruptcy case, and their respective successors and assigns, including any trustee appointed as a representative of the Debtor's estate whether under any chapter of the Bankruptcy Code or similar law.   The provisions of this Interim Order, the Factoring Documents, and any actions taken pursuant thereto, shall survive entry of and shall govern with respect to any conflict with any order, including without limitation any order which may be entered confirming any plan of reorganization, converting this Chapter 11 case to a case under any other chapter of the Bankruptcy Code, or dismissing this bankruptcy case.

CHIC_3542175.1

**6.2    Waiver of Section 506(c) Claims.**  Except for inventory and equipment, which may be subject to surcharge pursuant to § 506(c) of the Bankruptcy Code, neither the Collateral nor Sun Capital shall be subject to any surcharge pursuant to § 506(c) of the Bankruptcy Code or other law without the express prior written consent of Sun Capital.

**6.3    Term.**  Notwithstanding any other term or provision of this Interim Order, the term of the Post-Petition Factoring shall terminate (a "Termination") as of the earlier of either:

(a)    As provided in the Factoring Agreement as amended by the Post-Petition Factoring Amendment; or

(b)    Upon the occurrence of an Event of Default that is not cured pursuant to Section 4.2 of this Interim Order.

**6.4    Extension.**  Notwithstanding the occurrence of a Termination, factoring by Sun Capital and such Termination may be extended by Sun Capital and the Debtor by written agreement, without further notice, motion, hearing, or order of this Court.  This Interim Order shall be deemed as approval of any extension of factoring by Sun Capital and Termination as provided herein.

**6.5    Objections Overruled.**  All objections to the Factoring Motion on an interim basis are hereby overruled.

**6.6    Service Of Order.**  Service of a copy of this Interim Order shall be accomplished by the Debtor via regular first class U.S. Mail upon the Noticed Parties within three (3) business days after entry of this Interim Order, which shall be deemed good and sufficient service hereof for all purposes.

**6.7    Order Controls.**  In the event of any inconsistency between the Post-Petition Factoring Amendment or the Pre-Petition Factoring Documents and this Interim Order, the terms of this Interim Order shall control.

**6.8    Final Hearing And Response Dates.**  A final hearing on the Factoring Motion pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure ("Final Hearing") is scheduled for _____, 2008, at _____.m. before the Honorable John H. Squires in

the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, 219 S.

Dearborn St., Courtroom 680, Chicago, IL 60604.  Notice of the Final Hearing shall be provided

by Debtor via regular first class U.S. Mail to all appropriate parties on or before

_____, 2008.  Any opposition to the relief to be sought at the Final Hearing shall be

served on (a) counsel for the Debtor, Foley & Lardner LLP, 321 North Clark Street, Suite 2800,

Chicago, Illinois 60610, Attn:  Edward J. Green, Esq., (b) counsel for Sun Capital Healthcare,

Inc., Buchalter Nemer, a Professional Corporation, 1000 Wilshire Blvd., Suite 1500, Los

Angeles, California 90017-2457, Attn: Mary H. Rose, Esq., and (c) the United States Trustee,

219 S. Dearborn Street, Room 873, Chicago, Illinois 60604, and filed with the Court by

_____, 2008.


DATED: _____, 2008          _____
                                       UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT A**

## POST-PETITION CHAPTER 11 BANKRUPTCY RIDER TO SUN CAPITAL HEALTHCARE, INC.'S MASTER PURCHASE AND SALE AGREEMENT

This Post-Petition Chapter 11 Bankruptcy Rider to Sun Capital HealthCare, Inc.'s Master Purchase and Sale Agreement (hereinafter referred to as the "Bankruptcy Rider") is made and entered into this as of October 3, 2008, by and between the Chapter 11 Debtor-In-Possession, Michael Reese Medical Center Corporation, a Delaware corporation (hereinafter referred to as "Debtor" or "Provider"), and Sun Capital HealthCare, Inc., a Florida corporation (hereinafter referred to as "Sun Capital," or "Factor" or "Purchaser").

**RECITALS:**

A.      Debtor filed a voluntary petition (the "Petition") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on September 28, 2008 (the "Petition Date"), with the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court"), Case No. 08-25811 (the "Bankruptcy Case"). Debtor is continuing to operate its business and manage its affairs as debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

B.      Debtor is engaged in the business of operating an acute care hospital and related facilities from premises located at 2929 South Ellis Avenue, Chicago, Illinois 60616.

C.      Prior to the commencement of the Bankruptcy Case, Debtor and Sun Capital entered into agreements whereby Sun Capital (a) purchased certain accounts and rights to payment from Debtor and (b) provided certain financial accommodations to Debtor, secured by a first priority security interest in personal property assets of Debtor. The agreements existing as of the Petition Date (the "Pre-Petition Agreements") are as follows:

1.      Master Purchase and Sale Agreement. On or about March 6, 2008, Debtor and Sun Capital executed and delivered a Master Purchase and Sale Agreement (the "Master Agreement"), a true and correct copy of which is attached hereto as Exhibit 1 and incorporated herein by reference. The Master Agreement provides, *inter alia,* for Sun Capital to purchase certain accounts and rights to payment from Debtor and that Sun Capital receive a first priority security interest in all of Debtor's accounts and rights to payment (whether or not purchased by Sun Capital), chattel paper, documents, instruments, letter of credit rights, supporting obligations, deposit accounts, general intangibles, and the proceeds, products and offspring thereof.

2.      UCC Financing Statements. On or about March 5, 2008, Sun Capital perfected its security interest in Debtor's assets by filing and recording UCC Financing Statements (the "UCC Financing Statements"), true and correct copies of which are attached hereto as Exhibit 2 and Exhibit 3, respectively, and incorporated herein by reference, with the Secretary of State of the State of Delaware and the Secretary of State of the State of Illinois.

3.    <u>Lockbox Agreement</u>. On or about March 27, 2008, Debtor, Sun Capital and Sun Trust Bank executed and delivered a Wholesale Lockbox Deposit and Blocked Account Service Agreement with Provider (the "Lockbox Agreement"), a true and correct copy of which is attached hereto as <u>Exhibit 4</u> and incorporated herein by reference. The Lockbox Agreement provides, *inter alia*, for the use of certain lockbox and deposit account services at Sun Trust Bank and the establishment of certain lockboxes and lockbox bank accounts (the "Lockbox Bank Accounts") to facilitate the collection and transfer of funds in connection with the Master Agreement.

4.    <u>Assignment of Prior Accounts Receivable Purchase and Security Agreements</u>. On or about March 6, 2008, Medical Provider Financial Corporation III ("Medical Capital") assigned all of its rights under its accounts receivable purchase and security agreements with the Debtor to Sun Capital pursuant to an Assignment and Assumption Agreement, a true and correct copy of which is attached hereto as <u>Exhibit 5</u> and incorporated herein by reference. On or about March 7, 2008, filed assignments of Medical Capital's UCC Financing Statements with the Secretary of State of the State of Delaware, true and correct copies of which are attached hereto as <u>Exhibit 6</u> and incorporated herein by reference.

5.    <u>Balance</u>. The outstanding balance owed to Sun Capital by Debtor as of the Petition Date is the sum of $10,325,736.13, excluding fees, costs, and reasonable attorneys' fees.

D.    Debtor and its counsel have reviewed the Pre-Petition Agreements, and such other documents as they have determined to be appropriate with respect to the validity, enforceability, and non-avoidability and amount of Debtor's indebtedness to Sun Capital under the Pre-Petition Agreements and the validity, enforceability, perfection, priority, and non-avoidability of Sun Capital's liens and security interests pursuant thereto.

E.    Debtor acknowledges and agrees that it is obligated to Sun Capital in the aggregate principal amount of $9,230,227.05, plus accrued discount fees in the aggregate amount of $1,095,509.08 as of the Petition Date, plus continuing discount fees and other fees and costs from and after the Petition Date, plus the actual amount of additional fees, costs and other expenses incurred by Sun Capital in connection with the Pre-Petition Agreements and this Bankruptcy Rider. Debtor further acknowledges and agrees that its obligations to Sun Capital are valid, allowable, enforceable and unavoidable and that these claims are not subject to any right of setoff, counterclaim, recoupment or defense.

F.    Debtor acknowledges and agrees that, pursuant to the Pre-Petition Agreements, Sun Capital holds valid, enforceable, perfected and unavoidable first priority liens on and security interests in: (1) the Subject Property (as defined in the Master Agreement) (hereinafter, the "Collateral"; and (2) all cash, negotiable instruments, documents of title, securities, deposit accounts, accounts receivable, insurance or other cash equivalents, and general intangibles directly or indirectly related to or arising from the Collateral or the business conducted by Debtor, and all replacements, substitutions, additions, accessions, proceeds, products, offspring, revenues, issues or profits thereof wherever located and whenever acquired by Debtor or its

2

estate before, on, or after the Petition Date (the "Cash Collateral"). Debtor also acknowledges that (b) Sun Capital owns the Purchased Accounts (as defined in the Master Agreement) and proceeds thereof as provided for in the Master Agreement.

G.    Debtor and Factor are entering into this Bankruptcy Rider, which incorporates by reference the Master Agreement (the Bankruptcy Rider and the Master Agreement are collectively hereinafter referred to as the "Factoring Agreement"), as of the Petition Date for the purpose of enabling Debtor to continue to sell accounts to, and obtain financial accommodations from, Factor as provided herein and therein.

H.    The Factoring Agreement is subject to the approval by and is made in contemplation of the entry of a non-appealable, final order (the "Factoring Order") to be entered by the Bankruptcy Court in the Bankruptcy Case, although Factor may, in its discretion, operate under the "safe harbor" provisions of §§ 363(m) and 364(e) of the Bankruptcy Code.

I.    Debtor and Factor acknowledge that once the Factoring Agreement has been executed by the Debtor and Factor, it shall be submitted to the Bankruptcy Court promptly by counsel for the Debtor and all requisite notices and mailings shall be done in conformity with all applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of the United States Bankruptcy Court for the Northern District of Illinois (the "Local Bankruptcy Rules"), all of which shall be the primary responsibility of Debtor's counsel, in order to obtain a Factoring Order approving same.

Now, therefore, in consideration of the mutual promises contained herein, the parties hereto agree as follows:

**AGREEMENT:**

1.    The foregoing recitals are a part of this Bankruptcy Rider for all purposes and acknowledged as accurate by Debtor.

2.    Debtor shall cause each of the following documents to be promptly delivered to counsel for Factor within one business day after filing with the Bankruptcy Court, or if such document is filed by a party other than Debtor's counsel, then within one business day after receipt of such document by Debtor's counsel:

    a)    The Petition.

    b)    The Schedules of Assets and Liabilities required by Bankruptcy Rule 1007(b) and official form number 6.

    c)    The Statement of Executory Contracts and Unexpired Leases required by Bankruptcy Rule 1007(b) and official form number 6, schedule G.

    d)    The Statement of Financial Affairs required by Bankruptcy Rule 1007(b) and official form number 7.

3

e)     The List of Equity Security Holders required by Bankruptcy Rule 1007(a)(3).

f)     All applications and orders to employ attorneys, accountants or any other professional on behalf of the debtor-in-possession.

g)     Any order entered by the Bankruptcy Court appointing an unsecured creditors' committee and any orders authorizing the committee to employ attorneys, accountants or other professionals.

h)     Any motions filed by secured creditors seeking stay relief or sequestration of cash collateral or agreements that have been approved by the Bankruptcy Court with respect to same.

i)     All real property leases upon which the Debtor operates and any agreements with landlords and motions with respect to real property leases that have been filed.

j)     Any plan of reorganization that has been prepared and/or filed.

k)     All Debtor-in-Possession reports (i.e., reports that are routinely required to be filed with the Bankruptcy Court or the United States Trustee periodically, usually every month, addressing all financial activity within that time period) as well as all other materials required to be provided to the United States Trustee during the Bankruptcy Case.

A.     Debtor shall be responsible to have a Motion for Order (i) Approving Post-Petition Factoring Agreement, (ii) Granting Security Interest and Superpriority Administrative Expense Treatment and (iii) Approving Sun Capital HealthCare, Inc.'s Fees and Costs (the "Motion"), duly served, filed and noticed for hearing with the Bankruptcy Court, which Motion and the proposed Factoring Order shall be in form and substance satisfactory to Factor.

B.     Debtor shall cause each of the following documents to be signed and delivered to Factor's counsel prior to the filing of the Motion:

1.     The Motion and the proposed Factoring Order.

2.     Any other documents Factor may reasonably require, including a post-petition budget of the Debtor.

3.     Section 4.4 of the Master Agreement entitled "Information Relating to Collections on Accounts; Payment of Deferred Purchase Price and Non-Purchased Account Amount" is supplemented by adding the following:

4

Debtor shall furnish to Factor: (a) reports relating to the creation of Accounts as may reasonably be required by Factor; (b) quarterly financial statements within 45 days after the end of each fiscal quarter of the Debtor; (c) annual financial statements within 90 days after the end of each fiscal year of the Debtor; and (d) any other financial or accounting reports or statements as Factor may reasonably request from time to time.

    4.    Section 7 of the Master Agreement entitled "Representations and Warranties of the Provider" is amended by (a) modifying subsection (a)(v) to (i) exclude the Bankruptcy Case and all actions, suits, proceedings and investigations that may have existed prior to the Petition Date and (ii) delete the representation that "[t]he Provider is solvent and will not be rendered insolvent by the transactions contemplated by this Agreement," and (b) modifying subsection (b)(ii) to delete the representation that there is "no recording or filing against the Provider, as debtor, covering or purporting to cover, any interest of any kind in any Account except (w) as has been released by each party holding such interest or lien in the Account, (x) to Equicare Portfolio I, LLC, (y) alleged judicial liens arising out of citations to discover assets, and (z) in favor of Purchaser."

    5.    Section 8 of the Master Agreement entitled "Covenants of Provider" is amended as follows:

    (i)    subsection (h) is limited in all respects by the disclosure requirements applicable in Bankruptcy Cases, and no act of disclosure by the Debtor during the Bankruptcy Case that is reasonably necessary or appropriate to the Chapter 11 process shall be deemed a violation of subsection (h); and

    (ii)    subsections (l) and (n) are deleted during the pendency of the Bankruptcy Case.

    6.    Section 9 of the Master Agreement entitled "Security Interest" is amended by deleting subsection (a) in its entirety and inserting the following: (a)(i) "Subject Property " (sometimes referred to herein as "Collateral") means all of the Provider's right, title and interest in, to and under any and all of the following, whether arising prior to, on or after the Petition Date: inventory, equipment, chattel paper, documents, instruments, general intangibles, and accounts receivable (whether offered for purchase or not, and whether purchased or not, unless released as described in section 8(a) of this Agreement), including without limitation, all Accounts, representing any and all of Provider's rights to payment, whenever arising, together with all accounts, chattel paper, documents, instruments, letter of credit rights, supporting obligations, deposit accounts, and general intangibles arising from or related thereto, all rights, remedies, guarantees, security interests and liens in respect of any of the foregoing, all records (other than patient medical records to the extent protected from disclosure by law) and other information necessary or relevant to the collection of such Collateral, whether now owned or existing or hereafter created, acquired or arising and wherever located, and all of the proceeds, products, and offspring of the foregoing (all of such terms, as applicable, are presently or hereafter defined in the Uniform Commercial Code), including but not limited to (i) all rights to payment under any agreements with all Third Party Obligors, (ii) all cash deposited with Purchaser or that Purchaser is entitled to retain or otherwise possess as collateral pursuant to the provisions of this Factoring Agreement, and (iii) any and all cash and non-cash proceeds of the

5

foregoing (including, but not limited to, any claims to any items referred to in this definition and any claims against third parties for loss of, damage to or destruction of any or all of the Collateral or for proceeds payable under or unearned premiums with respect to policies of insurance) in whatever form.

(a)(ii)   Subject to Permitted Liens, the Purchaser is granted a first priority security interest in and to the Collateral to secure the repayment of all amounts advanced to or for the benefit of the Provider and all other amounts due or owing to the Purchaser by the Provider [;provided, however, that the Debtor's inventory and equipment shall secure the repayment only of (i) amounts advanced to or for the benefit of the Provider on or after the Petition Date and (ii) all other amounts that become due or owing to the Purchaser by the Provider on or after the Petition Date with respect to such advances, including all "Reimbursable Expenses" under section 13 of this Bankruptcy Rider incurred by the Purchaser on or after the Petition Date.

7.   Section 11 of the Master Agreement entitled "Term; Termination is hereby amended by deleting subsection (b) and inserting the following:  (b) The Provider may terminate its obligation to offer to sell Accounts to the Purchaser pursuant to this Agreement upon no less than thirty (30) days prior written notice to the Purchaser.

8.   Section 11 of the Master Agreement entitled "Term; Termination" is supplemented by adding the following Termination Events after subsection (c)(iii):

(iv)   any non-avoidable lien or encumbrance is granted, is discovered, or attaches to any of the Collateral, except the liens and security interests in favor of Factor, and Permitted Liens (as set forth on the attachment hereto entitled "Permitted Liens"), without the express written consent of Factor;

(v)   any administrative expense claim is allowed and is senior to or pari passu with the Factor's claims or if any lien shall be granted in the Bankruptcy Case with respect to any of the Collateral (other than those granted with the written consent of Factor or as authorized by this agreement); however, Debtor is not prohibited from paying ordinary and routine operating expenses, United States Trustee fees and other professional fees and costs;

(vi)   the Debtor makes any disposition of assets outside the ordinary course of Debtor's business without the express written consent of Factor;

(vii)   the Debtor fails to pay timely any statutory fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6);

(viii)   any representation or warranty made by the Debtor to Factor is or becomes incorrect in any material respect;

(ix)   the Bankruptcy Case is dismissed or converted to a Chapter 7 Bankruptcy Case, or a Chapter 11 trustee or an examiner with expanded powers is appointed in the Bankruptcy Case;

6

(x)    the Factoring Order approving the Factoring Agreement is stayed, amended, modified, reversed or vacated;

(xi)    a plan of reorganization is confirmed that fails to provide for termination of the Factoring Agreement and payment in full, in cash, of Debtor's obligations under the Factoring Agreement on the effective date of the plan unless the plan adopts the exact terms of the Factoring Agreement, as approved by the Bankruptcy Court, or Factor agrees, in writing, to a modification or different treatment and affirmatively votes in favor of the plan;

(xii)    the Bankruptcy Court enters an order granting relief from the automatic stay to any creditor with respect to any claim in an amount equal to or exceeding $10,000.00 in the aggregate; provided, however, that it shall not be a Termination Event if the automatic stay is lifted solely for the purpose of allowing a creditor to liquidate its claim against the Debtor or seek payment from an insurance policy, or the Debtor files a document with the Bankruptcy Court acknowledging that such property is not necessary to an effective reorganization;

(xiii)    Debtor's current principals cease to actively manage and be involved in the operations of the Debtor and replacements reasonably acceptable to the Factor shall not be retained or the principal(s) of the Debtor become deceased, incompetent or incarcerated, notwithstanding Bankruptcy Rule 1016;

(xiv)    an order is entered in the Bankruptcy Case authorizing the sale or other disposition of all, or substantially all, of the assets of Debtor, unless such order provides for payment in full, in cash, of Debtor's obligations under the Factoring Agreement upon consummation of the sale; or

In addition, subsection (c)(ii) of section 11 of the Master Agreement is amended so that said subsection is deemed inapplicable during the pendency of the Bankruptcy Case and until such time as a plan of reorganization is confirmed.

9.    [Intentionally Omitted].

10.    Section 11 of the Master Agreement entitled "Term; Termination" is supplemented by adding the following: Unless Factor agrees in writing, at its sole discretion, to extend the term of the Factoring Agreement, or until a Termination Event, the obligations due the Factor under the Factoring Agreement are to be paid in full within 15 days after the date of the entry of any order confirming a plan of reorganization unless the Debtor assumes the terms of the Factoring Agreement in its entirety without modifications; or, the Debtor and Factor agree to other treatment under the plan. (The confirmation order shall not provide for a discharge or otherwise affect in any way any of the obligations of the Debtor or any Guarantors as those obligations are detailed in agreements approved by the Bankruptcy Court).

CHIC_3542381.1

Termination of the Factoring Agreement shall not terminate, extinguish, or remove any liens or security interests granted to Factor until Debtor has fully paid and discharged all of its obligations to Factor.

11.     Section 13 of the Master Agreement entitled "Controlling Law" is supplemented by adding the following:  ";provided, however, that during the Bankruptcy Case, federal bankruptcy law shall be controlling to the extent it may be inconsistent with Florida law."

12.     Section 14 of the Master Agreement entitled "Waiver of Jury Trial, Jurisdiction and Venue" is modified to provide that during the pendency of the Bankruptcy Case, the Bankruptcy Court shall have sole and exclusive jurisdiction to determine any and all disputes arising under or relating to the Factoring Agreement or any of the other documents delivered and to be delivered pursuant thereto.

13.     The Master Agreement is supplemented with a new section 16 entitled "Reimbursable Expenses," which reads as follows:  Factor shall be entitled to use its own internal auditors when possible; otherwise it shall be entitled to engage an outside auditor or professional to perform audit or investigative services of the Debtor's financial condition or with respect to the Collateral.  Factor shall be entitled to be reimbursed all of its post-petition, pre-plan confirmation reasonable attorneys' fees and costs (including without limitation, all reasonable attorneys' fees and costs incurred in (i) the preparation and negotiation of this Bankruptcy Rider, the Factoring Order, any cash collateral agreements or orders, and related documents and instruments, (ii) the exercise of the rights of Factor and the enforcement of Debtor's obligations under the Factoring Agreement, the Factoring Order, and any cash collateral agreements or orders, and (iii) Factor's participation in and monitoring of such other matters as may arise in or in connection with the Bankruptcy Case), in accordance with the following procedure:  Factor, or its counsel, shall transmit a copy of its monthly statements for fees and costs to the United States Trustee, counsel for any unsecured creditors' committee and Debtor's counsel for their review each month.  Unless a written objection (specifying the line item of the bill objected to, the reason for the objection and a proposed resolution of the objection) is received by Factor's counsel with 10 days after submission of the monthly statement to the above stated parties, Factor shall automatically be entitled to charge Debtor's account or demand payment. All obligations (as referenced in this section) of the Debtor to the Factor shall likewise be secured by a senior, first priority lien pursuant to § 364(d)(1) of the Bankruptcy Code, and payable forthwith.

14.     The Master Agreement is supplemented by the addition of a new section 17 entitled "Bankruptcy Provisions," which reads as follows:

(a)     Debtor shall at all times fully comply with all substantive and procedural requirements of the Bankruptcy Court, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and all other applicable local rules of court, including any administrative orders.

(b)     Debtor shall permit the Factor or a professional retained by the Factor, to (i) inspect the Debtor's books and records at reasonable times, (ii) to discuss the Debtor's affairs, finances and accounts with its professionals, officers, and employees, (iii) to obtain from

CHIC_3542381.1

the Debtor copies of the Debtor's records, and (iv) furnish all information reasonably requested by the Factor.

(c)     Debtor shall keep financial statements in accordance with the standard known as Generally Accepted Accounting Principles or GAAP, as GAAP is applicable to similar entities operating under Chapter 11.

(d)     Debtor shall cause to be promptly delivered to Factor's counsel all pleadings, motions, applications, financial information, DIP reports and other documents filed by or against Debtor in the Bankruptcy Court or that may be distributed to any official committee appointed in the Bankruptcy Case.

(e)     Debtor shall timely pay all post-petition taxes and other obligations including those required under 28 U.S.C. § 1930(a)(6).

(f)     Debtor shall notify the Factor immediately of any Termination Event as defined in section 11 of the Master Agreement or in this Bankruptcy Rider.

(g)     Debtor acknowledges that under § 506(a) of the Bankruptcy Code, the value of Sun Capital's claims against Debtor is fully secured.

(h)     Except as expressly provided herein, Debtor hereby waives any and all rights of the debtor-in-possession: (a) to recover from Sun Capital or from the Collateral costs and expenses of preserving or disposing of the Collateral or any other costs, expenses, or claims, whether such rights would arise under § 506(c) of the Bankruptcy Code or otherwise; and (b) to subordinate any or all of Sun Capital's claims, liens or security interests to any other claims, liens or security interests under § 510(c) of the Bankruptcy Code or otherwise.

(i)     .Debtor hereby acknowledges that Sun Capital has perfected, first priority, enforceable, unavoidable liens on and security interests in the Collateral (including the Cash Collateral and the Lockbox Bank Accounts), with priority over all other liens, and agrees that Debtor, as debtor-in-possession, shall not be permitted to assert against Sun Capital any of the avoiding powers under the Bankruptcy Code, including such powers arising under §§ 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code.

(j)     Debtor hereby acknowledges that the transfer of title from Debtor to Sun Capital of each Purchased Account is a true sale, not subject to recharacterization, and that Sun Capital owns all right, title and interest in and to all Purchased Accounts, free and clear of all liens, claims, encumbrances and interests (other than liens and security interests of Sun Capital).

(k)     The terms and conditions of the Factoring Agreement (and any extensions or renewals thereof):  (a) may not be modified through any plan of reorganization or plan of liquidation without Sun Capital's prior written consent obtained after the Bankruptcy Court approves the Factoring Agreement; and (b) be binding upon any trustee appointed

9

in this Chapter 11 Bankruptcy Case or any Chapter 7 case to which this Chapter 11 Bankruptcy Case may be converted.

(l)    Debtor agrees that, in consideration of Sun Capital's entering into the Factoring Agreement, Sun Capital shall be excused from compliance with any requirement that Sun Capital take any additional actions or file, record or serve any additional instruments, documents or notices to perfect or enforce its liens on or security interests in any Collateral (including the Cash Collateral and the Lockbox Bank Accounts), including the filing of a notice pursuant to Bankruptcy Code § 546(b) or the filing of a motion for sequestration or any other motion, and that Sun Capital's liens on and security interests in the Collateral (including the Cash Collateral and the Lockbox Bank Accounts) shall be deemed automatically perfected as of the Petition Date without any further notice or action or order of the Bankruptcy Court.

(m)    The parties to the Factoring Agreement have been represented and advised by counsel with respect to the Factoring Agreement, and have entered into it freely and voluntarily. The Factoring Agreement is intended to be enforceable according to its written terms, is an integrated agreement, and there are no promises, oral agreements, or expectations of the parties to the contrary. The Bankruptcy Court may enter an order enforcing any of the terms and conditions of the Factoring Agreement after notice and opportunity for a hearing to Debtor, Sun Capital, the United States Trustee, and any other party in interest.

(n)    In the event that the Factoring Agreement is not approved by the Bankruptcy Court for any reason, then both the Factoring Agreement and this Bankruptcy Rider shall be null and void and of no further force and effect, and no action or procedure taken, and no statement made in connection with the negotiation, preparation, formulation, or seeking approval thereof, shall be referred to by any entity in connection with any proceeding or action.

(o)    Whenever the Factoring Agreement requires Debtor or Sun Capital to deliver a writing to, or serve a writing upon the other, such writing shall be delivered or served upon each of the following:

If to Sun Capital:

Howard B. Koslow, President
SUN CAPITAL HEALTHCARE, INC.
999 Yamato Road, Third Floor
Boca Raton, Florida 33431
Phone: (800) 880-1702
Fax:    (561) 998-9043

and

Mary H. Rose, Esq.
BUCHALTER NEMER
A Professional Corporation

10

1000 Wilshire Blvd., Suite 1500
Los Angeles, California 90017-2457
Phone:  (213) 891-5727
Fax:     (213) 630-5629
mrose@buchalter.com

If to Debtor:

Paul R. Tuft, President
MICHAEL REESE MEDICAL CENTER CORPORATION
6720 North Scottsdale Road, Suite 275
Scottsdale, Arizona 85253
Phone: (480) 348-1099
Fax:     (480) 948-7104

and

Edward J. Green, Esq.
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, Illinois 60610
Phone: (312) 832-4375
Fax:     (312) 832-4700
egreen@foley.com

(p)    This Bankruptcy Rider may be executed in counterparts, all of which taken together shall constitute a single document.

(q)    The headings in this Bankruptcy Rider are inserted for convenience and are not a part of this Bankruptcy Rider.

(r)    The Factoring Agreement shall be binding on and inure to the benefit of the parties' respective successors and assigns, including any trustee appointed under the Bankruptcy Code.

(s)    The terms and conditions set forth in the Factoring Agreement and the Factoring Order approving same shall not affect in any way the obligations of any person or entity that guaranteed or is otherwise liable in any way on Debtor's obligations to Sun Capital.

(t)    The Factoring Agreement is the product of negotiation among the parties hereto and represents the jointly conceived, bargained-for and agreed upon language mutually determined by the parties to express their intention in entering into the Factoring Agreement.  Any ambiguity or uncertainty in the Factoring Agreement shall be deemed to be caused by, or attributable to, all parties hereto collectively.  In any action or proceeding to enforce or interpret the Factoring Agreement, the Factoring Agreement shall be construed in a neutral manner, and no term or condition of the Factoring

11

Agreement, or the Factoring Agreement as a whole, shall be construed more or less favorably to any one party, or group of parties, to the Factoring Agreement.

15.     As to any terms of the Master Agreement displaced by or inconsistent with this Bankruptcy Rider, this Bankruptcy Rider shall govern; otherwise, the terms of the Master Agreement shall remain unaffected and in full force and effect.

[END OF TEXT]

12

IN WITNESS WHEREOF, the parties hereto have executed this Bankruptcy Rider as of the date first above written.

MICHAEL REESE MEDICAL CENTER
CORPORATION, a Delaware corporation, debtor
and debtor-in-possession

By: _____
Name: _____
Title: _____

The foregoing is acknowledged, accepted and agreed to:

SUN CAPITAL HEALTHCARE, INC.,
a Florida corporation

By: _____
Name: _____
Title: _____

13

## Permitted Liens

The following are "Permitted Liens":

1.      Liens and security interests of the following parties, to the extent valid, perfected, unavoidable and existing as of the Petition Date, in equipment of the Debtor:

      a.      Tygris Asset Finance, Inc.

      b.      Xtria, LLC; and

      c.      General Electric Capital Corp.

# **EXHIBIT A-1**

## MASTER PURCHASE AND SALE AGREEMENT

MASTER PURCHASE AND SALE AGREEMENT dated as of the ___6___ day of ___March___, 2008, between **Sun Capital HealthCare, Inc.**, located at 999 Yamato Road, Third Floor, Boca Raton, Florida 33431 (the "Purchaser") and **Michael Reese Medical Center Corporation** located at **2929 South Ellis Avenue, Chicago, Illinois** (the "Provider") relating to the sale, from time to time, of certain third-party payable accounts receivable of the Provider.

1.      **Accounts to be Offered.** On the terms and subject to the conditions set forth in this Agreement, during a period of one (1) year subject to the provisions of Section 11 hereof (the **"Offer Period"**) from the date hereof the Provider shall offer, to sell to Purchaser, free and clear of all liens, claims, encumbrances, and rights of any other person or entity, third party payable accounts receivable (the **"Accounts"**), owing to the Provider arising out of the delivery of medical, surgical, diagnostic, or other healthcare related goods or services, of which a portion of (or all of) such Accounts are payable by commercial insurance companies, not-for-profit insurance companies (such as Blue Cross and Blue Shield entities) issuing health, personal injury, workers' compensation, or other types of insurance, employers or unions that self-insure for employee or member health insurance, prepaid healthcare organizations, preferred provider organizations, health maintenance organizations or other similar entities, Medicare, Medicaid, governmental bodies or other similar entities, or any third-party intermediary with respect to any of the foregoing (each a **"Third Party Obligor"**), together with all accounts, chattel paper, and general intangibles related thereto, all rights, remedies, guarantees, security interests, and liens in respect of any of the foregoing, all records (other than patient medical records to the extent protected from disclosure by law), and other information necessary or relevant to the collection of the Accounts, and all proceeds of any of the foregoing. Accounts for which the Third Party Obligor is the United States of America or any state or any agency or instrumentality thereof or any state that is obligated to make any payments with respect to Medicare or Medicaid Accounts, or representing amounts owing under any other program established by a federal or state law that provides for payments for healthcare goods or services to be made to the Provider are hereinafter referred to as **"Governmental Accounts"**; all other Accounts are sometimes hereinafter referred to as **"Non-Governmental Accounts."** The Purchaser shall have the right, in its sole discretion for any or for no reason, to purchase, or not purchase, any of the Accounts as are acceptable to it, but shall in any event have a lien and security interest, upon (i) all accounts owned by and payable to the Provider by any Third Party Obligor and (ii) all accounts owned by and payable to the Provider by any patients directly (each a **"Patient Obligor"**).

2.      **Initial Down Payment and Purchase Price.**

(a)      Upon Purchaser's receipt and acceptance of each Purchase Schedule (Exhibit A), or any portion thereof, Purchaser may advance to the Provider up to eighty-five percent (<u>85%</u>) of the expected **Net Collectible Amount** (as hereinafter defined) of the Accounts therein described (the **"Initial Down Payment"**), subject to Purchaser's right to maintain a Reserve Account. The Reserve Account shall be an account maintained on Purchaser's books, and Purchaser shall not be obligated to: (i) maintain cash or other funds in such account; or (ii) segregate funds or other amounts held in or credited to the Reserve Account from other funds held by Purchaser. The

Provider shall not be entitled to any interest or income on amounts credited to the Reserve Account. All checks received shall be deemed credited to the Reserve Account not less than two (2) days after receipt. The Reserve Account shall mean an amount sufficient to cover, among other things, returns, allowances, deductions, reductions in the unpaid balance of an Account, and disputes and/or charge backs including any charge back Purchaser anticipates might arise in the future, as security for the payment of the Provider's obligations to Purchaser. Purchaser may, upon notice to Provider, increase or decrease the amount of the Reserve Account as Purchaser may deem necessary to protect Purchaser's interests. Subject to Purchaser's right to withhold funds with respect to the Reserve Account, on each Friday (or if such Friday is a bank holiday in the State of Florida, on the next business day that is not such a bank holiday) of the week in which all Purchased Accounts (as hereinafter defined) set forth on the applicable Purchase Schedule have been collected in good funds (other than as to any Purchased Account not collected as a result of a discharge in bankruptcy or insolvency of the applicable Third Party Obligor), Purchaser will pay to the Provider the amount of the Purchase Price minus (i) the Initial Down Payment, (ii) the Purchaser's discount fees, (iii) all returns, allowances, deductions, reductions, and discounts calculated upon shortest or longest selling terms, at Purchaser's option, on any alternative terms of sale offered by the Provider to Third Party Obligor, and (iv) (subject to an advanced notification period of 10 business days) all other unpaid sums charged or chargeable to the Provider, which shall include, but not be limited to, reasonable costs and expenses (including attorneys' fees), of any kind and nature, Purchaser may incur including notice, audit, lien searches and title examinations, and including protecting and preserving its interests under or in connection with this Agreement.

(b)    Purchaser's discount fee as to each Purchased Account shall be a percentage of the Net Collectible Amount (as hereinafter defined) of each Purchased Account based on the number of days elapsed between the Closing Date (as defined below) relating to such Purchased Account and the date on which Purchaser shall have received collections in an amount equal to the Initial Down Payment for such Purchased Account.

| Days Elapsed | Percentage of Net Collectible Amount |
|---|---|
| 1-150 | .05% per day |
| Over 150 | 10% |

(c)    The purchase price for each Account (the **"Purchase Price"**) a percentage of the NCA as determined by the Purchaser and the Provider.

(d)    As used herein the term **"Net Collectible Amount ("NCA")"** with respect to an Account means the gross amount billed to the applicable Third Party Obligor, less those anticipated contractual allowances, all discounts taken, available, or extended by the Third Party

Obligor, and credits or deductions of any kind allowed or granted to or taken by the Third Party Obligor, all of which shall be determined in the Purchaser. The Net Collectible Amount of a Purchased Account is the amount reasonably expected by the Purchaser, in consultation with the Provider, to be collected on such Purchased Account from Third Party Obligors (excluding any amount to be collected from Patient Obligors) and is based on actual collection experience and other relevant factors. Provider shall promptly provide Purchaser with supporting documentation as to Provider's calculation of the Net Collectible Amount of any Account upon Purchaser's request.

(e) As referenced in paragraph 2(a) above, any Initial Down Payment is in Purchaser's sole discretion, in accordance with the terms of this Agreement, and all Initial Down Payments are subject to: (1) Accounts that are in dispute; (2) Accounts that are not payable by a Third Party Obligor; (3) rejected Accounts pursuant to the terms of this agreement; and (4) any fees, actual or estimated, that are chargeable to the Reserve Account.

3.   **Procedures for Offers, Purchases and Payments.** During the Offer Period, the Provider shall offer its Accounts to the Purchaser at the Purchase Price by sending Purchaser (a) a Purchase Schedule (in the form of Exhibit A hereto) signed by the Provider (an **"Offer Notice"**) with respect to each Account then being offered and (b) any other information or documentation, including all required Uniform Commercial Code (the "UCC") releases or financing statements the Purchaser may need in order to identify the Accounts purchased from the Provider and obtain payment from the respective Third Party Obligors thereon, and by simultaneously therewith sending to the servicer, currently Sun Capital Healthcare, Inc., including its successors and assigns and any substitute servicers appointed by Purchaser (the **"Servicer"**) of Accounts purchased by the Purchaser, a complete set of claim documentation, all in the form submitted to the Third Party Obligor, for each Account offered for sale to the Purchaser, together with copies of invoices, which may include, but are not limited to, Form UB-82/92, HCFA 1500, transmission reports, electronic media such as on-line access or such other forms approved by Purchaser and/or any Third Party Obligor, all shipping or delivery receipts, eligibility cards, insurance verification forms, nurses' notes, treatment authorization requests, and such other proof of sale and delivery or performance as Purchaser may, at any time or from time to time, require. Within seventy-two (72) hours following its receipt of an Offer Notice (or, if the day on which the seventy-two (72nd) hours occurs is a Saturday, Sunday, or a bank holiday in the State of Florida, upon the next succeeding business day that is not such a bank holiday), the Purchaser will advise the Provider which if any of such Accounts it will purchase by delivering to the Provider a list of the Accounts it desires to purchase (the **"Purchased Accounts"**). All such Purchased Accounts shall be sold to the Purchaser, and title to such Purchased Accounts shall pass to Purchaser on the day on which the Purchaser sends such list to the Provider (each such date of title transfer being hereinafter referred to as the **"Closing Date"**). Notwithstanding the foregoing, any Offer Notice received by the Purchaser after 5:00 p.m. Eastern Standard Time on any day (and any Offer Notice received by the Purchaser on a day that is a Saturday, Sunday, or a day that is a bank holiday in the State of Florida), will be deemed to have been received by the Purchaser on the next day that is not a Saturday, Sunday or bank holiday in the State of Florida.

Purchaser shall pay to the Provider the Initial Down Payment for the applicable Purchased Accounts on the Closing Date.  At Purchaser's option, Purchaser may pay some or all of such payment for a Purchased Account (or some or all of any other amounts payable by Purchaser to the Provider) by netting against amounts otherwise payable to Purchaser by the Provider (Providing Purchaser provides Provider notice of such event.).  Except with respect to Purchased Accounts that are Governmental Accounts, all invoices or other statements to Third Party Obligors concerning Accounts shall clearly state, in language satisfactory to Purchaser, that each such Account has been sold and assigned to Purchaser and is payable to Purchaser and to Purchaser only.  Copies of such invoices and statements shall also bear such language.

**3.1    Effect of Purchase.**    Upon each Weekly Closing Date, all of the Provider's right, title, and interest in and to all Accounts listed in the applicable list of Purchased Accounts and in any proceeds of such Accounts shall automatically vest in the Purchaser, which shall thereby be and become the sole and absolute owner of all such Purchased Accounts and all of the Provider's rights and remedies with regard to such Purchased Accounts (including, without limitation, rights to payment from the respective Third Party Obligors on such Accounts) and all of the Provider's rights under all guarantees, assignments and securities, if any, with respect to each such Purchased Account. Subject to the terms of this Agreement, Provider will retain (i) the right to receipt of payment on Purchased Accounts that are Governmental Accounts and (ii) all rights to demand or otherwise make any claim upon applicable Governmental Third Party Obligors.   Notwithstanding the foregoing, to the extent not prohibited by applicable law, Purchaser shall be entitled from time to time to obtain and enforce orders and injunctions from one or more courts directing one or more Third Party Payors (including without limitation Medicare and Medicaid programs) to make payments on Purchased Accounts directly to Purchaser and its designee.

**3.2    Liabilities Not Assumed by the Purchaser.** The Provider hereby represents, warrants, covenants and agrees that the Purchaser shall not be deemed by anything contained in this Agreement to have assumed any liabilities whatsoever relating to, or arising out of, any Account, including, without limitation, the following:

(a)    any liability of the Provider to any person or entity, the existence of which constitutes a breach of any representation, warranty, covenant or agreement of the Provider contained in this Agreement;

(b)    any liability of the Provider for any federal, state, municipal, local or foreign taxes, assessments, additions to tax, interest, penalties, deficiencies, duties, fees, and/or any other governmental charges or impositions of each and every kind or description, whether measured by properties, assets, wages, payroll, purchases, value added, payments, sales, use, business, capital stock, surplus, or income with respect to ownership of any of the Purchased Accounts or with respect to the sale of any Purchased Accounts;

(c)     any liability or obligation (contingent or otherwise) of the Provider to any person or entity arising out of any litigation, claim, arbitration, or other proceeding;

(d)     any liability or obligation of any kind whatsoever relating to any action or inaction by any person or entity, including, without limitation, any of the Provider's officers, directors, shareholders, employees, agents, representatives, or independent contractors relating in any way to the services rendered by any of them, including without limitation by similarity or otherwise, any liability or obligation for claims of medical or other malpractice in connection with any of the Accounts or the servicing of any of the Accounts in the case of such servicing;

(e)     any liability or obligation (contingent or otherwise) of the Provider arising out of defects in or mislabeling of, or damages to persons or entities or property arising out of defects or mislabeling of products (including, without limitation, prescription medications) manufactured, sold, or prescribed by the Provider in connection with any of the Accounts;

(f)     any liability or obligation of the Provider to compensate any person or entity, including, without limitation, any agent, licenser, supplier, distributor, or customer of the Provider, in respect of any services rendered or products manufactured, sold, or prescribed in connection with the Accounts;

(g)     any recapture, set-off, recoupment, or other claim made by any Third Party Obligor against any of the Accounts;

(h)     any liability of the Provider for any overpayments including (without limitation) any penalties imposed or sought to be imposed by any Third Party Obligor, including, but not limited to, Medicare or Medicaid programs; and

(i)     any liability of the Provider arising out of any activities that are prohibited under federal Medicare and Medicaid statutes, federal CHAMPUS statutes, or the regulations promulgated pursuant to such statutes or any other federal or state or local statutes or regulations or that are prohibited by rules of professional conduct, including but not limited to: (i) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment; (ii) knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment; (iii) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment; (iv) knowingly and willfully soliciting or receiving any remuneration (including without limitation any kickback, bribe, or rebate), directly or indirectly, overtly or covertly, in cash or in kind, or offering to pay such remuneration: (A) in return for referring an individual to a person or entity for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare, Medicaid, or any federal healthcare program or other governmental healthcare program, or (B) in return for purchasing, leasing, or ordering or arranging for or recommending the purchasing, leasing, or ordering of any good, facility, service, or item for

which payment may be made in whole or in part by Medicare, Medicaid, or any federal healthcare program or other governmental healthcare program; or (v) making prohibited referrals. For purposes hereof, a **"federal healthcare program"** shall mean any plan or program that provides health benefits, whether directly, through insurance, or otherwise, that is funded, in whole or in part by the United States Government.

3.3    **Further Information.**    From time to time on and after any Closing Date, the Provider shall use it best efforts to immediately provide the Purchaser or the Servicer, as the case may be, with any and all additional information that the Purchaser or the Servicer may request in order to assure that the Purchaser can exercise any and all rights of the Provider to collect, record, track, and take all actions to obtain collections with respect to each Purchased Account.

3.4    **Further Assurances.**    From time to time on and after each Closing Date, the Provider shall use its best efforts to (a) immediately execute and deliver to the Purchaser or, if requested, the Servicer, such instruments of sale, transfer, conveyance, assignment, and delivery, consents, assurances, powers of attorney, and other instruments as may be requested by the Purchaser or the Servicer in order to evidence the fact that the Purchaser has purchased all right, title, and interest of the Provider in and to the Purchased Accounts, and (b) take such other actions as the Purchaser or the Servicer may request in order to carry out the purpose and intent of this Agreement.

3.5    **Applicability of Representations and Warranties.**    Every representation, warranty, covenant, and agreement of the Provider in this Agreement shall also apply to every Purchased Account irrespective of when purchased, and shall survive the closing of the purchase and sale of each Purchased Account.

4.    **Lockbox Agreement; Collection of Purchased Accounts.**

4.1    **Lockbox Agreement.**    Simultaneously herewith, if permitted by Bank the Purchaser will assume the Provider's current Bank of America lock box accounts, and shall enter into Agreements with Bank of America for control and direction of funds., Bank of America, as agent for the Purchaser and the Provider, shall rent two separate post office boxes to receive checks, drafts, money orders, or any other negotiable instrument or order for the payment of money (and the proceeds thereof) payable to the Provider or the Purchaser as the case may be (collectively **"Items"**) from (i) Non-Governmental Third Party Obligors (the **"Purchaser Lockbox"**) and (ii) Governmental Third Party Obligors (the **"Provider Lockbox"**; the Purchaser Lockbox and the Provider Lockbox being referred to collectively as **"Lockboxes"**). The Lockbox Bank shall deposit all Items received (i) in the case of the Purchaser Lockbox to a dedicated bank account for all Non-Governmental Accounts (the **"Purchaser Lockbox Bank Account"**), and (ii) in the case of the Provider Lockbox to a dedicated bank account for all Governmental Accounts (the **"Provider Lockbox Bank Account"**; the Purchaser Lockbox Bank Account and the Provider Lockbox Bank Account being referred to collectively as the **"Lockbox Bank Accounts"**).

*Master Purchase and Sale Agreement*
*Sun Capital Healthcare, Inc. and*
*Michael Reese Medical Center Corporation*
*Page 7*

**4.2   Payment Mechanics of Non-Governmental Accounts.** (a) The Provider shall take all necessary and appropriate steps, including the sending of a notice to Third Party Obligors of Non-Governmental Accounts ("**Non-Governmental Third Party Obligors**"), in the form of Exhibit C hereto or in such other form as Purchaser may at any time or from time to time provide for such purpose, to assure that all proceeds paid with respect to all Non-Governmental Accounts, together with all related Explanations of Benefits ("**EOBs**"), be sent exclusively to the Purchaser Lockbox and that all wire transfers or other electronic payments of proceeds with respect to Non-Governmental Accounts be made directly into the Purchaser Lockbox Bank Account. The Lockbox Agreement provides that the Lockbox Bank shall transfer automatically on each business day all amounts then on deposit in the Purchaser Lockbox Bank Account to a separate collection account at the Lockbox Bank in the name of Purchaser (the "**Purchaser Collection Account**").

(b)   The Provider hereby covenants and agrees that, on and after the date hereof all invoices to be sent to Non-Governmental Third Party Obligors (and return envelopes if supplied currently, which shall, in each instance, be furnished by the Provider) shall set forth only the address of the Purchaser Lockbox as a return address for payment of Non-Governmental Accounts and delivery of related EOBs and only the Purchaser Lockbox Bank Account as a receiving account with respect to wire transfers and other electronic transfers for payment of Non-Governmental Accounts. The Provider hereby further covenants and agrees to instruct and notify each of the members of the Provider's accounting and collections staff to provide identical information in communications with all Non-Governmental Third Party Obligors with respect to Non-Governmental Accounts and related collections, wire transfers and EOBs.

**4.3   Payment Mechanics of Governmental Accounts.**

(a) The Provider shall instruct the Lockbox Bank to: (i) transfer and deposit automatically on the close of business on each business day all checks and other Items received in the Provider Lockbox into the Provider Lockbox Bank Account; and (ii) transfer automatically on each business day all amounts then on deposit in the Provider Lockbox Bank Account to the Purchaser Collection Account. The Provider shall have no right, title, or interest in any Purchaser Collection Account. Provider agrees to provide Purchaser with at least twenty-one days prior written notice of any change of automatic transfer instructions set forth in this Section 4.3(a). Provider shall not change or cancel such automatic transfer orders at any time, or, without the prior written consent of the Purchaser, change the identity of the Provider Lockbox Account or the Provider Lockbox Bank Account or the instructions, if any, to any Third Party Obligor of a Purchased Account to make its payments to such Provider Lockbox or Provider Lockbox Bank Account.

(b) The Provider shall take all necessary and appropriate steps, including without limitation the sending of a notice to all Third Party Obligors of Governmental Accounts ("**Governmental Third Party Obligors**"), in the form of Exhibit D hereto or in such other form as Purchaser may at any time or from time to time provide for such purpose, to assure that all proceeds paid with respect to all Governmental Accounts, together with all related EOBs, be sent

*Master Purchase and Sale Agreement*
*Sun Capital Healthcare, Inc. and*
*Michael Reese Medical Center Corporation*
*Page 8*

exclusively to the Provider Lockbox and that all wire transfers or other electronic transfers of proceeds with respect to Governmental Accounts be made directly into the Provider Lockbox Bank Account. All wire or EFT transfers will be credited on the date received in the Purchaser Collection Account and all checks, drafts, money orders or any other negotiable instruments shall be credited within two (2) business days after received into the Purchaser Collection Account.

(c) The Provider hereby covenants and agrees that on and after the date hereof, all invoices to be sent to Governmental Third Party Obligors or their respective fiscal intermediaries (and return envelopes if currently provided, which shall, in each instance, be furnished by the Provider) shall set forth only the address of the Provider Lockbox as a return address for payment of Governmental Accounts and delivery of related EOBs and only the Provider Lockbox Bank Account as a receiving account with respect to wire transfers and other electronic transfers for payment of Governmental Accounts. The Provider hereby further covenants and agrees to instruct and notify each of the members of the Provider's accounting and collections staff to provide identical information in communications with all Governmental Third Party Obligors and their respective fiscal intermediaries with respect to Governmental Accounts and related collections, wire transfers and other electronic transfers and EOBs.

(d) The Provider shall maintain the Provider Lockbox Bank Account solely and exclusively for the receipt of payments from Governmental Third Party Obligors. The Provider shall take all actions necessary to ensure that no payments from any Non-Governmental Third Party Obligor or any other entity or person shall be deposited into, and that no withdrawals, other than in accordance with the Lockbox Agreement, shall be made from, the Provider Lockbox or the Provider Lockbox Bank Account. The Provider shall not have any other account (other than the Provider Lockbox Bank Account) or post office box (other than the Provider Lockbox) into which proceeds from any Account payable by a Governmental Third Party Obligor purchased by Purchaser shall be deposited.

**4.4 Information Relating to Collections on Accounts; Payment of Deferred Purchase Price and Non-Purchased Account Amount.** (a) On or about each Wednesday and Friday, Purchaser shall cause the Lockbox Bank to deliver, by Federal Express or other recognized overnight courier, (Purchaser agrees to work with provider in allowing additional methods of delivery of EOB documents such as email, PDF or fax) to each of the Provider, the Purchaser, and the Servicer, with respect to the period since the close of business on the most recent day covered by a previous delivery: (i) copies of (A) each Item, EOB and other documents or other communication received in the Purchaser Lockbox and (B) advices of each wire transfer or other electronic transfer received in the Purchaser Lockbox Bank Account; and (ii) copies of (A) each Item, EOB and other document or other communication received in the Provider Lockbox, and (B) advices of each wire transfer or other electronic transfer received in the Provider Lockbox Bank Account. The Provider shall cause the Lockbox Bank to include any corrections or adjustments in respect of any such delivery promptly after discovery of the need therefor.

(b)    Not more frequently than once a week, the Provider shall send by facsimile or approved electronic transmission to the Servicer and the Purchaser a report in form and

substance satisfactory to the Purchaser, signed by an authorized representative of the Provider (an **"Activity Payment Report"**), which shall set forth for all Items received in the Lockbox Bank Accounts during the period covered by such report.

(c)     Unless Provider is in default under the terms of this Agreement, promptly, but not later than the second (2nd) business day after the Purchaser shall have received notice of Servicer's approval of any Activity Payment Report (or amended Activity Payment Report), and on the fourth (4th) business day after the Purchaser shall have received an Activity Payment Report (or amended Activity Payment Report) for which the Servicer shall not have delivered notice of its approval (or valid reasons for its non-approval), the Purchaser shall transfer the Deferred Purchase Price (less any amounts owed to Purchaser by Provider), and the Non-Purchased Account Amount (less any amounts owed to Purchaser by Provider (subject to any notification period), as each is reflected on such Activity Payment Report or amended Activity Payment Report to a business checking account established by the Provider with Bank of America and specified in writing by Provider to Purchaser at least two (2) days prior to any such transfer (the **"Provider Operating Account"**). The Purchaser shall transfer such Deferred Purchase Price and Non-Purchased Account Amount, if any, to the Provider Account prior to the Weekly Closing Date following the date that is one (1) business day after receipt by the Servicer of any Activity Payment Report.

**"Non-Purchased Account Amount,"** with respect to any Account other than a Purchased Account, means the excess, if any, of (i) the aggregate amount of collections on such account received by the Purchaser over (ii) the amount of such collections applied by Purchaser to pay amounts owed by Provider to Purchaser pursuant to this Agreement, to pay amounts owed by Purchaser or Provider to the Lockbox Bank pursuant to the Lockbox Agreement, or to reimburse Purchaser for amounts paid by Purchaser (directly or indirectly, including without limitation by a debit to a bank account) to the Lockbox Bank pursuant to the Lockbox Agreement.

**"Target Amount"** means, with respect to a Purchased Account, the sum of (a) the Initial Down Payment for such Purchased Account plus (b) the amount of Purchaser's discount fees accrued with respect to such Purchased Account through the date on which Purchaser has received collections on such Purchased Account in an amount at least equal to the Initial Down Payment for such Purchased Account.

(d)     The amounts of all Deferred Purchase Prices and Non-Purchase Account Amounts transferred to the Provider Operating Account as described above are subject to collection.

**5.     Misdirected Payments; EOBs.**  Any payment with respect to an Account, whether in the form of check or other instrument, cash or wire transfer, received by the Provider but that, pursuant to Section 4 hereof, should have been sent to either the Purchaser Lockbox or the Purchaser Lockbox Bank Account or the Provider Lockbox or the Provider Lockbox Bank Account shall be deemed a **"Misdirected Payment."** In the case of any Misdirected Payment, the Provider, at its sole cost and expense, shall promptly take all necessary steps described in

paragraphs (a) through (d) of this Section 5 and, pending the delivery of any such payments as so provided, shall: (i) hold all such payments in trust for the Purchaser and (ii) segregate all such payments and not deposit the same in the account of any other person or entity other than as provided below nor commingle the same with the funds of the Provider or the funds of any other person or entity.

(a)    In the event that the Provider receives a Misdirected Payment from a Third Party Obligor in the form of a check or other instrument, the Provider shall, as applicable, either: (i) in the case of Non-Governmental Accounts, immediately deliver to the Purchaser Lockbox such check or other instrument, duly endorsed over to the Purchaser, together with the related EOB and the envelope in which such payment was received; or (ii) in the case of Governmental Accounts, immediately deliver to the Provider Lockbox such check or other instrument, together with the related EOB and with best efforts the envelope in which such payment was received. In the event that the Provider receives a Misdirected Payment in the form of cash or wire transfer or other electronic transfer, the Provider shall immediately wire transfer the full amount of the Misdirected Payment directly into the Purchaser Lockbox Bank Account and shall simultaneously therewith send all related EOBs to the Purchaser Lockbox. All Misdirected Payments and EOBs shall be so deposited or wire transferred not later than the Provider's close of business on the first business day following its receipt of such Misdirected Payment or EOB.

(b)    If the Provider does not deposit or wire transfer a Misdirected Payment into the applicable Lockbox or the applicable Lockbox Bank Account, as applicable, in accordance with paragraph (a) above, then the Provider shall pay interest on such Misdirected Payment to the Purchaser, from such date until and including the date such Misdirected Payment is received in such Lockbox or Lockbox Bank Account, as the case may be, at a rate equal to eighteen percent (18%) per annum or the maximum rate legally permitted if less than such rate (the "**Additional Charge**"). Such interest shall be payable on demand or, at the option of the Purchaser, in accordance with paragraph (c) below. For purposes of the foregoing, if a Misdirected Payment is in the form of a check or other instrument, the Provider shall be deemed to have received such Misdirected Payment on the date that is five (5) business days after the postmark date on the envelope from the Third Party Obligor enclosing such check or instrument (or, if no such envelope is deposited in the applicable Lockbox, on the date that is five (5) business days after the date of such check or other instrument).

(c)    The Purchaser shall have the right, to set-off or recoup the full amount of all Misdirected Payments, upon written notice (plus interest thereon accrued or accruing in accordance with paragraph (b) above) against any amounts payable from time to time to the Provider pursuant to this Agreement.

(d)    The Provider hereby agrees and consents that the Purchaser or Servicer, as the case may be, shall have the right to take such actions as are deemed by either of them to be necessary or appropriate to ensure that future payments from the Third Party Obligor of a Misdirected Payment shall be made in accordance with the notice previously delivered to such Third Party Obligor pursuant to paragraph 4.2 or 4.3 of this Agreement, including, without

limitation by: (i) the Purchaser or Servicer executing on the Provider's behalf and delivering to such Third Party Obligor a new notice and (ii) the Purchaser or the Servicer contacting such Third Party Obligor by telephone to confirm the instructions previously set forth in the notice to such Third Party Obligor. Upon request, the Provider shall promptly (and, in any event, within one (1) business day from such request) take such actions as the Purchaser or Servicer may reasonably request.

6. **Ineligible Accounts.**  A Purchased Account shall be an "**Ineligible Account**" if one of the following has occurred:  (i) there has been a breach of any representation or warranty contained herein relating to such Purchased Account; (ii) Purchaser has not received collections with respect to such Purchased Account in an amount at least equal to the Target Amount for such Purchased Account within 150 days from the date of the invoice or bill was issued relating to such Purchased Account (other than as a result of the bankruptcy or insolvency or receivership of the applicable Third Party Obligor), or (iii) Purchaser reasonably has determined prior to the end of such 150 day period (other than a result of the bankruptcy or insolvency or receivership, or anticipated bankruptcy or insolvency or receivership, of the applicable Third Party Obligor) that such Third Party Obligor will not pay, by the end of such 150 day period, an amount on such Purchased Account equal to not less than the Target Amount for such Purchased Account. The Provider shall cure such breach or repurchase each such Ineligible Account from the Purchaser at a price equal to the Repurchase Price within ten (10) business days of the earlier of notification to, or discovery by, the Provider or Purchaser of the breach or failure of Purchaser to receive payment of the Target Amount as described above.  The "**Repurchase Price**" for an Ineligible Account (a "**Repurchased Account**") shall be equal to (i) the sum of the Initial Down Payment for such Account plus the amount of Purchaser's discount fees for such Account accrued through the date of Provider's repurchase of such Account, less (ii) any amount collected by the Purchaser with respect to such Ineligible Account. The Repurchase Price shall be payable by check or wire transfer, at the option of the Purchaser. Upon receipt by the Purchaser of the Repurchase Price, the Provider shall be deemed to have repurchased, and the Purchaser shall be deemed to have resold to the Provider, the Ineligible Account without any representation, warranty, or recourse whatsoever and, thereupon, the Purchaser shall have no obligation whatsoever to the Provider with respect to such Repurchased Account and such Account shall cease to be a Purchased Account. Notwithstanding any other provision of this Agreement to the contrary, and in addition to all other rights and remedies available to Purchaser under this Agreement or at law or in equity, the Purchaser may offset against or recoup from any amounts it may owe to the Provider any and all amounts due to the Purchaser with respect to Repurchased Accounts. If, after receipt of any payment of all or any part of the Repurchase Price for any Repurchased Account, the Purchaser is required to surrender such payment to any person or entity because such payment is determined to be void or voidable as a preference, impermissible set-off, diversion of trust funds, or for any other reason, this Agreement shall continue in full force (except, at the Purchaser 's option, with respect to any obligation it may be deemed to have to purchase any additional Accounts from the Provider) and the Provider shall be liable to the Purchaser for, and shall indemnify and hold the Purchaser harmless against, the aggregate amounts of all such surrendered payments.

7.     **Representations and Warranties of the Provider.**  The Provider represents and warrants to the Purchaser, each of which representation and warranty shall be deemed material and relied upon by the Purchaser, as follows:

(a)     With respect to the Provider, as of the date hereof and as of the date of each purchase of Accounts:

(i) If a corporation or a partnership or a limited liability company, the Provider is duly organized, validly existing, and in good standing as such under the laws of the jurisdiction of its organization; is qualified to do business and is in good standing under the laws of each state where the failure to so qualify would have a material adverse effect on the business and operations of the Provider; and has all the power and authority necessary to: (A) operate its business as it is now being conducted, including the sale of Accounts; (B) execute, deliver, and perform this Agreement, including all obligations contemplated hereby; (C) execute and deliver and perform its obligations under all other documents now or hereafter executed in connection herewith (all such documents to be included within the definition of Agreement); and (D) convey good and marketable title and ownership of the Purchased Accounts to the Purchaser. The execution, delivery, and performance by the Provider of this Agreement have been duly authorized by all appropriate action on behalf of the Provider. If a sole proprietorship, the Provider has the necessary power and capacity under applicable law to operate its business as it is now being conducted and to execute, deliver, and perform all its obligations as provided for in this Agreement.

(ii) This Agreement is the legal, valid, and binding obligation of the Provider, enforceable against the Provider in accordance with its terms except as may be limited by bankruptcy or law. Upon the filing of financing statements setting forth the collateral described on **Exhibit E** hereto in all appropriate jurisdictions, any security interest in favor of the Purchaser granted pursuant to this Agreement will be a fully enforceable first priority security interest validly perfected whether or not the Third Party Obligors have been notified of the sale of Accounts to the Purchaser.

(iii) To the best of Providers knowledge the execution, delivery, and performance of this Agreement does not and will not violate any provision of law, regulation, or any order or decree of any court or governmental agency, or violate any provision of the Provider's organizational documents (if a corporation or partnership or limited liability company) or any agreement to which the Provider is a party or by which it or any of its assets are bound, and does not and will not, with the giving of notice, the passage of time, or otherwise, conflict with, result in a breach of, or constitute a default under, any such agreement or result in the creation of any lien or security interest upon any of the Provider's assets, except in favor of the Purchaser.

(iv)     The Provider has all permits, licenses, provider numbers, accreditations, certifications, authorizations, approvals, consents, and agreements of all Third Party Obligors, governmental agencies, and instrumentalities, accreditation agencies and any other person or entity necessary or required for the Provider to own the assets that it now owns, to carry

on its business as now conducted, to execute, deliver, and perform this Agreement, including any other documents contemplated hereby, and to receive payments from the Third Party Obligors; and the Provider has not been notified by any such Third Party Obligor, governmental agency or instrumentality, accreditation agency or any other person or entity that any such Third Party Obligor, agency, instrumentality or other person or entity has rescinded or not renewed, or intends to rescind or not renew, any such permit, license, provider number, accreditation, certification, authorization, approval, consent, or agreement granted by it to the Provider or to which it and the Provider are parties.

(v) To the best of Providers knowledge there are no actions, suits, proceedings or investigations pending or threatened against the Provider before any court, governmental agency, or other tribunal that at this time could affect its ability to perform under this Agreement, and the Provider is not currently subject to, and has no intention of commencing, any bankruptcy or insolvency proceeding. The Provider is solvent and will not be rendered insolvent by the transactions contemplated by this Agreement. The Provider does not have any intent to hinder, delay, or defraud any of its creditors in connection with the transactions contemplated by this Agreement.

(vi) To the best of Providers knowledge neither the Provider nor any persons who provide professional services under agreements with the Provider have engaged in any activities that are prohibited under federal Medicare and Medicaid statutes, federal CHAMPUS statutes, or regulations promulgated pursuant to such statutes or any other federal or state or local statutes or regulations or that are prohibited by rules of professional conduct, including but not limited to: (A) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment; (B) knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment; (C) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment on its own behalf or on behalf of another; (D) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe, or rebate), directly or indirectly, overtly or covertly, in cash or in kind, or offering to pay such remuneration: (xx) in return for referring an individual to a person or entity for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare, Medicaid, or any federal healthcare program or other governmental healthcare program or (yy) in return for purchasing, leasing, or ordering or arranging for or recommending the purchasing, leasing, or ordering of any good, facility, service, or item for which payment may be made in whole or in part by Medicare, Medicaid or any federal healthcare program or other governmental healthcare program, or in connection with making prohibited referrals.

(vii) The Provider has valid business reasons for selling the Purchased Accounts.

(b)    With respect to each Account, as of the date such Account is purchased and continuing thereafter so long as the Provider shall have any obligations remaining hereunder:

(i) All documents and agreements relating to each Purchased Account that are necessary to collect such Purchased Account have been delivered to the Purchaser and all such documents and agreements are true, correct, and complete; the Provider has billed the applicable Third Party Obligor and the Provider has delivered or caused to be delivered to such Third Party Obligor all requested supporting claim documents with respect to such Purchased Account; all information set forth in the bill and supporting claim documents is true, correct, and complete, and, if any error has been made, the Provider will promptly correct the same and, if necessary, rebill or, if requested by the Purchaser or Servicer, cooperate to rebill such Purchased Account.

(ii) Each Account is exclusively owned by the Provider (immediately prior to the sale of such Account to Purchaser pursuant to this Agreement) and there is no security interest or lien in favor of any third party, and no recording or filing against the Provider, as debtor, covering or purporting to cover, any interest of any kind in any Account, except (x) as has been released by each party holding such interest or lien in the Account and (y) in favor of Purchaser. Upon the Weekly Closing Date with respect to a Purchased Account all right, title and interest of the Provider with respect thereto automatically shall be vested in the Purchaser, free and clear of any lien, security interest, claim or encumbrance of any kind, and the Provider agrees, at its sole cost and expense, to defend the same against the claims of all persons and entities.

(iii) Each Purchased Account: (A) is payable, in an amount not less than and in a manner consistent with the assumptions underlying the determination of its expected Net Collectible Amount, by the Third Party Obligor identified by the Provider as being obligated to do so; (B) is based on an actual and bona fide rendition of services or sale of goods to the patient by the Provider in the ordinary course of its business; (C) is denominated and payable only in lawful currency of the United States; (D) is an account or general intangible within the meaning of the UCC of the state in which the Provider has its principal place of business or is a right to payment under a policy of insurance or similar agreement or the proceeds thereof, and is not evidenced by any instrument; and (E) is calculated to be paid by the Third Party Obligor in an amount equal to the Net Collectible Amount within one hundred fifty (150) days after the related goods are provided or services are invoiced to Third Party Obligor by the Provider unless such Obligor, at such 150th day, is the subject of bankruptcy, insolvency, or receivership proceedings. There is no payor other than the Third Party Obligor identified by the Provider as the payor primarily liable on any Purchased Account.

(iv) Each Purchased Account is not subject to any action, suit, proceeding or dispute (pending or threatened), set-off, recoupment, counterclaim, defense, abatement, suspension, deferment, deductible, reduction or termination or the like by any Third Party Obligor. The Weekly Closing Date relating to a Purchased Account is not later than 60 days after the date of service giving rise to such Account.

(v) The Provider does not have any guaranty of, letter of credit providing credit support for, or collateral security for, any Purchased Account, other than any such guaranty, letter of credit, or collateral security that has been assigned and delivered to the Purchaser, and

any such guaranty, letter of credit, or collateral security is not subject to any lien in favor of any other person or entity.

(vi)  The goods provided or services rendered giving rise to each Purchased Account were furnished by Provider in the ordinary course of its business and were medically necessary for the patient; the fees charged for such goods or services were the usual, customary, and reasonable fees charged by other providers in the Provider's community and the community in which such patient resides for the same or similar goods and services; the fees for goods and services relating to the Purchased Accounts that are subject to limitations imposed by workers' compensation regulations or by contracts for reimbursement from Third Party Obligors do not exceed the limitations so imposed and each Purchased Account relating to goods and services the fees for which are so restricted has been clearly identified by the Provider to Purchaser as being subject to such restriction; the patient received such goods or services and the medical insurance coverage or other coverage by the responsible Third Party Obligor with respect thereto was effective at the time of treatment. Each patient signed a patient consent form in connection with all Purchased Accounts and such consent form is sufficient to allow the Provider to deliver to the Purchaser and Servicer with respect to each such Purchased Account, and for the Provider, the Purchaser, and the Servicer to deliver to the Third Party Obligor with respect to each such Purchased Account, information or documents necessary for the performance of servicing obligations with respect to such Purchased Accounts without violating any patients' privacy rights.

(vii) The expected payment by the applicable Third Party Obligor for the goods or services constituting the basis for each Purchased Account is consistent with the usual, customary, and reasonable fees charged by other similar medical service providers in the Provider's community for the same or similar services.

(viii) To the best of Providers knowledge the Third Party Obligor with respect to each Purchased Account is: (A) not, as of the date such Account is purchased, the subject of any bankruptcy, insolvency, or receivership proceeding, nor, as of the date such Account is purchased, is it generally unable to make payments on its obligations when due; (B) located in the United States; and (C) one of the following: (i) an entity that in the ordinary course of its business or activities agrees to pay for healthcare services received by individuals, including, without limitation, commercial insurance companies and not-for-profit insurance companies (such as Blue Cross and Blue Shield entities) issuing health, personal injury, workers' compensation, or other types of insurance, employers or unions that self-insure for employee or member health insurance, prepaid healthcare organizations, preferred provider organizations, health maintenance organizations or any other similar entity; or (ii) Medicare, Medicaid, governmental bodies, or another Third Party Obligor of the type described in the definition of Governmental Accounts.

(ix) The proceeds of the sale of the Purchased Accounts will be used for the business and commercial purposes of the Provider. The sale of the Purchased Accounts pursuant to this Agreement is made in good faith and without actual intent to hinder, delay, or defraud

present or future creditors of the Provider. The Purchase Price for the Purchased Accounts is reasonably equivalent to the value of such Purchased Accounts.

(x) The insurance policy, contract, or other instrument obligating a Third Party Obligor to make payment with respect to any Purchased Account: (A) does not contain any provision prohibiting the transfer of the right to receive such payment from the patient to the Provider, or from the Provider to the Purchaser; (B) to Providers knowledge has been duly authorized and, together with the Purchased Account, constitutes the legal, valid, and binding obligation of the Third Party Obligor enforceable against such Third Party Obligor in accordance with its terms; (C) together with the Purchased Account, does not contravene in any material respect any requirement of law applicable thereto; and (D) was in full force and effect and applicable to the patient at the time the goods or services constituting the basis for the Purchased Account were furnished.

(xi) The representations, warranties and statements made by the Provider in this Agreement and any other documents delivered pursuant hereto, any financial information with respect to the Provider delivered to the Purchaser and any other related documents, including, without limitation, any description of any Purchased Account, are true, correct, and complete and do not and will not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made therein not misleading.

(xii) The Provider has complied with all of its covenants and agreements in this Agreement with respect to each Account.

8. **Covenants of Provider.** The Provider covenants and agrees with the Purchaser as follows:

(a) The Provider shall authorize the filing of such financing statements under the UCC (naming the Purchaser as Purchaser and/or secured party) as the Purchaser may reasonably request with respect to all Accounts, whether or not purchased pursuant to this Agreement. From time to time, upon request of the Servicer or Provider, the Provider shall provide the Purchaser with any additional information, shall authorize or execute and deliver to the Purchaser any additional agreements, instruments, notices to Third Party Obligors, documents, or financing statements and shall take all actions deemed by the Purchaser as necessary or desirable to effectuate the provisions of this Agreement and any documents delivered pursuant hereto, to evidence, protect, and perfect the assignment of the title to the Purchased Accounts and the grant of a security interest in and lien on the Accounts and to facilitate the collection of the Purchased Accounts. Notwithstanding the foregoing, Purchaser shall have the right to file financing statements it deems necessary such right being hereby authorized. Unless otherwise requested by the Purchaser, the Uniform Commercial Code ("UCC") financing statement property description in the UCC financing statement filed by the Purchaser against the Provider shall be in the form of **Exhibit E**. By agreement the Purchaser, at any time and from time to time, the Provider may furnish to the Purchaser claim documents relating to Accounts that are not

Purchased Accounts. Purchaser agrees to not unreasonably withhold consent to allow Provider to sell non-Purchased Accounts or Accounts Purchaser rejected in order for Provider to sell or assign such account to "bad debt" collectors, so long as any proceeds from such assigned or sold accounts are paid into the Purchaser's lock boxes and lock box bank accounts.

(b)     The Purchaser and its agents and representatives are hereby constituted and designated as the Provider's attorneys-in-fact, which power of attorney is coupled with an interest: (i) to endorse or sign the Provider's name to remittances, invoices, assignments, checks (other than in payment of Governmental Accounts, unless the Purchaser has obtained an appropriate court order or decree), drafts or other instruments or documents in respect of the Purchased Accounts; (ii) to notify Third Party Obligors (other than Governmental Third Party Obligors, unless the Purchaser has obtained an appropriate court order or decree) to make payments on the Purchased Accounts directly to the Purchaser; and (iii) to bring suit in the Provider's name and to settle or compromise such Purchased Accounts as the Provider or the Servicer may, in its discretion, deem appropriate (other than with respect to Governmental Third Party Obligors, unless Purchaser has obtained an appropriate court order or decree); and (iv) to file financing statements as it deems necessary or advisable. Notwithstanding the foregoing, upon request of Purchaser from time to time, Provider shall cooperate with Purchaser in order to allow Purchaser to obtain a court order or decree directing Governmental Third Party Obligors to make payments on Governmental Accounts directly to the Purchaser Lockbox or the Purchaser Lockbox Bank Account.

(c)     The Provider shall pay to the Purchaser (or any assignee or participant) the reasonable out-of-pocket costs, fees, and expenses *(*including reasonable attorneys' fees and auditing fees) incurred by the Purchaser (or any assignee or participant) incident to the exercise of the rights of the Purchaser and the enforcement of the Provider's obligations hereunder, including those involving any bankruptcy or insolvency proceedings of the Provider, and the Purchaser's costs, fees, and expenses in monitoring and participating in any such proceedings, within thirty (30) days of the receipt of notice thereof. Upon request, Provider will reimburse Purchaser (or any assignee or participant) reasonable routine expenses, including credit research, filing searches, filing fees, wire transfer costs, overnight mail and travel expenses.

(d)     The Provider shall: (i) treat transfers to the Purchaser of Purchased Accounts hereunder as a sale for all purposes, including tax and accounting (and shall accurately reflect all such sales in its financial statements; the financial statements of the Provider shall disclose the effects of the sale and purchase of the Purchased Accounts in accordance with generally accepted accounting principles, including treating the sale of the Purchased Accounts as a sale rather than as a financing transaction; and the financial statements of the Provider shall clearly indicate that the Purchased Accounts have been purchased by the Purchaser and that the Purchased Accounts are not available to satisfy the obligations of the Provider or its affiliates), and shall promptly advise all persons and entities who inquire about the ownership of any Purchased Accounts that the Purchased Accounts have been sold to the Purchaser; (ii) not treat any Purchased Accounts as an asset on the Provider's books and records; (iii) record in the Provider's books, records and computer files pertaining thereto that the Purchased Accounts have been sold to the Purchaser and that the Purchaser has exclusive ownership of the Purchased

Accounts; (iv) pay all taxes, if any, relating to the transfer of the Purchased Accounts after the same have been purchased by the Purchaser; (v) not assign or grant any security interest in any Accounts from and after the date hereof to any person or entity other than the Purchaser, unless consent is granted by Purchaser as described in Section 8 ( a ); (vi) not impede or interfere with the Purchaser's collection of any Purchased Accounts; (vii) not amend, waive, or otherwise permit or agree to any deviation from the terms or conditions of Purchased Accounts; (viii) obtain all consents from patients that are required by law in order for the Purchaser or the Servicer to obtain information needed to obtain payment from the respective Third Party Obligors; (ix) bill Accounts on the same basis and using the same policies and practices that it has used in the past unless the Purchaser has been advised of and consented in writing to a change prior to its purchase of such Accounts; and (x) not claim any ownership interest in any Purchased Account. The Purchaser or its designated representatives from time to time may audit or otherwise verify any Accounts, inspect, check, and take copies of or extracts from the Provider's books, records, and files and interview employees and former employees of the Provider and, in each instance, the Provider shall make the same available to the Purchaser or such representatives at any reasonable time for such purposes.

(e)   The Provider agrees that the Purchaser, upon advanced notice, or the Servicer shall have the right but not the obligation to have at least one of its agents or representatives physically present in the Provider's administrative offices during normal business hours to assist the Provider in performing its obligations under this Agreement.

(f)   Until such time as the Provider has satisfied all obligations owed Purchaser under this Agreement, the Provider shall deliver to the Purchaser: (i) within 45 days after the end of each fiscal quarter, the Provider's financial statements for such period and for that portion of its fiscal year through the end of such period; (ii) within 180 days after the end of the Provider's fiscal year, the Provider's audited, annual financial statements for such year (or if such statements are not audited, annual financial statements certified by the Provider's chief financial officer); and (iii) promptly upon request, such other information concerning the Provider as the Purchaser or the Servicer may from time to time request, including without limitation Medicare cost reports and audits. All financial statements delivered to the Purchaser shall be prepared on a basis consistent with those previously submitted to the Purchaser. The Provider shall not change its accounting coding system for its Accounts without prior written notification to the Purchaser of such change.

(g)   The Provider shall promptly, upon its notification, notify the Purchaser and the Servicer in the event of any action, suit, proceeding, dispute, offset, deduction, defense, or counterclaim that is or may be asserted by a Third Party Obligor with respect to any Account. The Provider shall make all payments to the Third Party Obligors necessary to prevent the Third Party Obligors from offsetting any earlier overpayment to the Provider against any amounts the Third Party Obligors owe on any Purchased Accounts.

(h)   The Provider shall not at any time, during or after the Offer Period, disclose to any third party the terms of this Agreement (including without limitation the exhibits hereto) or

any information or materials communicated to the Provider by the Purchaser or obtained by the Provider from the Purchaser (the **"Confidential Materials"**) unless specifically authorized in writing by the Purchaser to do so; provided, however, that the Provider may disclose certain Confidential Materials, on a need-to-know basis, to its officers, directors, shareholders, and employees as is reasonably necessary for compliance with the terms of this Agreement, provided, further, however, that the Provider shall comply with its obligations under this Agreement to inform third parties that the Purchaser owns the Purchased Accounts. In the event that at any time or from time to time the Purchaser shall give the Provider written authorization to make any disclosures of Confidential Materials, the Provider shall do so only within the limits and to the extent of such authorization. In addition, the Provider shall take all actions necessary to prevent disclosure of any Confidential Materials to any third party. In the event that the Provider is requested or directed to supply any information contained in any such Confidential Materials pursuant to the terms of a subpoena, order, civil investigation demand, or similar process issued by a court of competent jurisdiction or by a governmental body, the Provider shall: (a) immediately notify the Purchaser of the service of such process and of all other terms and circumstances surrounding such request or direction; (b) consult with the Purchaser on the advisability of taking legally available steps to resist or limit such request or direction; and (c) if disclosure of such information is required, furnish only that portion of the Confidential Materials that, in the opinion of the disclosing party's counsel, is legally required to be so disclosed and advise the Purchaser as far in advance of such disclosure as is possible in order that the Purchaser may have an opportunity to seek an appropriate protective order or other reliable assurance that confidential treatment will be accorded such Confidential Materials. Without limiting the generality of the foregoing, the Provider shall not oppose any actions by the Purchaser or any of its agents or representatives to obtain appropriate protective orders or other reliable assurances that confidential treatment shall be accorded to such Confidential Materials.

      (i)    The Provider shall not: (i) enter into any agreement to subordinate its rights with respect to any Accounts to any other person or entity without the prior written consent of the Purchaser, or (ii) amend any such agreement as to which Purchaser's consent has been given, without, in each such instance, the prior written consent of Purchaser to such amendment.

      (j)    The Provider shall, upon its notification, use its best efforts to notify the Purchaser of any default in any indebtedness of the Provider. The Provider agrees that, subject to the penultimate sentence of this paragraph, the Purchaser shall have the right, in its sole discretion, to pay any person or entity as to whom such default exists out of amounts otherwise payable to the Provider pursuant to this Agreement, and the Provider hereby authorizes the making of any such payment directly to such aggrieved person or entity and any such payment by the Purchaser to such person or entity shall be deemed to constitute a payment to the Provider of the corresponding amount payable by Purchaser to the Provider. In the event of a good faith dispute as to the existence of any such default, the Provider agrees that, subject to the penultimate sentence of this paragraph, the Purchaser shall have the right to make any such payment into an escrow account pending determination thereof. It is understood and agreed that this provision is for the benefit of the Purchaser and that the third party person or entity shall not be entitled to enforce any rights

hereunder. It is further understood that prior to the Purchaser making any payments pursuant to this paragraph (whether directly to another person or entity or to an escrow account), the Purchaser shall give the Provider prior written notice of the Purchaser's intent to make such payment and the Purchaser shall give the Provider 20 business days to cure such default. If such default is not cured within such 20 business day period the Purchaser shall be entitled to make the payments described in this paragraph.

(k)     The Provider shall notify the Purchaser if any representation or warranty made by the Provider pursuant to this Agreement shall cease to be true, correct, and complete in all respects.

(l)     The Provider shall notify the Purchaser in writing (i) if it has any intention of commencing any bankruptcy or insolvency proceeding or (ii) upon the commencement of any bankruptcy or insolvency proceeding by or against the Provider.

(m)     Provider acknowledges that there is no, and it will not seek or attempt to establish any, fiduciary relationship between Purchaser and Provider and Provider waives any right to assert, now or in the future, the existence or creation of any fiduciary relationship between Purchaser and Provider in any action or proceeding (whether by way of claim, counterclaim, crossclaim, or otherwise) for damages or other relief.

(n)  Provider acknowledges that this Agreement is one of financial accommodation and not assumable by any debtor, trustee, or debtor-in-possession in any bankruptcy proceeding without Purchaser's express written consent.

(o)     Purchaser's books and records shall be admissible in evidence without objection as prima facie evidence of the status of the accounts between Purchaser and Provider. Each statement, report, or accounting rendered or issued by Purchaser to Provider shall be deemed conclusively accurate and binding on Provider unless within thirty (30) business days after the date of issuance Provider notifies Purchaser to the contrary by registered or certified mail, setting forth with specificity the reasons why Provider believes such statement, report or accounting is inaccurate, as well as what Provider believes to be correct amount(s) therefor.

(p)     In the event Provider's principals, officers, or directors form a new Entity to engage in the business of healthcare, whether corporate, partnership, limited liability company during the term of this Agreement or while Provider remains liable to Purchaser for any obligations under this Agreement, such entity shall be deemed to have expressly guaranteed the obligations due Purchaser by Provider under this Agreement.  Upon the formation of any such entity, Purchaser shall be deemed to have been granted an irrevocable power of attorney with authority to execute file, on behalf of the newly formed entity, a new UCC-1 financing statement with any and all appropriate secretaries of state or other UCC filing offices.  Purchaser shall be held harmless by Provider and be relieved of any liability as a result of Purchaser's filing or recording of any such financing statement or the resulting perfection of a lien in any of the new entity's assets.  In addition, Purchaser shall have the right to notify the new entity's Third Party

Obligors of Purchaser's rights, including without limitation, Purchaser's right to collect all Accounts, and to notify creditor of the new entity that the Purchaser has rights in such new entity's assets.

### 9.    Security Interest.

(a)    "Subject Property" (sometimes referred to herein as "Collateral") means all of the Provider's right, title, and interest in, to, and under any and all of the following:    accounts receivables (whether offered for purchase or not, and whether purchased or not, unless released as described in section 8 ( a ) of this Agreement), including without limitations all Accounts, representing any and all of Provider's rights to payment, whenever arising, together with all accounts, chattel paper, documents, instruments, letter of credit rights, supporting obligations, deposit accounts, and general intangibles arising from or related thereto, all rights, remedies, guarantees, security interests, and liens in respect of any of the foregoing, all records (other than patient medical records to the extent protected from disclosure by law) and other information necessary or relevant to the collection of such Collateral, whether now owned or existing or hereafter created, acquired, or arising and wherever located, and all of the proceeds, products, and offspring of the foregoing (all of such terms, as applicable, are presently or hereafter defined in the Uniform Commercial Code), including but not limited to (i) all rights to payment arising under any agreements with Third Party Obligors, (ii) all cash deposited with Purchaser or that Purchaser is entitled to retain or otherwise possess as collateral pursuant to the provisions of this Factoring Agreement, and (iii) any and all cash and non-cash proceeds of the foregoing (including, but not limited to, any claims to any items referred to in this definition and any claims against third parties for loss of, damage to, or destruction of any or all of the Collateral or for proceeds payable under or unearned premiums with respect to policies of insurance) in whatever form.

(b)    The Purchaser is granted a first priority security interest in and to the Collateral to secure the repayment of all amounts advanced to or for the benefit of the Provider and all other amounts due or owing to the Purchaser by the Provider.

(c)    In the event that, contrary to the mutual intent of the Provider and the Purchaser, any purchase of any Purchased Accounts is not characterized as a sale, the Provider shall, effective as of the date hereof, be deemed to have granted (and the Provider does hereby grant) to the Purchaser a first priority security interest in and to all of the Purchased Accounts to secure the repayment of all amounts advanced to or for the benefit of Provider hereunder and all other amounts due or owing to the Purchaser by the Provider, and this Agreement shall be deemed to be a security agreement for such purposes. **In such event, it is agreed that this Agreement is intended to comply in all respects with all provisions of law and not to violate, in any way, any legal limitations on interest charges. Accordingly, if, for any reason, the Provider is required to pay, or has paid, interest or fees at a rate in excess of the highest rate of interest that may be charged by the Purchaser or that the Provider may legally contract to pay under applicable law (the "Maximum Rate"), then the interest rate shall be deemed to be reduced, automatically and immediately, to the Maximum Rate, and interest or fees payable**

hereunder shall be computed and paid at the Maximum Rate and the portion of all prior payments of interest or fees in excess of the Maximum Rate shall be deemed to have been prepayments of the amounts advanced to the Provider hereunder.

(d)      With respect to the grant of a security interest as set forth above, the Purchaser may, at its option, exercise from time to time any and all rights and remedies available to it under the UCC or otherwise.    The Provider agrees that twenty-five (25) business days shall be reasonable prior notice of the date of any public or private sale or other disposition of all or part of the Subject Property.

(e)      The Provider represents and warrants that: (i) the location of the Provider's principal place of business, chief executive office and all locations in which the Provider maintains records with respect to the Accounts are set forth in the introductory paragraph of this Agreement, and that the Provider has not changed any such location in the last five (5) years; and (ii) the exact name of the Provider is as set forth in the introductory paragraph of this Agreement and, except as set forth therein, the Provider has not changed its name in the last five (5) years and during such period the Provider did not use, nor does the Provider now use, any fictitious, doing business as or trade name or any other name. Each Provider shall notify the Purchaser in writing thirty (30) business days prior to any change in any location referred to in clause (i) and/or any change in any name referred to in clause (ii).

**10.      Remedies.** Each of the Purchaser's rights and remedies under this Agreement are cumulative, and such rights and remedies are in addition to and not by way of limitation of any other rights or remedies the Purchaser may have under applicable law. The Purchaser shall have the right, in its sole discretion, to determine which rights and remedies, and in which order any of the same, are to be exercised. No act, failure, or delay by the Purchaser shall constitute a waiver of any of the rights and remedies to which it would otherwise be entitled.  In the event Purchaser deems it necessary to seek equitable relief, including, but not limited to, injunctive or receivership remedies, as a result of Provider's default, Provider waives any requirement that Purchaser post or otherwise obtain or procure any bond.  Alternatively, in the event Purchaser, in its sole and exclusive discretion, desires to procure and post a bond, Purchaser may procure and file with the court a bond in an amount up to and not greater than $10,000.00 notwithstanding any common or statutory law requirement to the contrary.  Upon Purchaser's posting of such bond it shall be entitled to all benefits as if such bond was posted in compliance with applicable law.  Provider also waives any right it may be entitled to, including an award of attorneys' fees or costs, in the event any equitable relief sought by and awarded to Purchaser is thereafter, for whatever reason(s), vacated, dissolved, or reversed.

**11.      Term; Termination.** (a) The Offer Period shall be renewable from year to year on the terms and conditions set forth in this Agreement unless (i) Purchaser shall, not less than thirty (90) business days prior to the expiration of the initial one year Offer Period or any subsequent one year Offer Period, give to Provider notice of Purchaser's intention not to so renew or (ii) Provider, in accordance with paragraph (b), give to Purchaser notice of Provider's intention to terminate this Agreement. This Agreement shall be binding upon the parties hereto upon its

execution and shall continue until the later of (i) the collection of all Accounts sold hereunder or (ii) the payment of any Repurchase Prices and all amounts due hereunder.

(b) The Provider may terminate its obligation to offer to sell Accounts to the Purchaser pursuant to this Agreement upon no less than sixty (60) days prior written notice to the Purchaser.

(c) Notwithstanding anything contained herein to the contrary, the Purchaser may terminate this Agreement immediately and without notice upon the occurrence of any of the following events (each a **"Termination Event"**): (i) the Provider fails to make any payment (including the delivery to Purchaser of any Misdirected Payment (after right to cure) required under this Agreement, (ii) there is an occurrence of a **Bankruptcy Event** (as defined below) with respect to the Provider or (iii) the Provider fails to honor any obligation set forth in this Agreement. For purposes of this Agreement, **"Bankruptcy Event"** shall mean the Provider generally not paying its debts as such debts become due, or admitting in writing its inability to pay its debts generally, or making a general assignment for the benefit of creditors; or any proceeding being instituted by or against the Provider seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, dissolution, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency, or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian, or other similar official for it or for any substantial part of its property or assets and, in the case of any such proceeding instituted against it (but not instituted by it), either such proceeding shall remain undismissed or unstayed for a period of 60 days, or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or for any substantial part of its property or assets) shall occur; or the Provider taking any action to authorize or acquiesce in any of the actions set forth above in this paragraph.

(d) If a Termination Event shall occur and be continuing, the Purchaser may, without limiting any right of the Purchaser hereunder, take complete authority and control of all administration and servicing of the Accounts. Upon any such action, the Purchaser shall have, in addition to the rights and remedies it may have under this Agreement, all other rights and remedies provided after default under the UCC and under other applicable law, which rights and remedies shall be cumulative. A Termination Event shall not affect any security interest granted pursuant to this Agreement, including but not limited to security interests in property not yet owned by Provider or not created as of the Termination Event.

**12.    Indemnification.** This Agreement shall not constitute an assumption by the Purchaser of any obligation to any Third Party Obligor or patient. The Provider shall indemnify and hold harmless the Purchaser, its officers, directors, shareholders, employees, representatives, agents, and assigns (each an **"Indemnified Party"**), from and against all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, and disbursements of any kind or nature whatsoever (including, without limitation, settlement costs and any attorneys and accountants fees and expenses relating to or in connection with the enforcement of the Parties s

rights and remedies hereunder, or for investigating, prosecuting, or defending any actions or threatened actions) that may be imposed on, incurred by, or asserted against, any Indemnified Party in any way relating to or arising out of any breach by the Parties of any representation, warranty, covenant, or agreement contained in this Agreement, including without limitation any document furnished pursuant hereto, together with interest on cash disbursements in connection therewith at the Additional Charge from the date cash disbursements were made or incurred by any Indemnified Party until paid in full.. Any amount payable by either Party under any provision of this Agreement shall be paid without any deduction or set-off of any kind.

**13.    Controlling Law.**  This Agreement, each of the other documents delivered and to be delivered pursuant hereto, and all of the rights and obligations of the parties hereunder and thereunder shall be governed by and interpreted in accordance with the laws of the State of Florida, without regard to the conflict of law provisions of the State of Florida.

**14.    Waiver of Jury Trial, Jurisdiction and Venue.**  THE PROVIDER HEREBY WAIVES ALL RIGHTS TO A TRIAL BY JURY IN THE EVENT OF ANY LITIGATION WITH RESPECT TO ANY MATTER RELATING TO THIS AGREEMENT AND/OR ANY OF THE DOCUMENTS DELIVERED AND TO BE DELIVERED HEREUNDER AND THE PROVIDER HEREBY IRREVOCABLY CONSENTS TO THE SOLE AND EXCLUSIVE JURISDICTION OF, AT THE OPTION OF THE PURCHASER, THE STATE OR FEDERAL COURTS IN THE STATE OF FLORIDA, PALM BEACH COUNTY, IN CONNECTION WITH ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT AND/OR ANY SUCH DOCUMENTS.    PROVIDER ALSO WAIVES ANY RIGHT TO OBJECT TO VENUE OR SEEK TO CHANGE VENUE BASED ON INCONVENIENCE OR OTHERWISE. THE PROVIDER WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS AND AGREES THAT SERVICE THEREOF MAY BE MADE BY CERTIFIED OR REGISTERED MAIL DIRECTED TO THE PROVIDER AT THE PROVIDER'S ADDRESS FIRST ABOVE SET FORTH IN THIS AGREEMENT. THE PROVIDER SHALL APPEAR IN ANSWER TO SUCH SUMMONS, COMPLAINT OR OTHER PROCESS WITHIN THE TIME PRESCRIBED BY LAW, FAILING WHICH THE PROVIDER SHALL BE DEEMED IN DEFAULT AND JUDGMENT MAY BE ENTERED BY THE PURCHASER AGAINST THE PROVIDER FOR THE AMOUNT OF THE CLAIM AND ANY OTHER RELIEF REQUESTED THEREIN.

**15.    Miscellaneous.**

(a)    This Agreement sets forth the entire agreement and understanding of the parties hereto concerning the subject matter provided for herein. This Agreement supersedes any and all prior agreements and understandings between the parties with respect to such subject matter, whether oral or written.

(b)    This Agreement may only be amended by a writing signed by both of the parties hereto. No waiver shall be effective unless it is in writing and is signed by the waiving

party. Any waiver shall be effective only in the specific instance and for the specific purpose for which it is given.

(c)    This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. Notwithstanding the foregoing, the Provider may not, directly or indirectly, voluntarily or by operation of law, assign this Agreement or any of its rights or obligations hereunder without first obtaining the prior written consent of the Purchaser. The Provider acknowledges that the Purchaser may pledge, assign, or transfer any or all of its rights and obligations hereunder and its interest in the Purchased Accounts and the other Subject Property to another entity, including as collateral security for any indebtedness of the Purchaser.

(d)    The invalidity or unenforceability of any provision of this Agreement shall not impair the validity or enforceability of any other provisions of this Agreement.

(e)    Unless otherwise expressly provided in this Agreement, all notices and other communications provided for herein shall be in writing and shall be deemed to have been given when delivered by facsimile transmission or overnight delivery service or five (5) business days after mailed by first class registered or certified mail, postage prepaid, to the addresses first above set forth, or to such other address as may be furnished from time to time by notice similarly served to the other party at the address first above set forth.

(f)    The representations, warranties, and covenants of the Provider contained herein shall survive the purchase of the Purchased Accounts and shall remain in full force and effect unless any investigation made by or on behalf of the Purchaser and unless any knowledge (actual or imputed) that the Purchaser may have is inconsistent therewith.

(g)    The Provider agrees that the Servicer shall not be liable in any respect to the Provider for the structuring of this Agreement, the flow of funds received from the servicing of Purchased Accounts, or any of the Purchaser's obligations to the Provider.   Any provision in this Agreement that refers to the Servicer shall also apply to any sub-servicer that may at any time or from time to time be appointed by the Purchaser or the Servicer.

(h)    This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same instrument.

(i)    Nothing set forth herein or otherwise shall render Purchaser and Provider partners of one another, or constitute the Provider as an agent of Purchaser.

(j)    In the event that any of the Parties hereto institutes any action, suit or proceeding to enforce the provisions of this Agreement, or for breach thereof, or to declare the rights of the Parties with respect thereto, the prevailing Party shall be entitled to recover, in

addition to damages, reasonable costs and expenses including, without limitation, reasonable attorneys' fees.

(k)    Provider agrees to execute any and all forms (including without limitation, Forms 8821 and/or 2848) that Purchaser may require in order to enable Purchaser to obtain and receive tax information with respect to Provider from the Department of the Treasury, Internal Revenue Service or other taxing authority, or to receive refund checks.

(l)    The Provider agrees that it shall not institute against, or solicit or encourage any person or entity to institute against, or join any person or entity in instituting against, the Purchaser or any of its property any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceedings or any other similar proceeding under any federal, state or other law.

Each of the parties hereto, by its signature below, acknowledge that all of the terms, conditions, and agreements set forth above are acceptable to it and that it shall comply with all of the terms and conditions set forth in this Agreement.  The date of this Agreement is the date set forth on the first page of this Agreement.

PURCHASER-
**Sun Capital HealthCare, Inc.**

By: _____
Name: Howard Koslow
Title: President & COO
Date: March 6, 2008.


PROVIDER-
**Michael Reese Medical Center Corporation**

By: Paul R Tuft
Name: PAUL R. TUFT
Title: CEO
Date: 3-5-2008

*Master Purchase and Sale Agreement*
*Sun Capital HealthCare, Inc. and*
*Michael Reese Medical Center Corporation*
*Page 27*

## EXHIBIT A

## SUN CAPITAL HEALTHCARE, INC.
## PURCHASE SCHEDULE

[Account information shall be specified in each Purchase Schedule in form and substance satisfactory to Purchaser]

# EXHIBIT B

Lockbox Agreement
[attached]

## EXHIBIT C

Form of Provider Notice of
Sale to **Non-Governmental Third Party Obligors**
(Pursuant to Section 4. 2(a))

[Letterhead of the Provider]

Date

RE:  Client Name, Tax ID

Dear Sir or Ms.:

**Please be advised that the following legal entity and Tax ID number:**
Client Name          , Tax ID-          has assigned it's accounts receivable to SUN CAPITAL
HEALTHCARE, INC.  We therefore request that you send all payments for such entity's (entities')
accounts receivable that are made by wire transfer or by other electronic transfer directly into the following
SUNTRUST BANK account:

> SUNTRUST BANK ACCOUNT NUMBER:
> ROUTING/ABA NUMBER:
> REFERENCE: Client Name

Please send all hard copy checks, explanation of benefits, remittance advices, and all communication
involving such accounts receivable (i.e., denials, rejections, etc.) to:

> Client Name
> c/o SUNTRUST BANK
> P.O. BOX
> Atlanta, GA 30368-

All such payments shall be made payable to the legal entity name as noted previously in this letter. These
instructions may only be changed with the consent of both of the parties that sign below.

If you should have any questions concerning this letter, please contact Alissa Cohen at #800-880-1709.
Thank you for your assistance in this matter and your attention to these requests.

Sincerely,                                    Agreed To And Acknowledged:

**Client Name**                               **Sun Capital Healthcare, Inc.**

Signature:_____                    Signature:_____

Name:_____                       Name: Howard B. Koslow

Title:_____                      Title: President & Chief Operating Officer

*Master Purchase and Sale Agreement*
*Sun Capital HealthCare, Inc. and*
*Michael Reese Medical Center Corporation*
*Page 30*

## EXHIBIT D

**Form of Provider Notice of Payment Direction to Governmental Third Party Obligors**
(Pursuant to Section 4.3(b))

[Letterhead of the Provider]


Date


RE:  ACCOUNTS RECEIVABLE PAYMENT ADDRESS

Dear Sir or Ms:

We have opened a new post office box and a new bank account at Sun Trust Bank. Accordingly, we hereby request that:

(1) all wire transfers or other electronic transfers be made directly into the following account at- Sun Trust Bank:
      Account No._____
      Reference : _____

(2) all explanations of benefits, remittance advises, and other forms of payment, including checks, be sent to the following post office box:
      **Entity Name**
      c/o Sun Trust Bank
      P.O. Box _____
      _____, _____

Thank you for your cooperation in this matter and appreciate your attention.

Sincerely,

**Entity Name**

Signature:_____

Name: _____

Title: _____

**EXHIBIT E**
**Form of UCC Language**
**(until otherwise specified by the Purchaser)**
**(Pursuant to Sections 8(a) and 9(a))**

All now owned or existing or hereafter acquired, arising or created accounts, , , chattel paper, documents, instruments and general intangibles, and all proceeds and products and offspring of the foregoing (as all of such terms are presently or hereafter defined in the Uniform Commercial Code), as well as all Accounts and Purchased Accounts as defined in the Master Purchase and Sale Agreement between Debtor and the Secured Party (as amended, amended and restated, or otherwise modified from time to time), including but not limited to all rights to payment under any agreements with all Third Party Obligors as defined therein.

# **EXHIBIT A-2**

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)

Diligenz                                  8008585294

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

DILIGENZ, INC.

6500 HARBOR HEIGHTS PARKWAY

SUITE 400

MUKILTEO WA 98275

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 02:54 PM 03/05/2008
INITIAL FILING # 2008 0793925

SRV: 080285932

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| MICHAEL REESE MEDICAL CENTER CORPORATION | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2929 SOUTH ELLIS AVENUE | CHICAGO | IL | 60616 | US |

| 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION |
|---|---|
| CORPORATION | DE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION |
|---|---|
| | |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| SCM CAPITAL HEALTHCARE, INC. | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 999 YAMATO ROAD, STE. 300 | BOCA RATON | FL | 33431 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

All now owned or existing or hereafter acquired, arising or created accounts, inventory, equipment, chattel paper, documents, instruments and general intangibles, and all proceeds and products and offspring of the foregoing (as all of such terms are presently or hereafter defined in the Uniform Commercial Code), as well as all Accounts and Purchased Accounts as defined in the Master Purchase and Sale Agreement between the Debtor and the Secured Party (as amended, amended and restated, or otherwise modified from time to time), including but not limited to all rights to payment under any agreements with all Third Party Obligors as defined therein. NOTICE- Pursuant to an agreement between seller/debtor and puchaser/secured party, seller/debtor has agreed not to further encumber the collateral described herein and any violation of that covenant may constitute unlawful interference.

**5. ALTERNATIVE DESIGNATION - 2007**

| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|

**8. OPTIONAL FILER REFERENCE DATA**

Michael Reese    [32709866]

# EXHIBIT A-3

RECEIVED

IL SECRETARY OF STATE
UNIFORM COMMERCIAL CODE

20080305    1354

$20.00    Electronic

## UCC FINANCING STATEMENT
**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**13017026**    FS

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Diligenz                    (800)858-5294

**B. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

Diligenz, Inc.

6500 Harbour Heights Pkwy #400

Mukilteo, WA, 98275

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| MICHAEL REESE MEDICAL CENTER CORPORATION | | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2929 SOUTH ELLIS AVENUE | CHICAGO | IL | 60616 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATION ID #, if any | |
|---|---|---|---|---|---|
| | | CORPORATION | DE | 2914312 | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATION ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| SUN CAPITAL HEALTHCARE, INC. | | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 999 YAMATO ROAD, STE. 300 | BOCA RATON | FL | 33431 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

ALL NOW OWNED OR EXISTING OR HEREAFTER ACQUIRED, ARISING OR CREATED ACCOUNTS, INVENTORY, EQUIPMENT, CHATTEL PAPER, DOCUMENTS, INSTRUMENTS AND GENERAL INTANGIBLES, AND ALL PROCEEDS AND PRODUCTS AND OFFSPRING OF THE FOREGOING (AS ALL OF SUCH TERMS ARE PRESENTLY OR HEREAFTER DEFINED IN THE UNIFORM COMMERCIAL CODE), AS WELL AS ALL ACCOUNTS AND PURCHASED ACCOUNTS AS DEFINED IN THE MASTER PURCHASE AND SALE AGREEMENT BETWEEN THE DEBTOR AND THE SECURED PARTY (AS AMENDED, AMENDED AND RESTATED, OR OTHERWISE MODIFIED FROM TIME TO TIME), INCLUDING BUT NOT LIMITED TO ALL RIGHTS TO PAYMENT UNDER ANY AGREEMENTS WITH ALL THIRD PARTY OBLIGORS AS DEFINED THEREIN. NOTICE- PURSUANT TO  AN AGREEMENT BETWEEN SELLER/DEBTOR AND PUCHASER/SECURED PARTY, SELLER/DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN AND ANY VIOLATION OF THAT COVENANT MAY CONSTITUTE UNLAWFUL INTERFERENCE.

| 5. ALTERNATIVE DESIGNATION (if applicable): | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.  Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [optional]  ☐ ALL DEBTORS  ☐ DEBTOR 1  ☐ DEBTOR 2 |
|---|---|

**8. OPTIONAL FILER REFERENCE DATA**

MICHAEL REESE [32709215]

FILING OFFICE COPY - UCC FINANCING STATEMENT (FORM UCC1)  (REV. 05/22/02)

# **EXHIBIT A-4**

## WHOLESALE LOCKBOX DEPOSIT AND
## BLOCKED ACCOUNT SERVICE AGREEMENT WITH PROVIDER

This Agreement (hereinafter "Agreement"), setting forth the understanding of the parties hereto, is made and entered into as of the _21_ day of _March_ , 2008 by and among SunTrust Bank (hereinafter "Bank"), a Georgia banking corporation, Michael Reese Medical Center Corporation (hereinafter "Provider"), a Delaware corporation with its principal office located at 2929 South Ellis Avenue, Chicago, Illinois 60616; and Sun Capital Healthcare, Inc. (hereinafter "Purchaser") a Florida corporation with its principal office located at 999 Yamato Road, Third Floor, Boca Raton, Florida 33431, for the use of Bank's Wholesale Lockbox Deposit Service to facilitate the presentation, collection, and transfer of checks, drafts, money orders, or any other negotiable instruments or orders for the payment of money and the proceeds thereof payable to Provider and/or Purchaser, as the case may be (hereinafter collectively "Items").

### RECITALS

WHEREAS, Provider and Purchaser have entered into a separate agreement *dated as of March 6, 2008* (as the same may be amended, amended and restated, or otherwise modified from time to time, the "Master Purchase and Sale Agreement"), by and between the Provider and the Purchaser, providing for the unconditional sale, transfer, and assignment by Provider to Purchaser of certain accounts receivable due and owing to Provider from various third-party obligors (including without limitation both Governmental Accounts and Non-Governmental Accounts, each as defined in the Master Purchase and Sale Agreement) (hereinafter "Purchased Accounts") and for the procedures governing the collection of both such Purchased Accounts and all other "Accounts" as hereinafter defined; and

WHEREAS, as an inducement to Purchaser to enter into the Master Purchase and Sale Agreement, Provider has granted Purchaser a first priority security interest in all accounts receivable generated by the Provider (all such accounts receivable and Purchased Accounts hereinafter collectively referred to as "Accounts"), and all proceeds thereof (including without limitation the Items); and

WHEREAS, the parties hereto desire to set forth their respective rights, duties, and obligations with respect to the Accounts, certain lockbox and deposit accounts established with Bank, the Items, and all amounts that may be on deposit with Bank from time to time.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, as well as other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

### 1.   MAIL; LOCKBOXES

A.   Bank, on behalf of Provider and Purchaser, respectively, shall rent two separate post office boxes as follows:  (i) one in the name of Provider to receive Items and mail from obligors of Governmental Accounts (as defined in the Master Purchase and Sale Agreement) (hereinafter "Provider Lockbox"), and (ii) one in the name of Purchaser to receive Items and mail from obligors of Non-Governmental Accounts (as defined in the Master Purchase and Sale Agreement) (hereinafter "Purchaser Lockbox").  The Provider Lockbox and Purchaser Lockbox are hereinafter collectively referred to as the "Lockboxes."  Bank shall have unrestricted and

1

exclusive access to the Lockboxes and shall have its messenger collect the contents therein at least once during each business day.

B.    In the case of Governmental Account obligors pursuant to Section 1.A.(i) above, Provider shall instruct its remitters to mail all payments to the Provider Lockbox at:

> Michael Reese Medical Center Corporation
> c/o SunTrust Bank
> P.O. Box 116240
> Atlanta, GA  30368-6240

C.    In the case of Non-Governmental Account obligors pursuant to Section 1.A.(ii) above, Provider shall instruct its remitters to mail all payments to the Purchaser Lockbox at:

> Sun Capital Healthcare, Inc.
> c/o SunTrust Bank
> P.O. Box 116059
> Atlanta, GA 30368-6059

## 2.    OWNERSHIP OF ITEMS; ENDORSEMENT

A.    IN LIGHT OF PROVIDER'S UNCONDITIONAL SALE, TRANSFER, AND ASSIGNMENT OF THE PURCHASED ACCOUNTS TO PURCHASER AND ITS GRANTING OF A FIRST PRIORITY SECURITY INTEREST IN FAVOR OF PURCHASER IN ALL ACCOUNTS, PROVIDER SPECIFICALLY DISCLAIMS ANY AND ALL RIGHT, TITLE, AND INTEREST IN OR TO ANY AND ALL ITEMS TENDERED OR REMITTED BY ANY OBLIGOR, WHETHER GOVERNMENTAL OR NON-GOVERNMENTAL, AND PROVIDER AGREES, REPRESENTS, AND WARRANTS THAT ALL SUCH RIGHT, TITLE, AND INTEREST IS SOLELY VESTED IN PURCHASER, EVEN IN THE ABSENCE OF ANY ENDORSEMENT BY PROVIDER ON ANY ITEM.    PROVIDER FURTHER AGREES, REPRESENTS, AND WARRANTS THAT PURCHASER HAS SOLE RIGHT, TITLE, AND INTEREST IN AND TO THE CONTENTS OF THE LOCKBOXES, INCLUDING, WITHOUT LIMITATION, THE ITEMS, ALL FUNDS HELD THEREIN, AND ANY MAIL OR OTHER CONTENTS, AND PROVIDER HEREBY DISCLAIMS ANY RIGHT OF ANY NATURE WHATSOEVER TO CONTROL OR OTHERWISE DIRECT OR MAKE ANY CLAIM AGAINST SAID ITEMS, FUNDS, MAIL, AND OTHER CONTENTS AS RECEIVED UNDER THIS AGREEMENT FROM TIME TO TIME, EXCEPT THAT BANK MAY SET-OFF AGAINST THE LOCKBOXES, THE LOCKBOX BANK ACCOUNTS AS ESTABLISHED PURSUANT TO SECTION 3.A. OF THIS AGREEMENT, THE PURCHASER COLLECTION ACCOUNT ESTABLISHED UNDER SECTION 3.C.2. OF THIS AGREEMENT, AND OTHER ACCOUNTS OR ASSETS OF PROVIDER OR PURCHASER HELD BY BANK IN ACCORDANCE WITH BANK'S RIGHTS UNDER SECTIONS 4, 10, AND 11 OF THIS AGREEMENT.

B.    Bank shall deposit all processed Items received in any Lockbox In accordance with the instructions hereinafter set forth.  IT IS AGREED BY THE PARTIES HERETO THAT BANK IS NOT IN PRIVITY WITH PROVIDER AND PURCHASER IN RESPECT OF THE MASTER PURCHASE AND SALE AGREEMENT.  ACCORDINGLY, BANK SHALL HAVE NO DUTY OF INQUIRY AS TO ANY OF THE CIRCUMSTANCES OF THE ENDORSEMENT, TRANSFER, DELIVERY, OR DISPOSITION BY PURCHASER OF ALL SUCH ITEMS (AND PROCEEDS THEREOF), FUNDS, MAIL, AND OTHER CONTENTS.

2

C.     Purchaser and Provider hereby grant to Bank an irrevocable power of attorney, coupled with an interest to take in such person's name, to take all action that must be taken to grant Bank access to the Lockboxes and to endorse each remittance delivered to the Lockboxes as follows: (i) "Deposited for credit to payee's Account without prejudice and with reservation of all rights. Absence of Endorsement Guaranteed SunTrust Bank, SFOC Lockbox," or (ii) by any other endorsement or notation in whatever form or type in accordance with either usual banking practice or such other practice in accordance with any other applicable laws, rules, or regulations, including without limitation Clearing House or Federal Reserve Bank rules. Notwithstanding anything to the contrary in this Agreement, both Provider and Purchaser shall at all times be, and remain, jointly and severally liable as endorsers and/or depositors and/or transferors to Bank, as depository bank, on all Items in accordance with all applicable provisions of law. Nothing contained on any Item shall be deemed to constitute notice to Bank of any defect, irregularity, or impropriety with respect to any such Item.

## 3.     DEPOSITS; COLLECTION OF PURCHASED ACCOUNTS

A.     *Establishment of Lockbox Bank Accounts:*

On each business day, Bank shall deposit the various Items received (i) in the case of the Provider Lockbox to the deposit account established by Purchaser for this purpose with Bank as account number 1000063146178 (hereinafter "Provider Lockbox Bank Account"), and (ii) in the case of the Purchaser Lockbox to the deposit account established by Purchaser for this purpose with Bank as account number 1000063146228 (hereinafter "Purchaser Lockbox Bank Account"). The Purchaser Lockbox Bank Account and the Provider Lockbox Bank Account are hereinafter collectively referred to as the "Lockbox Bank Accounts." Bank shall also receive wire transfers and other electronic funds transfers in the Lockbox Bank Accounts. All transactions in the Lockbox Bank Accounts shall be subject to the same rules, regulations, terms, conditions, and schedules of fees as would apply to any customer deposit made in the normal course of business.

B.     *Payment and Processing Procedures;*
       *Transfer to Purchaser; Standing Instructions:*

1.     The parties agree that: (i) Bank shall use good faith efforts to notify Purchaser in writing by facsimile transmission and by telephonic notice in the event that Provider or anyone purporting to act on behalf of Provider shall provide any instructions to Bank that are inconsistent with the instructions set forth in Section 3.A. above, provided, however, Bank shall not be liable to Purchaser for any failure to provide such notice. The Provider agrees to provide Purchaser twenty-one (21) days prior notice of its intent to change the instructions set forth in Section 3.A.

2.     Provider shall not, without the prior written consent of Purchaser, (i) change or cancel any funds transfer instructions under this Agreement at any time, or (ii) change the identity of any Lockbox or Lockbox Bank Account or (iii) instruct any governmental or non-governmental obligor to make payments other than to the Lockboxes and the Lockbox Bank Accounts.

3

C.    *Processing; Transfer to Purchaser Collection Account:*

1.    Provider and Purchaser each acknowledge and agree that all Items shall be processed automatically and without inspection. Provider and Purchaser shall be and remain jointly and severally liable to Bank for such all Items as endorsers and/or depositors and/or transferors to Bank in accordance with all applicable provisions of law. In addition, nothing contained in any Item shall be deemed to constitute notice to Bank of any defect, irregularity, or impropriety with respect to any such Item, and Bank shall be under no obligation to identify Items bearing any "payment in full" or similar legends and shall have no liability to either Provider or Purchaser therefor, but nothing contained in this Agreement shall prohibit Purchaser or Provider from enforcing any rights they may have regarding any such Items against any non-governmental or governmental obligors.

2.    Provider and Purchaser each hereby authorize and direct Bank, in accordance with whatever internal methods or procedures Bank at its sole discretion elects to utilize, to transfer at the end of each business day or as soon as practicable thereafter all collected and available funds in the Lockbox Bank Accounts to such account or accounts (collectively, the "Purchaser Collection Account") of Purchaser at Bank or otherwise as Purchaser may direct from time to time in writing reasonably acceptable to Bank. Purchaser and Provider each agree to execute any and all further agreements, including without limitation any electronic or other funds transfer agreement, as may be required by Bank to effect such transfers at any time.

## 4.    <u>RIGHT OF SETOFF</u>

A.    *Limited Waiver:*

Bank agrees that, solely as against the Purchaser Collection Account, the Provider Lockbox, Purchaser Lockbox, and the Lockbox Bank Accounts, it shall not exercise or claim any security interest in or right of set-off or banker's lien against such post office boxes and such accounts or any funds on deposit therein, except to the extent permitted by Sections 4.B., 10, and 11 hereof.

B.    *Order of Setoff:*

If any Item deposited in any of the accounts designated in Paragraph 4.A. above is returned unpaid or otherwise dishonored for any reason, including without limitation "insufficient funds," "uncollected funds," or is otherwise returned or claimed upon for reasons of alleged forgery, alteration, improper or unauthorized endorsement, lack of good title, or any other defect for which Provider or Purchaser may be liable to Bank at law or in equity, or in the event any Item is credited to the account in error or creates an overdraft, Bank shall have the right to charge any and all such returned, dishonored, or claimed upon Items or any Items credited in error or creating an overdraft against, in order of priority:  (i) any Lockbox or Lockbox Bank Account; (ii) Provider directly on demand by Bank; (iii) any other account of Provider maintained at Bank, or (iv) subject to notice to Purchaser as below specified, any balance of Items or collected funds then in the Purchaser Collection Account or any other account with Purchaser maintained at Bank. If, in the aggregate, (i) Provider is unable or unwilling to promptly repay such amounts to Bank, and (ii) if the balance of collected funds then on deposit in any other

account of Provider maintained at Bank is insufficient for such purpose, and (iii) if the balance of collected funds then on deposit in the Lockboxes and Lockbox Bank Accounts and Purchaser Collection Account is insufficient for such purpose, then Bank will immediately notify the Provider and Purchaser, and the Purchaser will immediately reimburse Bank for the amount of any sums due Bank, provided, however, that the Purchaser's obligation shall be subject to the conditions that (i)   Purchaser shall have previously received the proceeds of such Items pursuant to this Agreement and (ii) any such reimbursement shall be only to the extent that Bank is not reimbursed therefor by Provider after demand by Bank upon Provider.  Provider shall be liable to Purchaser for any and all amounts paid by Purchaser to Bank whether directly or indirectly (including without limitation by debit of any deposit account), including without limitation pursuant to this paragraph.  Upon written notice by Bank to Purchaser, Bank may also charge the Lockboxes, Lockbox Bank Accounts, and the Purchaser Collection Account for all service charges owing Bank with respect to the Lockboxes, Lockbox Bank Accounts, the Purchaser Collection Account, and any other account of Purchaser maintained at Bank, it being agreed between Provider and Purchaser that Provider shall immediately reimburse all such amounts to Purchaser.  Purchaser shall maintain a balance in the Purchaser Collection Account sufficient to offset any amounts charged against the account under this section 4.B. and all costs and service fees provided under sections 10 and 11.

## 5.    RIGHT TO EQUITABLE RELIEF

Provider agrees that Purchaser shall be entitled to obtain, to the fullest extent permitted under applicable law, an immediate court order for specific performance of the obligations of Provider under this Agreement relating to any lock boxes or accounts established under this Agreement or to any funds at any time deposited therein, in the event of a failure by Provider to comply with its obligations under this Agreement or the Master Purchase and Sale Agreement, it being agreed in advance that any remedy at law would be inadequate in the event of such a failure.

## BINDING AGREEMENT; ASSIGNMENT

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, with the sole exception that Provider shall not be entitled to assign or delegate any of its rights or duties hereunder without first obtaining the express prior written consent of Purchaser and Bank.  Purchaser shall have the right upon prior written notice to Bank at any time and from time to time to assign and/or delegate any or all of its rights and obligations hereunder to any assignee of its rights and obligations under the Master Purchase and Sale Agreement and/or to its servicer appointed pursuant to the Master Purchase and Sale Agreement but, upon any actual or purported assignment or delegation by Purchaser or Provider, as the case may be, Bank may terminate this Agreement by notice as of the effective date of such assignment or delegation or upon thirty (30) business days prior written notice delivered in accordance with paragraph 13 below, whichever is earlier.  In no event shall any assignment or delegation impair, cancel, or affect any obligations to Bank due and owing from Provider or Purchaser and Bank's rights in connection therewith under this Agreement or otherwise.

Bank shall at its sole and exclusive discretion have the right, without any advance notice to either Provider or Purchaser, at any time and from time to time to assign and/or delegate any

or all of its rights and obligations under this Agreement to any Bank affiliate, parent, subsidiary, or successor in interest; provided that Bank shall cause any such assignee to be bound by the terms of this Agreement pursuant to a written agreement, in form and substance reasonably satisfactory to Purchaser and Lender, not later than three business days after such assignment or delegation.

## 6.    COUNTERPART ORIGINALS; USE OF SINGULAR OR PLURAL

This Agreement may be executed in any number of counterparts, and by the parties hereto on different counterparts, each of which shall be deemed an original and which together shall be deemed a single document. Any singular terms used herein shall include the plural, and vice versa.

## 7.    RECORD RETENTION; STATEMENTS

Bank shall maintain a microfilm or other record of each Item included in each deposit to the Lockbox Bank Accounts. Said microfilm or other record shall be available to Purchaser, upon written request, for a period of not less than four (4) years from the date of deposit of the Item, in accordance with Bank's usual practice or procedure from time to time.

    (i)    On or about each Wednesday and Friday, the Bank shall deliver, by Federal Express or other recognized overnight courier, to each of Provider, Purchaser, and a "servicer" designated by Purchaser from time to time, with respect to the period since the close of business on the most recent day covered by a previous delivery:

    (a) copies of:

        (1)    each Item and other document or other communication received in the Purchaser Lockbox and

        (2)    advices of each wire transfer or other electronic transfer received in the Purchaser Lockbox Bank Account; and

    (b) copies of

        (1)    each Item and other document or other communication received in the Provider Lockbox, and

        (2)    advices of each wire transfer or other electronic transfer received in the Provider Lockbox Bank Account.

    (ii)    The Bank shall include any corrections or adjustments in respect of any such delivery promptly after discovery of the need therefor.

## 8.    TERMS AND TERMINATION

This Agreement shall commence upon each party's execution of this Agreement and shall continue in full force and effect until terminated by Purchaser or Bank for any reason upon thirty (30) days prior written notice to each other and Provider. Notwithstanding anything to the contrary in the foregoing however, if in the reasonable opinion of Bank, Provider or Purchaser shall be in breach of any material provision contained herein, Bank may terminate this Agreement upon five (5) business days prior written notice to Purchaser and Provider, provided

6

that if Bank for any reason at its sole discretion deems itself insecure or at risk at any time under this Agreement, Bank may terminate this Agreement immediately upon written notice to Purchaser and Provider, said notice to be provided either prior to, simultaneously with, or within a reasonably prompt time following such termination.   In the event of termination of this Agreement for any reason, as well as by Bank for reasons of either breach of any material provision under this Agreement or Bank deeming itself insecure or at risk as set forth above, Bank shall upon the effective date of termination, and subject to all rights of set-off and otherwise of Bank, return and forward to Purchaser with respect to Items, funds, or other contents received in the Lockboxes or the Lockbox Bank Accounts, at Purchaser's sole cost and expense, any Items, funds, mail, or other contents that may be received by Bank after such termination for a period not to exceed 60 days after termination.  Termination of this Agreement shall not impair, cancel, or affect any obligation due and owing from Provider or Purchaser to Bank at the time of such termination.

## 9.   COSTS

Bank shall upon notice have the right to debit the Lockboxes, Lockbox Bank Accounts, and Purchaser Collection Account for all expenses incurred by Bank in the performance of this Agreement, including but not limited to, post office box rental, telephone, mailing, messenger, and postage costs.  If sufficient collected funds shall not be present in such accounts to cover such costs, Bank shall have the right, without demand or notice of any kind, the receipt of which is hereby waived by Provider and Purchaser, to setoff any and all outstanding costs against any balances, credits, deposits, accounts, or monies of Provider or Purchaser held by Bank.

## 10.   SERVICE FEES

Provider shall pay Bank's service fees for its services under this Agreement as set forth in the attached Schedule 1.  Bank shall have the right to increase said service fees once during each year, upon the Bank's annual review of such service fees, and shall provide Provider with written notice of same a minimum of forty-five (45) days prior to the effective date of such increase.  Upon Provider's failure to pay the service fee, Bank shall have the right to debit the Lockboxes, Lockbox Bank Accounts, and Purchaser Collection Account, or any other account of Purchaser maintained at Bank for all such service fees.  If sufficient collected funds shall not be present in such accounts to cover such fees, Bank shall have the right, without demand or notice of any kind, the receipt of which is hereby waived by Provider and Purchaser, to offset outstanding service fees against any balances, credits, deposits, accounts or monies of Provider or Purchaser held by Bank in the same order of priority as set forth in Section 4.B.

## 11.   [INTENTIONALLY OMITTED]

## 12.   NOTICES

Any notice to Bank by Provider or Purchaser shall be effective only  (i) if in writing and (ii) upon actual receipt by Bank, Attention:  Paula Pearson, Lockbox Processing, at 800 South Federal Highway, Boca Raton, Florida 33432.  If Provider or Purchaser is a partnership, corporation, or limited liability company, such notice shall be accompanied by a resolution, signed by all of the partners, the president and secretary (with corporate seal), or managing member, as applicable.  Any notice to Provider or Purchaser shall be deemed effective upon mailing or delivery via overnight courier to the last known address of Provider or Purchaser or

upon facsimile to the last known telecopy number of Provider or Purchaser appearing in the records of Bank.

## 14.   RESOLUTIONS

Upon execution of this Agreement, Provider and Purchaser shall provide Bank with appropriate resolutions authorizing the execution, delivery, and performance of this Agreement and the transactions contemplated hereby.

## 15.   LIABILITY; INDEMNIFICATION

Provider and Purchaser agree that Bank shall have no liability to any of them for any loss or damage that any or all may claim to have suffered or incurred, either directly or indirectly, by reason of this Agreement or any transaction or service contemplated by the provisions hereof, unless occasioned by the gross negligence or willful misconduct of Bank.  In no event shall Bank be liable for losses or delays resulting from computer malfunction, interruption of communication facilities, labor difficulties, or other causes beyond Bank's reasonable control or for indirect, special, consequential, punitive, or exemplary damages.  Provider and Purchaser, jointly and severally, shall defend, indemnify, and hold Bank harmless against any and all demands, losses, damages, liabilities, judgments, assessments, awards, costs, legal (including without limitation reasonable attorneys' fees, court costs, and other reasonable litigation expenses), and other reasonable expenses, and in each instance other than resulting from the gross negligence or willful misconduct on the part of Bank, arising from or in connection with Bank entering into this Agreement or the performance of its duties and obligations hereunder, including any claim, proceeding, action, or suit, including any compromise or settlement thereof, that is either (i) brought against Bank in connection with the performance of Bank's obligations hereunder other than with respect to any claim brought against Bank by Purchaser or Provider, and (ii) brought by Bank to enforce any rights or obligations hereunder, including without limitation any rights to payment. Provider and Purchaser agree that Bank's compliance with the terms hereof, including the transfer of amounts on deposit in the Lockbox Bank Accounts or Purchaser Collection Account, shall not constitute willful misconduct by the Bank whether or not the terms of this Agreement comply with applicable statutes, rules, regulations, orders, or decisions of any court or governmental body.  Furthermore, notwithstanding anything in this Agreement to the contrary, (i) Bank shall not be concerned with the terms, provisions, or content of any agreement entered into by the other parties to this Agreement and to which Bank is not a party regarding or relating to the subject matter or purpose of this Agreement, including but not limited to any such agreement expressly referred to in this Agreement, (ii) Bank shall have no fiduciary duties under this Agreement or any transaction or service contemplated by the provisions hereof, to any party, and (iii) Bank shall have no liability as a result of acting or refraining from acting in good faith on any written notice, request, or withdrawal, payment, transfer, or other instruction (including but not limited to electronically confirmed facsimiles) purportedly furnished by Provider or Purchaser in accordance with the terms hereof, in which case the parties agree that Bank has no duty to make any further inquiry whatsoever.

## 16.   SEVERABILITY

In the event that any provision of this Agreement shall for any reason be held invalid, illegal, or unenforceable by a court of competent jurisdiction, the remaining provisions of this Agreement shall remain unimpaired.  The parties hereto agree that any such invalid, illegal, or

8

unenforceable provision shall be replaced by a mutually acceptable valid, legal, and enforceable provision that most closely approximates the economic intent and effect of the invalid, illegal, or unenforceable provision.

## 17.   NON-WAIVER

No obligation or duty of Bank, Provider, or Purchaser hereunder shall be deemed waived and no breach excused unless such waiver or consent shall be in writing and signed by an authorized representative of the party waiving such obligation or duty. Failure or delay by any party to exercise any right, power, privilege, or remedy hereunder shall not operate as a waiver of any different or subsequent breach hereunder.

## 18.   MODIFICATIONS

No change, addition, modification, or discharge, in whole or in part, of any of the terms and conditions contained herein shall be effective unless it is in a separate writing and signed by all parties hereto.

## 19.   FORCE MAJEURE

Bank shall not be liable or responsible for failure or delay in the performance of its duties or obligations under this Agreement if such failure or delay is due to causes beyond the reasonable control of Bank, including but not limited to, acts of civil or banking authorities, national emergencies, labor difficulties, fire, flood, or other catastrophes, nuclear disaster, acts of God, insurrection, war, public utility failure, accident, or malfunctions of the processing equipment involved.

## 20.   GOVERNING LAW; VENUE; WAIVER OF JURY TRIAL; NO BANKRUPTCY PROCEEDINGS

This Agreement has been made, executed, and shall be performed in the state of Florida, and shall be governed and construed for all purposes under and in accordance with the laws of the state of Florida, without regard to its conflict of laws principles. The parties hereto consent to the exclusive jurisdiction and venue of the state or federal courts located within the County of Palm Beach, state of Florida, for any action or proceeding arising out of or relating to this Agreement. Each party hereto hereby waives personal service of any summons, complaint, or other process in connection with any such action or proceeding and agrees that the service thereof may be made by first class mail to the address determined in accordance with Section 13. The parties hereto waive, to the fullest extent permitted by law, all rights to trial by jury in any action, proceeding, or counterclaim brought by any party against the other, or in any matter whatsoever arising out of or in any manner related to this Agreement. Provider agrees that it shall not institute against, or solicit or encourage any person or entity to institute against, or join any person or entity in instituting against, Purchaser or any of its property any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceedings or any similar proceeding under any federal, state, or other applicable law.

9

### 21.   LEGAL PROCESS

To the extent it is in accordance with Bank's usual or customary practice, Bank agrees to use its best efforts to provide Purchaser with notice of the service of any levies, restraining notices, attachments, court orders, or other or similar legal process affecting any of the Lockboxes or the Lockbox Accounts or the Purchaser Collection Account so that Purchaser may have an opportunity within any required time in keeping with applicable law to apply for relief from such process to any appropriate court, agency, or applicable party.  Bank shall have no obligation to undertake any defense or challenge to such process or to retain counsel for that purpose.  In the event Purchaser or Provider challenges the legal validity or effectiveness, in whole or in part, of such process Provider and Purchaser jointly and severally agree at their sole cost and expense agree to defend, indemnify, and hold Bank harmless from any judgment, loss, cost, expense, fee (including attorneys' fees), penalties, sanctions, and any other amounts that may be imposed or Bank may suffer of whatever type or nature as the result of such process.

### 22.   TITLES OF CONVENIENCE

The Section titles in this Agreement are included as a matter of convenience, for reference purposes only, and in no way define, limit, expand, or describe the scope or intent of any provision herein.

### 23.   ACCEPTANCE

This Agreement shall not become effective until accepted by all parties hereto, such acceptance to be evidenced solely by each party's execution of this Agreement.

### 24.   INTEGRATION

This Agreement is intended as the complete and exclusive statement of the Agreement among the parties hereto relating to the subject matter hereof, and supersedes all prior discussions, correspondence, negotiations, and agreements relating to the subject matter hereof.

### 25.   AUTHORITY

Provider and Purchaser hereby represent and warrant that the individuals signing on their respective behalves have the power and authority to enter into this Agreement and that this Agreement constitutes their valid and binding obligation.  If Provider or Purchaser is a partnership, Provider and Purchaser hereby represent and warrant that the signatures below are the authentic signatures of each and every one of their general partners.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SUNTRUST BANK

By: _Chas C. Klank_
Name: _Charles J. Klank_
Title: _EVP_

SUN CAPITAL HEALTHCARE, INC.

By: _[signature]_
Name: _Lawrence Leder_
Title: _Executive VP & CFO_

MICHAEL REESE MEDICAL CENTER CORPORATION

By: _Paul R Tuft_
Name: _Paul Tuft_
Title: _President_

Z:\FORMS\Michael Reese Lockbox Agrmt 2008.doc

11

# **EXHIBIT A-5**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement ("Agreement") is entered into between **Medical Provider Financial Corporation III**, ("Assignor"), and **Sun Capital HealthCare, Inc.** ("Assignee"), a Florida corporation located at 999 Yamato Road, Third Floor, Boca Raton, FL 33431.

WHEREAS, Assignor wants to assign to Assignee those certain contract listed on Exhibit "A", as well as all related contract and other rights (the "Contracts"); and

WHEREAS, Assignee wants to accept such assignment, as well as to assume all of the liabilities and obligations attendant to the Contracts and to exercise all available rights and remedies pursuant to the Contracts.

NOW, THEREFORE, for Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follow The foregoing recitals are part of this Agreement for all purposes.

2.      Assignor hereby assigns to Assignee all right, title, and interest Assignor has in the Contracts.

3.      Assignee hereby assumes all liabilities and obligations arising under and attendant to the Contracts.

4.      This Agreement shall be deemed effective upon Assignor's execution and shall be binding upon, and inure to the benefit of, Assignor and Assignee and their respective heirs, executors, administrators, successors, and assigns and may be assigned by Assignee, in whole or in part, without notice to Assignor.

5.      This Assignment shall be construed according to and governed by the laws of the State of Florida.

6.     This Assignment may be executed in one or more identical counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

7.     <u>Assignee's and Assignor's Representations and Warranties</u>.

Each of Assignee and Assignor hereby represent and warrant to each other that all necessary and appropriate action has been taken by each with respect to the execution and delivery of this Agreement and the performance by each of its obligations hereunder, that this Agreement has been duly authorized, executed, and delivered by Assignee and Assignor, and that this Agreement constitutes the valid and binding obligation of Assignee and Assignor in accordance with its terms, and the consummation of the transactions contemplated by this Agreement will not conflict with any applicable, federal, state or local law, rule, regulation, writ, decree, or order to which Assignee or Assignor is a party, and will not conflict with or violate any term, provision, covenant of any indenture, contract, agreement, instrument, or judgment applicable to Assignee or Assignor.

a.     <u>Entire Agreement</u>.     This Agreement and the exhibits and schedules referred to herein embody the entire agreement and understanding of the parties hereto with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements and understanding with respect thereto, including the Letter of Intent.

b.     <u>No Third Party Beneficiary</u>.     Subject to the terms of this Agreement, nothing herein, express or implied, is intended or shall be construed to confer upon or give to any person, firm, corporation, or other legal entity, other than then the parties hereto, any rights, remedies, or other benefits under or by reason of this Agreement.

2

    c.   <u>Captions</u>.   The section headings and other captions in this Agreement and the exhibits hereto are inserted for convenience only and shall not constitute a part of this Agreement in construing or interpreting any provision hereof.

    d.   <u>Attorneys' Fees</u>.   In the event of any litigation arising out of the transactions contemplated herein, the costs of litigation and reasonable attorneys' fees or paralegal's fees of the prevailing party (whether or not suit be brought, incurred at or before trial, on appeal, or in bankruptcy) shall be paid by the losing party.

    e.   <u>Survival</u>.   The representations and warranties of Assignor and Assignee shall survive the Closing for a period of three (3) years.

    8.   <u>Jury Trial Waiver.</u>  ASSIGNEE AND ASSIGNOR ACKNOWLEDGE THAT THE TRANSACTIONS AND MATTERS SET FORTH IN THIS AGREEMENT AND THE OTHER DOCUMENTS ARE COMPLEX IN NATURE AND THAT ANY LITIGATION ARISING THEREFROM WOULD BE MOST APPROPRIATELY, ECONOMICALLY, AND SPEEDILY RESOLVED BY A NON-JURY TRIAL. ASSIGNEE AND ASSIGNOR THEREFORE HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE THE RIGHT THAT THEY MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION, DIRECTLY OR INDIRECTLY, BASED ON OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY, OR IN ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER WRITTEN OR ORAL), OR ACTIONS OR OMISSIONS OF ANY PARTY TO THIS AGREEMENT.    THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE

PARTIES' ENTERING INTO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

9.    <u>Venue</u>.  The parties agree that all actions or proceedings arising in connection with this Agreement shall be tried and litigated only in the state and federal courts located in the County of Palm Beach, State of Florida.  Assignors and Assignee waives any right it may have to assert the doctrine of *forum non conveniens* or to object to such venue.

Sun Capital HealthCare, Inc.

By: _____
Print Name: _Howard B. Koslow_
Its: _President and COO_
Date: _3 - 6 - 08_


Medical Provider Financial Corporation III

By: _____
Name: _Joseph J. Lampariello_
Its: _President_
Date: _1/5/08_

4

## EXHIBIT "A"

1.      Assignment of Accounts agreement between Pacifica of the Valley Corporation and Medical Provider Financial Corporation III dated January 4, 2007.

2.      Security Agreement (Accounts) between Pacifica of the Valley Corporation and Medical Provider Financial Corporation III dated January 4, 2007.

3.      Guaranty Agreement (Accounts Purchase Agreement) (Michael Reese, Chicago, Illinois) between Paul Tuft and Medical Provider Financial Corporation III dated January 4, 2007.

4.      Accounts Receivable Purchase Agreement (Forest Park Hospital, St. Louis, Missouri) between Medical Provider Financial Corporation III, Medical Capital Corporation, and Forest Park Hospital Corporation #1 dated January 4, 2007.

5.      Accounts Receivable Purchase Agreement (Michael Reese, Chicago, Illinois) between Medical Provider Financial Corporation III, Medical Capital Corporation, and Michael Reese Medical Center Corporation dated January 4, 2007.

6.      Accounts Receivable Purchase Agreement (Pacifica Hospital, Sun Valley, California) between Medical Provider Financial Corporation III, Medical Capital Corporation, and Pacifica of the Valley Corporation dated January 4, 2007.

7.      Accounts Receivable Purchase Agreement (St. Alexius – Broadway and Jefferson Campus Hospitals, St. Louis, Missouri) between Medical Provider Financial Corporation III, Medical Capital Corporation, and St. Alexius Hospital Corporation #1 dated January 4, 2007.

8.      Accounts Receivable Purchase Agreement (Greater Southeast, Washington, D.C.) between Medical Provider Financial Corporation III, Medical Capital Corporation, and Greater Southeast Community Hospital Corporation I dated January 4, 2007.

# **EXHIBIT A-6**

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Diligenz                                          8008585294

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

DILIGENZ, INC.

6500 HARBOR HEIGHTS PARKWAY

SUITE 400

MUKILTEO WA 98275

**DELAWARE DEPARTMENT OF STATE**
**U.C.C. FILING SECTION**
**FILED 03:21 PM 03/07/2008**
**INITIAL FILING # 2007 0020163**
**AMENDMENT       # 2008 0823615**
**SRV: 080295339**

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 2007 0020163 | ☐ |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☑ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.  ☐ DELETE name: Give record name to be deleted in item 6a or 6b.  ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

6a. ORGANIZATION'S NAME

MEDICAL PROVIDER FINANCIAL CORPORATION IV

OR

| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

7a. ORGANIZATION'S NAME

SUN CAPITAL HEALTHCARE, INC.

OR

| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 999 YAMATO ROAD, STE. 300 | BOCA RATON | FL | 33431 | US |

| 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION |
|---|---|
| | |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☑ assigned.

**All collateral as assigned.**

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT

Medical Provider Financial Corporation IV

10. OPTIONAL FILER REFERENCE DATA

M. Reese Med.    [32772820]

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 02:10 PM 01/03/2007
INITIAL FILING # 2007 0020163

SRV: 070005314

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY
A. NAME & PHONE OF CONTACT AT FILER [optional]
Gary Sheppard (415) 781-7900
B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CT CORPORATION
Melissa Guglielmana
1350 Treat Blvd., Suite 100
Walnut Creek, CA 94597-2152
(800-874-8820)    682-1967-1

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Michael Reese Medical Center Corporation | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2929 South Ellis Avenue | Chicago | IL | 60616 | USA |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| 86-0927556 | | corporation | Delaware | DE 2914312 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Medical Provider Financial Corporation IV | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3770 Howard Hughes Parkway, Suite 301 | Las Vegas | NV | 89109 | USA |

4. This FINANCING STATEMENT covers the following collateral:

The types and items of property and interests in property covered hereby are described in Exhibit A
attached hereto and incorporated herein by this reference.

| 5. ALTERNATIVE DESIGNATION [if applicable] | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. | Attach Addendum | [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | All Debtors | Debtor 1 | Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA
Delaware 2994-125560 (Precautionary)

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)
NATUCCI - ®s®I C T System Online

EXHIBIT A
TO
UCC-1 FINANCING STATEMENT
Debtor: Michael Reese Medical Center Corporation
Secured Party: Medical Provider Financial Corporation IV

MICHAEL REESE MEDICAL CENTER CORPORATION, a Delaware corporation (the "Debtor"), hereby grants to MEDICAL PROVIDER FINANCIAL CORPORATION IV, a Nevada corporation ("Secured Party") a first priority continuing security interest in all of Debtor's right, title and interest in and to all of its property and assets, whether personal, tangible or intangible, and whether now owned or existing or hereafter arising or acquired, or in which it now has or at any time in the future may acquire any right, title or interest (collectively, the "Collateral"). The Collateral shall include all of the following property and interests in property wheresoever located:

"Accounts" including all "account(s)", as defined in the Nevada version of the Uniform Commercial Code (the "Code"), with respect to Debtor's right to any payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy of insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred, (v) for energy provided or to be provided, (vi) for the use or hire of a vessel under a charter or other contract, (vii) arising out of the use of a credit card or charge card or information contained on or for use with the card, and (viii) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state of governmental unit of a state. Accounts includes health care insurance receivables;

"Books and Records" of Debtor, including collectively all books, records, board minutes, contracts, licenses, insurance policies, maintenance and warranty records, environmental audits, business plans, files, ledgers, computer programs, computer files, computer discs and other data and Software (as defined below) storage and media devices, computer runs, accounting books and records, financial statements (actual and pro forma), filings with governmental authorities and any and all records and instruments relating to the Collateral or Debtor's business;

"Chattel Paper," "Instruments," and "Documents," including, collectively: (i) all chattel paper (including tangible chattel paper, intangible chattel paper and electronic chattel paper), rental contracts, and leases (collectively, "Chattel Paper"); (ii) all instruments and all payments thereunder, including all certificated securities and all promissory notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute Chattel Paper (collectively, "Instruments"); and (iii) all bills of sale, bills of lading, warehouse receipts and other documents of title, whether or not negotiable, including, without limitation, all other documents which purport to be issued by a bailee or agent and purport to cover goods in any bailee's or agent's possession which are either identified or are fungible portions of an identified mass, and all documents of title made available to the Secured Party for the purpose of ultimate sale or exchange of goods or for the purpose of loading, unloading, storing, shipping, transshipping, manufacturing, processing or otherwise dealing with goods in a manner preliminary to their sale or exchange (collectively, "Documents");

1 of 5

EXHIBIT A
TO
UCC-1 FINANCING STATEMENT
Debtor: Michael Reese Medical Center Corporation
Secured Party: Medical Provider Financial Corporation IV

"**Commercial Tort Claims**" including all commercial tort claims and all payments due or made to Debtor in connection therewith;

"**Deposit Accounts**" including, collectively, all deposit accounts (whether general or special), and all funds and amounts therein, whether or not restricted or designated for a particular purpose, but excluding the following: any lockbox deposit account of Debtor into which Debtor shall arrange to deposit only the proceeds of Accounts which contain or constitute or include payments from any federal or state healthcare programs or insurance program, including without limitation, arising under or in relation to a program known as "Medicare" and/or "Medicaid," or any successor, substitute or new program of similar nature and/or purpose, established, created, operated or maintained pursuant to Title 42 of the United States Code of Federal Regulations for healthcare and medical equipment and supplies property that have been or are to be sold, leased, licensed, assigned, or otherwise disposed of, and for healthcare and healthcare related services rendered or to be rendered;

"**Equipment**" including, collectively, all equipment as such term is defined in the Code, now owned or hereafter acquired by Debtor, wherever located, including any and all machinery, apparatus, equipment, fittings, furniture, fixtures, motor vehicles and other tangible personal property and all other goods (including Software embedded in such goods) (other than Inventory (as defined below)) of every kind and description that may be now or hereafter used in Debtor's operations or that are owned by Debtor or in which Debtor may have an interest, and all parts, accessories and accessions thereto and substitutions and replacements therefor;

"**General Intangibles**" including, collectively, all general intangibles as defined in the Code and other intangible property of any kind (other than Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Investment Property (as defined below) and Letter of Credit Rights (as defined below)), including, without limitation, (i) Payment Intangibles (as defined below), (ii) all uniform resource locators and the internet websites associated therewith; (iii) all rights to payment for loans, money or funds advanced or sold and other obligations receivable (other than Accounts); (iv) customer lists, credit files, correspondence, and advertising materials; (v) contracts and contract rights; (vi) all interests in partnerships, limited liability companies, joint ventures and other unincorporated Persons (as defined below) (other than the capital stock of any subsidiary); (vii) all tax refunds and tax refund claims; (viii) all right, title and interest under leases, subleases, licenses and concessions and other agreements relating to real or personal property (but excluding any interest in the underlying real property or personal property if such personal property constitutes equipment or fixtures); (ix) all payments due or made to Debtor in connection with any requisition, confiscation, condemnation, seizure or forfeiture of any property by any person or governmental authority; (x) all choses in action, causes of action or other claims (other than Commercial Tort Claims), and all payments due or made to Debtor in connection therewith; (xi) all credits with and other claims against carriers and shippers; (xii) all rights to indemnification; (xiii) all rights, priorities and privileges of Debtor relating to intellectual property, whether arising under United States, multinational or foreign laws or

SF/1375262v1 2994-125560

**EXHIBIT A**
**TO**
**UCC-1 FINANCING STATEMENT**
Debtor:  Michael Reese Medical Center Corporation
Secured Party: Medical Provider Financial Corporation IV

otherwise, including (1) all copyrights arising under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any foreign counterparts thereof; and the right to obtain all renewals thereof ("Copyrights"); (2) any written agreement naming Debtor as licensor or licensee granting any right under any Copyright, including the grant of any right to copy, publicly perform, create derivative works, manufacture, distribute, exploit or sell materials derived from any Copyright; (3) all letters patent of the United States, any other country or any political subdivision thereof and all reissues and extensions thereof, all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof and all rights to obtain any reissues or extensions of the foregoing ("Patents"), (4) all agreements, whether written or oral, providing for the grant by or to Debtor of any right to manufacture, use, import, sell or offer for sale any invention covered in whole or in part by a Patent, (5) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, brand names, labels, service marks, logos and other source or business identifiers, and, in each case, all goodwill associated therewith, all registrations and recordings thereof and all applications in connection therewith, in each case whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, all common-law rights related thereto, and the right to obtain all renewals thereof ("Trademarks"), (6) any agreement, whether written or oral, providing for the grant by or to Debtor of any right to use any Trademark (collectively, "Intellectual Property"), trade secrets, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom, advertising materials, slogans, and all goodwill associated with the foregoing; (xiv) all licenses and permits from any governmental authority; (xv) all license agreements and franchise agreements, (xvi) all reversionary interests in pension and profit sharing plans and reversionary, beneficial and residual interest in trusts; (xvii) all proceeds of insurance of which Debtor is beneficiary; and (xviii) all letters of credit, guaranties, liens, security interests and other supporting obligations held by or granted to Debtor;

"**Inventory**" including, collectively, all inventory as defined in the Code, including, without limitation, all goods, including Software embedded in such goods, wherever located, whether in the possession of Debtor or or of a bailee and whether consisting of whole goods, spare parts, components, supplies, materials, or returned or repossessed goods), which are held for sale or lease, which are to be furnished (or have been furnished) under any contract of service or which are raw materials, work in process, finished goods or materials used or consumed in Debtor's business;

"**Investment Property**" including, collectively, all of Debtor's investment property, as defined in the Code, other than the capital stock of any subsidiary;

3 of 5

EXHIBIT A
TO
UCC-1 FINANCING STATEMENT
Debtor:  Michael Reese Medical Center Corporation
Secured Party: Medical Provider Financial Corporation IV

"Letter of Credit Rights" including, collectively, all of Debtor's letters of credit and letter-of-credit rights, as defined in the Code, now owned or hereafter acquired, including rights to payment or performance under a letter of credit, whether or not such Person, as beneficiary, has demanded or is entitled to demand payment or performance;

"Payment Intangibles" including, collectively, all payment intangibles as such term is defined in the Code, now owned or hereafter acquired by any Person;

"Other Property" including, collectively, all money, cash and cash equivalents; all property or interests in property now owned or hereafter acquired by Debtor (but only to the extent not excluded from the Collateral elsewhere herein) which now may be owned or hereafter may come into the possession, custody or control of Debtor in any way and for any purpose (whether for safekeeping, deposit, custody, pledge, transmission, collection or otherwise); and all proceeds of loans;

"Proceeds" as such term is defined in the Code and, in any event, shall include, collectively: (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Debtor from time to time with respect to any Collateral; (ii) any and all payments (in any form whatsoever) made or due and payable to Debtor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of any Collateral by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority); (iii) any claim of Debtor against third parties (a) for past, present or future infringement of any Intellectual Property or (b) for past, present or future infringement or dilution of any Trademark or Trademark license or for injury to the goodwill associated with any Trademark, Trademark registration or Trademark licensed under any Trademark license; (iv) any recoveries by Debtor against third parties with respect to any litigation or dispute concerning any Collateral, including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, Collateral; (v) all amounts collected on, or distributed on account of, other Collateral, including dividends, interest, distributions and Instruments with respect to Investment Property and pledged equity interests; and (vi) any and all other amounts , rights to payment or other property acquired upon the sale, lease, license, exchange or other disposition of Collateral and all rights arising out of Collateral;

"Software" as such term is defined in the Code, now owned or hereafter acquired by any Person, including, collectively, all computer programs and all supporting information provided in connection with a transaction related to any program; and

"Supporting Obligations" including all of Debtor's presently existing and hereafter acquired supporting obligations, as defined in the Code;

together, for each component of the Collateral, with all Proceeds thereof, including without limitation accessions and additions thereto, substitutions therefore, and replacements, products thereof and any other property receivable or received from or upon the sale, lease, license, collection,

4 of 5

EXHIBIT A
TO
UCC-1 FINANCING STATEMENT
Debtor:  Michael Reese Medical Center Corporation
Secured Party: Medical Provider Financial Corporation IV

use, exchange or other disposition, whether voluntary or involuntary, of any of the foregoing, including "proceeds" as defined in the Code, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to or for the account of Debtor from time to time with respect to any of the of the foregoing, any and all payments (in any form whatsoever) made or due and payable to Debtor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental authority (or any Person acting under color of governmental authority), any and all other amounts from time to time paid or payable under or in connection with any of the foregoing or for or on account of any damage or injury to or conversion of any of the foregoing by any Person, any and all tangible or intangible property received upon the sale or disposition of the foregoing and all proceeds of proceeds.

As used herein, the term "Persons" means any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, entity or government (whether Federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof), and shall include such Person's successors and assigns.

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Diligenz                                    8009505294

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

DILIGENZ, INC.

6500 HARBOR HEIGHTS PARKWAY

SUITE 400

MUKILTEO WA 98275

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 03:21 PM 03/07/2008
INITIAL FILING # 2007 0020213
AMENDMENT        # 2008 0823623
SRV: 080295340

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 2007 0020213 | |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☒ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

6a. ORGANIZATION'S NAME
MEDICAL PROVIDER FINANCIAL CORPORATION IV

OR

| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

7a. ORGANIZATION'S NAME
SUN CAPITAL HEALTHCARE, INC.

OR

| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 999 YAMATO ROAD, STE. 300 | BOCA RATON | FL | 33431 | US |

| 7d. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION |
|---|---|
| | |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☒ assigned.

**All collateral as assigned.**

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT
Medical Provider Financial Corporation IV

10. OPTIONAL FILER REFERENCE DATA
M. Reese Med.   [32772862]

**UCC FINANCING STATEMENT**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Gary Sheppard (415) 781-7900

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CT CORPORATION
Melissa Guglielmana
1350 Treat Blvd., Suite 100
Walnut Creek, CA 94597-2152
(800-874-8820)

9L          68J967-M

DELAWARE  DEPARTMENT OF STATE
U.C.C.  FILING SECTION
FILED 02:10 PM 01/03/2007
INITIAL FILING # 2007 0020213

SRV: 070005331

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

1a. ORGANIZATION'S NAME
Michael Reese Medical Center Corporation

OR | 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2929 South Ellis Avenue | Chicago | IL | 60616 | USA |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| 36-0927556 | | corporation | Delaware | DE 2914312 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (2a or 2b) - do not abbreviate or combine names

2a. ORGANIZATION'S NAME

OR | 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - Insert only one secured party name (3a or 3b)

3a. ORGANIZATION'S NAME
Medical Provider Financial Corporation IV

OR | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3770 Howard Hughes Parkway, Suite 301 | Las Vegas | NV | 89109 | USA |

4. This FINANCING STATEMENT covers the following collateral:

The types and items of property and interests in property covered hereby are described in Exhibit A attached hereto and incorporated herein by this reference.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |

6. OPTIONAL FILER REFERENCE DATA
Delaware 2994-125560 (Accounts)

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)
NATUCC1 - M99 C T System Online

EXHIBIT A
TO
UCC-1 FINANCING STATEMENT
Debtor:  Michael Reese Medical Center Corporation
Secured Party: Medical Provider Financial Corporation IV

MICHAEL REESE MEDICAL CENTER CORPORATION, a Delaware corporation (the "Debtor"), hereby grants to MEDICAL PROVIDER FINANCIAL CORPORATION IV, a Nevada corporation ("Secured Party") a first priority continuing security interest in all of Debtor's right, title and interest in and to each of its deposit accounts (whether or not subject to a lockbox arrangement) including all rights to any and all funds and balances therein (including all provisional credits) including, but not limited to, all interest derived therefrom, and any Investment Property within the meaning of the Uniform Commercial Code (the "UCC") in which such accounts may be invested, reinvested, converted into, and any other personal property rights and interests represented by all of Debtor's ownership of such accounts, and in the checks and the right to issue payment instructions with respect to all such deposit accounts (the "Deposit Accounts").

The Deposit Accounts shall not include any lockbox deposit account of Debtor into which Debtor shall arrange to deposit only the proceeds of Accounts (as defined below) which contain or constitute or include direct payments from any federal or state healthcare programs or insurance program, including without limitation, arising under or in relation to a program known as "Medicare" and/or "Medicaid," or any successor, substitute or new program of similar nature and/or purpose, established, created, operated or maintained pursuant to Title 42 of the United States Code of Federal Regulations for healthcare and medical equipment and supplies property that have been or are to be sold, leased, licensed, assigned, or otherwise disposed of, and for healthcare and healthcare related services rendered or to be rendered.

As used herein, the term "Accounts" shall have the meaning as ascribed to such term in the UCC, and the Deposit Accounts are "deposit accounts" as defined in the UCC.

1 of 1

BF/1375264v1 2994-125560