UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MICHAEL REESE MEDICAL | ) | |
| CENTER CORPORATION, | ) | Case No. 08 B 25811 |
| | ) | |
| Debtor. | ) | Hon. John H. Squires |
| | ) | |

### FINAL ORDER:  (1) APPROVING POST-PETITION FACTORING AGREEMENT; (2) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE TREATMENT; (3) APPROVING SUN CAPITAL HEALTHCARE, INC.'S FEES AND COSTS

The *Motion Of Debtor For Interim And Final Orders: (1) Approving Post-Petition Factoring Agreement; (2) Granting Security Interests And Superpriority Administrative Expense Treatment; (3) Approving Sun Capital Healthcare, Inc.'s Fees and Costs; And (4) Setting Final Hearing* dated October 3, 2008 (the "Factoring Motion"), filed by Michael Reese Medical Center Corporation, the debtor and debtor-in-possession in the above-captioned Chapter 11 case (the "Debtor"), came on for a final hearing before the undersigned United States Bankruptcy Judge on October 30, 2008 (the "Final Hearing")

Having considered the Factoring Motion, any opposition to the Factoring Motion, all evidence and papers presented before or at the Final Hearing, and all argument at the Final Hearing,

THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.  Petition.

1.       On September 28, 2008 (the "Petition Date"), the Debtor filed a voluntary petition (the "Petition") for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

- 1 -

**B.**    **Jurisdiction.**

2.    This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. The Factoring Motion is a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (D), (G), (K), (M) and (N).

**C.**    **Interim Order And Notice Of Final Hearing.**

3.    On October 8, 2008, the Court granted the Factoring Motion on an interim basis by entering the *Interim Order: (1) Approving Post-Petition Factoring Agreement; (2) Granting Security Interests And Superpriority Administrative Expense Treatment; (3) Approving Sun Capital Healthcare, Inc.'s Fees And Costs; And (4) Setting Final Hearing* (the "Interim Order").

4.    Notice of the Final Hearing on the Factoring Motion was served on October 10, 2008, by providing a copy of the Interim Order by first-class mail on (a) counsel for the Official Committee of Unsecured Creditors (the "Committee"), (b) all allegedly secured creditors of the Debtor, (c) the holders of the twenty largest unsecured claims against the Debtor, (d) the Office of the United States Trustee, and (e) all other parties requesting notice under Bankruptcy Rule 2002.

5.    Based on the foregoing, the notice given relative to the Final Hearing and the relief requested in the Factoring Motion on a final basis is adequate and sufficient and in accordance with all applicable law.

**D.**    **Pre-Petition Obligations.**

6.    As of the Petition Date, Debtor was indebted to Sun Capital in the aggregate sum of not less than approximately $10,325,736.13, plus attorneys' fees and costs, under that certain Master Purchase and Sale Agreement, dated as of March 6, 2008 (the "Factoring Agreement"). Sun Capital asserts that Debtor's obligations under the Factoring Agreement as of the Petition Date ("Pre-Petition Obligations") are secured by valid, enforceable, and perfected liens ("Pre-Petition Liens") in the following assets of the Debtor, as more fully described in the Factoring Agreement:   all accounts and rights to payment, chattel paper, documents, instruments, letter of

- 2 -

credit rights, supporting obligations, deposit accounts, general intangibles, and the proceeds, products and offspring thereof, including cash (the "Pre-Petition Collateral"). As of the Petition Date, Debtor believes the value of the Pre-Petition Collateral exceeded the outstanding Pre-Petition Obligations. The Factoring Agreement and the related agreements, instruments and documents that accomplish, effectuate, implement and/or evidence the pre-petition factoring are collectively referred to herein as the "Pre-Petition Factoring Documents." Copies of the principal Pre-Petition Factoring Documents were filed with the Court in support of the Factoring Motion. Each of the allegations, assertions, findings or conclusions of law contained in this Paragraph are subject to Section 3 of this Final Order.

**E.     Need For Post-Petition Factoring.**

7.     The Debtor is in need of a post-petition factoring facility in order to increase its liquidity. Without such a facility, the Debtor does not have sufficient cash flow to enable it to pay for such critical expenses as payroll, supplies and taxes.

8.     The Debtor has an immediate need for factoring to minimize the disruption of its business and daily operations, manage and preserve the assets of its bankruptcy estate, provide patient care to existing and future patients and increase the likelihood of a successful reorganization or liquidation. In this regard, it is essential, in order to enable the Debtor to meet the day-to-day cash requirements for its post-petition business, that the Debtor be able to factor its pre-petition and post-petition accounts receivable and rights to payment.

9.     Without the sale of these accounts receivable and rights to payment on an ongoing basis, the Debtor would not have an adequate source of funds with which to fund payroll and conduct ongoing operations. Thus, the factoring facility contemplated in the Factoring Motion and approved by this Final Order ("Post-Petition Factoring") is necessary, essential, and appropriate to prevent immediate and irreparable harm to the Debtor, its estate, creditors, employees, and patients.

**F.     Post-Petition Factoring Facility.**

- 3 -

10.     The Debtor wishes to factor its accounts receivable and rights to payment with Sun Capital on the terms and conditions set forth in this Final Order, the Factoring Agreement, as amended by the Post-Petition Chapter 11 Bankruptcy Rider to Sun Capital Healthcare, Inc.'s Master Purchase and Sale Agreement (the "Post-Petition Factoring Amendment"), and all other agreements, instruments, documents and notes as Sun Capital may reasonably deem appropriate to accomplish, effectuate, implement and/or evidence the Post-Petition Factoring, as the same now exist or may hereafter be amended, modified, supplemented, ratified, assumed, extended, renewed, restated, or replaced (collectively with the Pre-Petition Factoring Documents, the "Factoring Documents"). A copy of the Post-Petition Factoring Amendment is attached hereto as Exhibit A and incorporated herein by this reference.

11.     Pursuant to the Factoring Documents and this Final Order, the Debtor will (a) sell to Sun Capital certain of its pre-petition and post-petition accounts receivable and rights to payment, and (b) in order to secure its obligations to Sun Capital under the Factoring Documents, grant to Sun Capital a superpriority lien on all of the Debtor's inventory, equipment, accounts and rights to payment, chattel paper, documents, instruments, letter of credit rights, supporting obligations, deposit accounts, general intangibles, and the proceeds, products and offspring thereof, including cash, subject only to any valid, perfected, and unavoidable security interests or liens existing as of the Petition Date and identified as Permitted Liens in the Post-Petition Factoring Amendment and the Carve-Out Expenses.

G.      **No Credit Available On Other Terms.**

12.     The Debtor is unable to procure other financing, in sufficient amounts and on a timely enough basis, whether in the form of (a) unsecured credit allowable under § 503(b)(1) of the Bankruptcy Code as an administrative expense, or (b) in exchange for the grant of an administrative expense superpriority pursuant to § 364(c)(1) of the Bankruptcy Code.

13.     The type of specialized working capital required by the Debtor can only be obtained by providing Sun Capital with a first-priority lien in certain of the Debtor's assets,

- 4 -

including accounts, general intangibles, inventory, equipment, documents and instruments as provided in this Final Order. The Debtor would not be able to obtain timely financing or other funding from any other source in an amount sufficient to provide for the Debtor's current and anticipated needs without granting a first-priority lien on such assets.

14.　　Sun Capital is unwilling to purchase the Debtor's accounts receivable and rights to payment pursuant to the terms of the Factoring Documents without being afforded the protections provided by §§ 364(c)(1)-(2) and § 364(d) of the Bankruptcy Code, and the entry of this Final Order.

**H.**　　**Good Cause For Entry Of Order.**

15.　　Good and adequate cause has been shown for the post-petition factoring facility pursuant to the Factoring Documents and the entry of this Final Order approving the Factoring Motion. Entry of this Final Order is in the best interests of the Debtor, its creditors, and its estate since it will (a) minimize the disruption to the Debtor's business and on-going operations, (b) increase the probability that the Debtor will achieve a successful reorganization or liquidation, (c) preserve the Debtor's assets, goodwill, and reputation, (d) preserve the value of the Debtor's accounts receivable and rights to payment, (e) avoid immediate and irreparable harm to the Debtor, its creditors, assets, business, goodwill, reputation and employees, and (f) prejudice no party in any demonstrable way, or in any way at all that is not clearly outweighed by significant benefits to the Debtor's estate, creditors, and parties in interest.

**I.**　　**Good Faith True Sale And Fair Terms.**

16.　　The terms and conditions of the Post-Petition Factoring pursuant to the Factoring Documents and this Final Order are fair, just, and reasonable under the circumstances and reflect the exercise of the Debtor's prudent business judgment, consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The transfer of title from Debtor to Sun Capital of a Purchased Account (as defined in the Factoring Agreement) is a true sale and is not subject to recharacterization, and Sun Capital owns all Purchased Accounts free

- 5 -

and clear of all liens, claims, encumbrances and interests (other than the liens and security interests of Sun Capital). The foregoing sentence is subject to Section 3 of this Final Order.

17.     This Final Order and the Factoring Documents have been negotiated in good faith and at arms-length by and between the parties, with all parties represented by counsel. Accordingly, any factoring provided by Sun Capital pursuant to this Final Order shall be deemed to have been extended or provided in good faith under §§ 364(e) and 363(m) of the Bankruptcy Code.

Based on the foregoing findings of fact and conclusions of law, after due consideration, and good cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

**Section 1: Authorization And Conditions To Factoring.**

1.1     **Motion Granted.**  The Factoring Motion is granted on a final basis in accordance with the terms of this Final Order.

1.2     **Authorization To Factor.**  The Debtor is authorized to enter into and perform under the Factoring Agreement as amended by the Post-Petition Factoring Amendment, including (a) the purchase by Sun Capital of pre-petition and post-petition accounts receivable and rights to payment (the "Ownership Interests") and (b) the borrowing and incurring of secured indebtedness to Sun Capital as provided under the terms of the Factoring Agreement as amended by the Post-Petition Factoring Amendment.  The purchases, advances, and all other indebtedness and obligations incurred by the Debtor to Sun Capital, of every nature and however arising, absolute or contingent, direct or indirect, including, without limitation, (x) any obligations due to misconduct or breach of duty by the Debtor under the Factoring Documents including, without limitation any misdirected payments, and (y) all regular and default discount fees, interest, charges, costs, and expenses ("Fees And Costs"), are hereinafter referred to as the "Obligations."

1.3     **Authorization And Approval Of Factoring Documents.**  The Debtor is authorized, empowered, and directed to enter into, execute, deliver and perform the Factoring

- 6 -

Documents, and each and every term contained therein, and all Obligations incurred thereunder, including without limitation all Fees And Costs (which Fees And Costs are subject to review, objection and determination by the Court in the event of a dispute), are approved. Subject to Section 3 of this Final Order, the executed Factoring Documents shall constitute valid and binding obligations of the Debtor enforceable against the Debtor. The Debtor is authorized and directed to perform and comply with all acts that may required under the terms, intent, and purpose of the Factoring Documents.

**1.4    Authorization To Use Cash Collateral.** The Debtor is authorized under § 363(c)(2) of the Bankruptcy Code to use cash collateral as provided, permitted, or required under the Factoring Documents.

**1.5    Payments To Sun Capital And Application Of Payments.** The Debtor is authorized to and shall make all payments and transfers of property to Sun Capital or for the benefit of Sun Capital as provided, permitted, or required under the Factoring Documents. Subject to Section 3 of this Final Order, those payments and transfers shall not be subject to avoidance under Bankruptcy Code § 549.

**1.6    Continuation Of Pre-Petition Collection Procedures And Lockboxes.** The Debtor's cash management system, as set forth in and approved by this Court in that certain (a) Order Authorizing the Maintenance of Existing Bank Accounts, Continued Use of Existing Business Forms, and Continued Use of Existing Cash Management System dated October 7, 2008, and (b) Stipulation and Agreed Order Resolving the Motion of the Committee to Require the Debtor to Segregate Cash dated October 28, 2008 (collectively, the "Cash Management Orders"), including all pre-petition payment practices and procedures for the collection of accounts receivable and rights to payment of the Debtor, turnover of cash, and delivery of property to Sun Capital, including without limitation, the lockboxes and lockbox accounts established at Sun Trust Bank pursuant to the "Wholesale Lockbox Deposit And Blocked Account Service Agreement With Provider" dated as of March 27, 2008 (the "Lockbox

- 7 -

Agreement"), a copy of which is attached to the Post-Petition Factoring Amendment, or such other collection accounts as may be approved by Sun Capital, shall continue subject to the Cash Management Orders, without interruption or break in continuity, with the same rights Sun Capital possesses or possessed prior to the Petition Date, and the Debtor is authorized to continue to perform under the Lockbox Agreement.

## Section 2:  Ownership Interests And Liens.

**2.1**    **Ownership Interests.**  Pursuant to § 363 of the Bankruptcy Code, the sale of the Debtor's pre-petition and post-petition accounts receivable and rights to payment pursuant to the Post-Petition Factoring shall be a true sale free and clear of all liens, claims, encumbrances and interests, other than the liens and security interests of Sun Capital and is approved on a final basis.

**2.2**    **Post-Petition Liens.**  As security for the Debtor's payment and performance of the Obligations incurred post-petition (the "Post-Petition Obligations") pursuant to §§ 364(c)(2) and 364(d) of the Bankruptcy Code, Sun Capital is hereby granted first-priority liens ("Post-Petition Liens") on all of the following assets, as more fully described in the Post-Petition Factoring Amendment, in which either the Debtor or its estate has an interest:   accounts receivable (whether offered for purchase or not), chattel paper, documents, instruments, letter of credit rights, supporting obligations, deposit accounts, general intangibles, inventory and equipment arising or existing as of or after the Petition Date, and all of the cash and non-cash proceeds, products, and offspring of the foregoing, subject only to Permitted Liens and the Carve-Out Expenses (as defined below); provided, however, that Sun Capital shall not be granted any lien on causes of action of the Debtor under chapter 5 of the Bankruptcy Code, except for causes of action under § 549 of the Bankruptcy Code to the extent that the transfer or transfers avoided under § 549 were made from cash or other assets or property of the Debtor subject to liens of Sun Capital granted by or recognized in this Final Order. All Chapter 5 causes of action, with the exception of the 549 actions referenced in the foregoing clause shall be

- 8 -

referred to as the "Excluded Avoidance Actions". Sun Capital and holders of Permitted Liens are collectively referred to as "Secured Parties." All assets subject to the Post-Petition Liens are collectively referred to herein as the "Post-Petition Collateral," and together with the Pre-Petition Collateral, as the "Collateral".

**2.3      Adequate Protection and Replacement Liens.**   As adequate protection of Sun Capital's interest in the Pre-Petition Collateral pursuant to § 361 of the Bankruptcy Code, in addition to the liens and security interests of Sun Capital pursuant to § 552(b) of the Bankruptcy Code, and with the exception of the proceeds of the Excluded Avoidance Actions, Sun Capital is hereby granted first-priority liens in the Post-Petition Collateral to the extent of any diminution in value of the Pre-Petition Collateral after the Petition Date including, without limitation, any diminution in value resulting from (a) the Debtor's cessation of business operations, or (b) use of the Pre-Petition Collateral after the Petition Date, subject only to Permitted Liens and the Carve-Out Expenses (the "Adequate Protection Liens").

**2.4      Validity And Perfection Of Post-Petition Liens.**   The Post-Petition Liens and the Adequate Protection Liens shall be valid, enforceable, attached, and perfected as of the Petition Date (and time) without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording or possession of the Collateral or other act ("Perfection Act"). Notwithstanding the foregoing, if Sun Capital shall, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, Sun Capital is authorized to perform such act which shall be deemed to have been accomplished as of the Petition Date (and time), notwithstanding the date and time actually accomplished. In lieu of or in addition to a Perfection Act, Sun Capital may file or record a certified copy of this Final Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act. Should Sun Capital so choose and attempt to file, record, or effectuate a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, or perfection of the Post-Petition Liens.

- 9 -

**2.5**   **Seniority Of Post-Petition Liens.**   The Post-Petition Liens and the Adequate Protection Liens shall be senior to, and shall not be subordinated or made equal to any lien, security interest, mortgage, or any other interest in favor of any party other than Secured Parties (according to their respective priorities) by any order of the Court or otherwise, including without limitation liens or interests (a) avoided and preserved for the benefit of the Debtor's estate under § 551 of the Bankruptcy Code; (b) authorized in connection with the use of cash collateral under § 363 of the Bankruptcy Code; (c) granted in connection with the obtaining of credit or incurring of indebtedness under § 364 of the Bankruptcy Code; (d) recognized as senior under § 510 of the Bankruptcy Code; or (e) provided pursuant to an order confirming a plan of reorganization; unless (x) Sun Capital shall have given its express prior written consent, which shall not be implied from any other action, inaction, or acquiescence by Sun Capital, or (y) the order providing for such lien, interest, or subordination is conditioned upon prior payment and satisfaction in full of the Obligations.

**2.6**   **Carve-Out Expenses.**   The following fees and expenses are hereinafter referred to as "Carve-Out Expenses": (a) statutory fees required to be paid to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6); (b) allowed fees and expenses of counsel for the Debtor (whose employment is approved by order of the Court) in an aggregate amount not exceeding the sum of $375,000.00 through December 31, 2008, regardless of whether such fees and expenses are allowed pursuant to order of this Court prior to or subsequent to December 31, 2008 (which amount is inclusive of any amounts remaining in the retainer received by counsel for the Debtor prior to the Petition Date); (c) allowed fees and expenses of professionals for the Committee (whose employment is approved by order of the Court) in an aggregate amount not exceeding the sum of $150,000.00 through December 31, 2008, regardless of whether such fees and expenses are allowed pursuant to order of this Court prior to or subsequent to December 31, 2008; and (d) any actual and necessary expenses incurred by members of the Committee (as approved by order of the Court). The Carve-Out Expenses shall be senior in priority to the Pre-Petition Liens, the

- 10 -

Post-Petition Liens, the Adequate Protection Liens, and Sun Capital's superpriority or other administrative expense claims.

**2.7**    **Superpriority Administrative Expense.**    All Post-Petition Obligations shall have the superpriority in payment afforded by § 364(c)(1) of the Bankruptcy Code, subject only to the Carve-Out Expenses; provided, however, that Sun Capital shall not be entitled to proceeds of any Excluded Avoidance Actions to pay its superpriority or other administrative expense claims.

**Section 3: Pre-Petition Obligations And Liens.**

**3.1**    **Objections To Pre-Petition Obligations.**    Any claim or defense objecting to or contesting the allowance of the Pre-Petition Obligations, or seeking any setoff, recoupment, counterclaim, deduction, or claim of any kind against the Pre-Petition Obligations, including without limitation any Pre-Petition Obligation arising from or relating to any discount or interest rate in the Pre-Petition Factoring Documents ("Pre-Petition Obligation Objection") by the Committee shall be filed with the Court no later than the seventy-fifth (75th) day after the first date of appointment of the Committee in this bankruptcy case, which objection deadline may be extended only with the prior written consent of Sun Capital or by order of this Court for good cause shown.    If Pre-Petition Obligation Objections are not timely filed or are timely filed but denied, the Pre-Petition Obligations shall be deemed allowed in full and not subject to any setoff, recoupment, counterclaim, deduction, or claim of any kind, and the Pre-Petition Obligations shall continue to accrue discount fees and other charges as provided in the Factoring Agreement.

**3.2**    **Objections To Pre-Petition Liens Or Ownership Interests.**    Any claim or defense objecting to or contesting the validity, perfection, or enforceability of the ownership or title of Sun Capital in the Purchased Accounts (as defined in the Factoring Agreement) or of the Pre-Petition Liens or ownership interests ("Pre-Petition Lien or Ownership Objection") by the Committee shall be filed with the Court no later than the seventy-fifth (75th) day after the first date of appointment of the Committee, which objection deadline may be extended only with the

- 11 -

prior written consent of Sun Capital or by order of this Court for good cause shown. If Pre-Petition Lien or Ownership Objections are not timely filed or are timely filed but denied, the Pre-Petition Liens and Ownership Interests shall be deemed valid, perfected, enforceable, and unavoidable for all purposes.

**3.3** **Causes Of Action Against Sun Capital.** Any claim or cause of action that could be asserted against Sun Capital or any of its officers, directors, employees, agents, attorneys, accountants, affiliates, successors or assigns by the Debtor or the Committee, on behalf of the Debtor's estate, whether under chapter 5 of the Bankruptcy Code or otherwise (a "Sun Cause of Action"), must be filed no later than the seventy-fifth (75th) day after the first date of appointment of the Committee, subject to extension by agreement or Bankruptcy Court order for good cause shown. If no Sun Cause of Action is timely filed or is timely filed but denied or dismissed, the Debtor's estate and the Committee shall be deemed to have forever released all Sun Causes of Action pursuant to Section 5.3 of this Final Order.

**3.4** **Standing.** By this Final Order, the Committee shall be granted standing to pursue any and all objections, claims, defenses, causes of action or other matters described in Section 3 without further notice or court order.

**3.5** **Limitation.** Notwithstanding anything to the contrary set forth in this Final Order, the rights of Sun Capital with respect to the Post-Petition Factoring, including without limitation, the post-petition Ownership Interests, Post-Petition Liens, the Adequate Protection Liens, and the superpriority administrative expenses granted to Sun Capital by this Final Order, shall not be subject to any of the objections, claims or causes of action described in this Section 3.

**Section 4: Default; Rights And Remedies; Relief From Stay.**

**4.1** **Events Of Default.** An event of default under the Post-Petition Factoring ("Event of Default") shall include any of the following:

      (a)    The Occurrence of a Termination Event under the Factoring Agreement as

- 12 -

amended by the Post-Petition Factoring Amendment;

(b)    Debtor's failure to perform or satisfy any of the terms, conditions, or covenants of this Final Order;

(c)    Debtor's filing, support, or confirmation of a Chapter 11 plan of reorganization or liquidation in this bankruptcy case that does not provide for the prior payment and satisfaction in full of the Obligations on or before the "effective date" of the plan, unless otherwise agreed to in writing by Sun Capital.

(d)    The termination of the Post-Petition Factoring by its own terms or operation of law;

(e)    The foreclosure, liquidation, levy, or similar act by any party with respect to any material portion of the Collateral;

(f)    The dismissal of the Debtor's chapter 11 case;

(g)    The appointment of a trustee under § 1104 of the Bankruptcy Code in the Debtor's chapter 11 case;

(h)    The conversion of the Debtor's chapter 11 case to a case under another chapter of the Bankruptcy Code;

(i)    The stay, modification, amendment, vacating, or reversal of any term of this Final Order or the Factoring Documents, or any of the rights and acknowledgments conferred thereunder, without the express prior written consent of Sun Capital; and

(j)    The commencement by the Debtor of any lawsuit or adversary proceeding against Sun Capital, or the filing of any other pleading by the Debtor, seeking to object to, contest or avoid the Obligations.

**4.2**    **Rights And Remedies Upon Event Of Default.**  Upon the occurrence of an Event of Default, Sun Capital shall provide Debtor, counsel for Debtor and Committee counsel with a notice of such Event of Default via telephone and fax ("Default Notice"). If the Event of Default is not cured within five (5) business' days after the giving of the Default Notice, then all

- 13 -

of the following shall occur: (a) all Obligations shall be immediately due and payable; (b) Sun Capital shall be under no obligation to purchase accounts, to advance money or extend credit to or for the benefit of Debtor; (c) the Post-Petition Factoring shall be terminated, which termination shall have no effect on the Post-Petition Liens, the Adequate Protection Liens, the Ownership Interests or the Obligations; and (d) Debtor shall not have any use of any cash collateral without further order of the Court.   With respect to an Event of Default that is not cured within five (5) business' days after the giving of the Default Notice, and after an additional five (5) business' days notice to the Debtor, Sun Capital may, in addition to the other rights and remedies of Sun Capital recognized in this Section 4.2: (x) take any and all acts to enforce its rights and remedies with respect to the Collateral; and/or (y) take any other action or exercise any or all rights and remedies available under this Final Order, the Factoring Documents, or applicable law.

    **4.3**    **Relief From Stay And Injunction.**  Subject to the conditions set forth in Section 4.2 of this Final Order, without further notice, motion, application, hearing, or order, all stays and injunctions, including without limitation the automatic stay of § 362 of the Bankruptcy Code, existing now or arising at any time in the future, are hereby lifted in favor of Sun Capital to permit Sun Capital: (a) to implement the Post-Petition Factoring pursuant to the terms of this Final Order and the Factoring Documents; (b) to create, validate, evidence, attach, or perfect the Post-Petition Liens and the Adequate Protection Liens; and (c) to assess, charge, collect, and receive payments and Fees And Costs, and apply such payments to the Obligations pursuant to the terms of the Factoring Documents and this Final Order.

    Notwithstanding the foregoing, upon an Event of Default, Sun Capital shall be entitled to a hearing on an expedited basis after five (5) business days' notice to the Debtor and counsel for the Debtor and Committee counsel, subject to the Court's calendar and availability, regarding immediate relief from the automatic stay of Bankruptcy Code § 362(a) in favor of Sun Capital to exercise any of its rights and remedies under the Factoring Documents, this Final

- 14 -

Order, or applicable law, including without limitation actions with respect to the Collateral including cash collateral.

**4.4** **No Modification Or Stay Of This Order.** Unless expressly consented to in writing by Sun Capital, (a) this Final Order, (b) the Factoring Documents, (c) the rights and remedies of Sun Capital under the Factoring Documents and this Final Order, (d) the Obligations, (e) the Post-Petition Liens, (f) the Adequate Protection Liens, and (g) the Ownership Interests shall not be subject to any stay, modification, alternation, amendment, vacating, or reversal in any respect whatsoever by any order of this Court. Notwithstanding any stay, modification, alteration, amendment, vacation, or reversal of this Final Order, the Factoring Documents, or any term thereunder, or the dismissal or conversion of this chapter 11 case ("Subject Event"), the acts taken by Sun Capital in accordance with this Final Order; and the Obligations incurred or arising prior to Sun Capital's receipt of written notice of such Subject Event, shall be governed in all respects by the original provisions of this Final Order, and the acts taken by Sun Capital in accordance with this Final Order, and the Post-Petition Liens, the Adequate Protection Liens, Ownership Interests, and other rights and remedies in favor of Sun Capital pursuant to this Final Order and the Factoring Documents, shall remain valid and in full force and effect, pursuant to §§ 364(e) and 363(m) of the Bankruptcy Code. For purposes of §§ 364(e) and 363(m), the term "appeal" shall include any proceeding for reconsideration, rehearing, or re-evaluation of this Final Order by this Court or any other tribunal.

**4.5** **Power To Waive Rights-Duties To Third Parties.** Sun Capital shall have the right to waive any of the terms, rights, and remedies provided in this Final Order or the Factoring Documents ("Sun Capital Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement of, or failure to exercise or enforce, any Sun Capital Rights. Any waiver by Sun Capital of any Sun Capital Rights shall not be or constitute a continuing waiver. Sun Capital's delay in or failure of exercising or enforcing any Sun Capital Rights shall neither constitute a waiver of such Sun Capital Rights, subject Sun Capital to any

- 15 -

liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert as a defense to any Obligations.

**4.6     Reservation Of Rights.**  Subject to the terms of this Final Order, this Final Order is without prejudice to the rights of Sun Capital to pursue any and all rights and remedies under the Bankruptcy Code, the Factoring Agreement as amended by the Post-Petition Factoring Amendment, the Factoring Documents, and any other applicable agreement or law, including without limitation rights to additional adequate protection, to seek relief from the automatic stay, to seek an injunction, to object to applications for allowance and/or payment of compensation of professionals employed by the Debtor or its estate or under the Bankruptcy Code, to object to any employee or management retention program, and to object to any sale of assets or plan of reorganization.

**4.7     Right To Factor On Other Terms.**  Sun Capital has not waived the right to provide factoring and related services to the Debtor on any other, different, or additional terms than in this Final Order.

**Section 5:  Representations And Covenants.**

**5.1     Limitation Of Use Of Proceeds.**  Notwithstanding any other provision of this Final Order, neither the factoring under the Factoring Documents nor the Collateral, including without limitation, cash collateral, shall be used either:  (a) in connection with the assertion, commencement, or continuation of any action or claim against Sun Capital or its officers, directors, employees, agents, attorneys, accountants, affiliates, successors or assigns, or (b) to object to or contest, or raise any defenses to the validity, perfection, priority, or enforceability of the Pre-Petition Obligations, the Post-Petition Obligations, the Pre-Petition Liens, the Post-Petition Liens, the Adequate Protection Liens or the Ownership Interests; provided, however, that no more than $25,000 in the aggregate may be used by the Committee to investigate the validity, priority and amount of the Pre-Petition Obligations, the Pre-Petition Liens and the Pre-Petition Ownership Interests.

- 16 -

**5.2** **Debtor's Acknowledgment.** Subject to Section 3 of this Final Order, this Final Order approves the Debtor's acknowledgment and agreement that the Factoring Agreement, as amended by the Post-Petition Factoring Amendment, the Factoring Documents, the Pre-Petition Obligations, the Post-Petition Obligations, the Pre-Petition Liens, the Post-Petition Liens, the Adequate Protections Liens, and the Ownership Interests are valid, enforceable, perfected, and unavoidable under the Bankruptcy Code or any other applicable law, in accordance with their terms.

**5.3** **Releases.** Subject to Section 3 of this Final Order with respect to parties other than the Debtor, notwithstanding any other provision of this Final Order, in consideration of Sun Capital's agreement to provide Post-Petition Factoring as provided in this Final Order and other valuable consideration, the Debtor releases and forever discharges all claims, rights, defenses, demands, damages, actions, causes of action, costs, expenses, and suits at law or in equity, whether known or unknown (collectively, "Claims"), which Debtor has held or now holds against Sun Capital and its officers, directors, employees, agents, attorneys, accountants, affiliates, successors and assigns, with respect to or in connection with the Pre-Petition Obligations, the Pre-Petition Collateral and Ownership Interests, and the Pre-Petition Factoring Documents, and any act by Sun Capital of any right or remedy thereunder, including without limitation, the application of the Collateral, and all claims under the Bankruptcy Code, including without limitation §§ 506, 544, 547, 548, 550, 552 and 553 of the Bankruptcy Code, or other law relating to acts arising or existing before the Petition Date.

**5.4** **Reporting.** In addition to all reporting requirements under the Factoring Documents, and subject to appropriate confidentiality: (a) the Debtor shall timely provide to Sun Capital and Committee counsel copies of all reports, pleadings and other documents filed or submitted to the Court or the United States Trustee by the Debtor; (b) the Debtor shall timely provide to the Committee copies of all financial reports provided to Sun Capital; and (c) Sun Capital shall timely provide to the Committee copies of all reports provided to the Debtor

- 17 -

regarding the status of both the pre-petition and post-petition factoring facilities.

**Section 6:  Other Rights And Obligations.**

    **6.1**    **Binding Effect.**  The provisions of this Final Order shall be binding upon the Debtor, all parties in interest in this bankruptcy case, and their respective successors and assigns, including any trustee appointed as a representative of the Debtor's estate whether under any chapter of the Bankruptcy Code or similar law.  The provisions of this Final Order, the Factoring Documents, and any actions taken pursuant thereto, shall survive entry of and shall govern with respect to any conflict with any order, including without limitation any order which may be entered confirming any plan of reorganization, converting this Chapter 11 case to a case under any other chapter of the Bankruptcy Code, or dismissing this bankruptcy case.

    **6.2**    **Section 506(c) Limitation.**  The Ownership Interests shall not be subject to any surcharge pursuant to § 506(c) of the Bankruptcy Code or other law without the express prior written consent of Sun Capital.

    **6.3**    **Term.**  Notwithstanding any other term or provision of this Final Order, the term of the Post-Petition Factoring shall terminate (a "Termination") as of the earlier of either:

    (a)    As provided in the Factoring Agreement as amended by the Post-Petition Factoring Amendment; or

    (b)    Upon the occurrence of an Event of Default that is not cured pursuant to Section 4.2 of this Final Order.

    **6.4**    **Extension.**  Notwithstanding the occurrence of a Termination, factoring by Sun Capital and such Termination may be extended by Sun Capital and the Debtor by written agreement, without further notice, motion, hearing, or order of this Court and with notice to Committee counsel. This Final Order shall be deemed as approval of any extension of factoring by Sun Capital and Termination as provided herein.

    **6.5**    **Objections Overruled.**  All objections to the Factoring Motion on a final basis are hereby resolved by this Final Order or overruled.

- 18 -

6.7   **Order Controls.**   In the event of any inconsistency between the Post-Petition Factoring Amendment or the Pre-Petition Factoring Documents and this Final Order, the terms of this Final Order shall control.

DATED: October 30, 2008

_____
UNITED STATES BANKRUPTCY JUDGE

- 19 -

# EXHIBIT A

## POST-PETITION CHAPTER 11 BANKRUPTCY RIDER TO SUN CAPITAL
## HEALTHCARE, INC.'S MASTER PURCHASE AND SALE AGREEMENT

This Post-Petition Chapter 11 Bankruptcy Rider to Sun Capital HealthCare, Inc.'s Master Purchase and Sale Agreement (hereinafter referred to as the "Bankruptcy Rider") is made and entered into this as of October 3, 2008, by and between the Chapter 11 Debtor-In-Possession, Michael Reese Medical Center Corporation, a Delaware corporation (hereinafter referred to as "Debtor" or "Provider"), and Sun Capital HealthCare, Inc., a Florida corporation (hereinafter referred to as "Sun Capital," or "Factor" or "Purchaser").

**RECITALS:**

A.      Debtor filed a voluntary petition (the "Petition") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on September 28, 2008 (the "Petition Date"), with the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court"), Case No. 08-25811 (the "Bankruptcy Case"). Debtor is continuing to operate its business and manage its affairs as debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

B.      Debtor is engaged in the business of operating an acute care hospital and related facilities from premises located at 2929 South Ellis Avenue, Chicago, Illinois 60616.

C.      Prior to the commencement of the Bankruptcy Case, Debtor and Sun Capital entered into agreements whereby Sun Capital (a) purchased certain accounts and rights to payment from Debtor and (b) provided certain financial accommodations to Debtor, secured by a first priority security interest in personal property assets of Debtor. The agreements existing as of the Petition Date (the "Pre-Petition Agreements") are as follows:

1.      Master Purchase and Sale Agreement. On or about March 6, 2008, Debtor and Sun Capital executed and delivered a Master Purchase and Sale Agreement (the "Master Agreement"), a true and correct copy of which is attached hereto as Exhibit 1 and incorporated herein by reference. The Master Agreement provides, *inter alia*, for Sun Capital to purchase certain accounts and rights to payment from Debtor and that Sun Capital receive a first priority security interest in all of Debtor's accounts and rights to payment (whether or not purchased by Sun Capital), chattel paper, documents, instruments, letter of credit rights, supporting obligations, deposit accounts, general intangibles, and the proceeds, products and offspring thereof.

2.      UCC Financing Statements. On or about March 5, 2008, Sun Capital perfected its security interest in Debtor's assets by filing and recording UCC Financing Statements (the "UCC Financing Statements"), true and correct copies of which are attached hereto as Exhibit 2 and Exhibit 3, respectively, and incorporated herein by reference, with the Secretary of State of the State of Delaware and the Secretary of State of the State of Illinois.

3.   <u>Lockbox Agreement</u>.  On or about March 27, 2008, Debtor, Sun Capital and Sun Trust Bank executed and delivered a Wholesale Lockbox Deposit and Blocked Account Service Agreement with Provider (the "Lockbox Agreement"), a true and correct copy of which is attached hereto as <u>Exhibit 4</u> and incorporated herein by reference.  The Lockbox Agreement provides, *inter alia*, for the use of certain lockbox and deposit account services at Sun Trust Bank and the establishment of certain lockboxes and lockbox bank accounts (the "Lockbox Bank Accounts") to facilitate the collection and transfer of funds in connection with the Master Agreement.

4.   <u>Assignment of Prior Accounts Receivable Purchase and Security Agreements</u>.  On or about March 6, 2008, Medical Provider Financial Corporation III ("Medical Capital") assigned all of its rights under its accounts receivable purchase and security agreements with the Debtor to Sun Capital pursuant to an Assignment and Assumption Agreement, a true and correct copy of which is attached hereto as <u>Exhibit 5</u> and incorporated herein by reference.  On or about March 7, 2008, filed assignments of Medical Capital's UCC Financing Statements with the Secretary of State of the State of Delaware, true and correct copies of which are attached hereto as <u>Exhibit 6</u> and incorporated herein by reference.

5.   <u>Balance</u>.  The outstanding balance owed to Sun Capital by Debtor as of the Petition Date is the sum of $10,325,736.13, excluding fees, costs, and reasonable attorneys' fees.

D.   Debtor and its counsel have reviewed the Pre-Petition Agreements, and such other documents as they have determined to be appropriate with respect to the validity, enforceability, and non-avoidability and amount of Debtor's indebtedness to Sun Capital under the Pre-Petition Agreements and the validity, enforceability, perfection, priority, and non-avoidability of Sun Capital's liens and security interests pursuant thereto.

E.   Debtor acknowledges and agrees that it is obligated to Sun Capital in the aggregate principal amount of $9,230,227.05, plus accrued discount fees and other fees and expenses in the aggregate amount of not less than $1,095,509.08 as of the Petition Date, plus continuing discount fees and other fees and costs from and after the Petition Date, plus the actual amount of additional fees, costs and other expenses incurred by Sun Capital in connection with the Pre-Petition Agreements and this Bankruptcy Rider.  Debtor further acknowledges and agrees that its obligations to Sun Capital are valid, allowable, enforceable and unavoidable and that these claims are not subject to any right of setoff, counterclaim, recoupment or defense.

F.   Debtor acknowledges and agrees that, pursuant to the Pre-Petition Agreements, Sun Capital holds valid, enforceable, perfected and unavoidable first priority liens on and security interests in:  (1) the Subject Property (as defined in the Master Agreement) (hereinafter, the "Collateral"; and (2) all cash, negotiable instruments, documents of title, securities, deposit accounts, accounts receivable, insurance or other cash equivalents, and general intangibles directly or indirectly related to or arising from the Collateral or the business conducted by Debtor, and all replacements, substitutions, additions, accessions, proceeds, products, offspring, revenues, issues or profits thereof wherever located and whenever acquired by Debtor or its

2

estate before, on, or after the Petition Date (the "Cash Collateral"). Debtor also acknowledges that (b) Sun Capital owns the Purchased Accounts (as defined in the Master Agreement) and proceeds thereof as provided for in the Master Agreement.

G.    Debtor and Factor are entering into this Bankruptcy Rider, which incorporates by reference the Master Agreement (the Bankruptcy Rider and the Master Agreement are collectively hereinafter referred to as the "Factoring Agreement"), as of the Petition Date for the purpose of enabling Debtor to continue to sell accounts to, and obtain financial accommodations from, Factor as provided herein and therein.

H.    The Factoring Agreement is subject to the approval by and is made in contemplation of the entry of a non-appealable, final order (the "Factoring Order") to be entered by the Bankruptcy Court in the Bankruptcy Case, although Factor may, in its discretion, operate under the "safe harbor" provisions of §§ 363(m) and 364(e) of the Bankruptcy Code.

I.    Debtor and Factor acknowledge that once the Factoring Agreement has been executed by the Debtor and Factor, it shall be submitted to the Bankruptcy Court promptly by counsel for the Debtor and all requisite notices and mailings shall be done in conformity with all applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of the United States Bankruptcy Court for the Northern District of Illinois (the "Local Bankruptcy Rules"), all of which shall be the primary responsibility of Debtor's counsel, in order to obtain a Factoring Order approving same.

Now, therefore, in consideration of the mutual promises contained herein, the parties hereto agree as follows:

**AGREEMENT:**

1.    The foregoing recitals are a part of this Bankruptcy Rider for all purposes and acknowledged as accurate by Debtor.

2.    Debtor shall cause each of the following documents to be promptly delivered to counsel for Factor within one business day after filing with the Bankruptcy Court, or if such document is filed by a party other than Debtor's counsel, then within one business day after receipt of such document by Debtor's counsel:

    a)    The Petition.

    b)    The Schedules of Assets and Liabilities required by Bankruptcy Rule 1007(b) and official form number 6.

    c)    The Statement of Executory Contracts and Unexpired Leases required by Bankruptcy Rule 1007(b) and official form number 6, schedule G.

    d)    The Statement of Financial Affairs required by Bankruptcy Rule 1007(b) and official form number 7.

3

e) The List of Equity Security Holders required by Bankruptcy Rule 1007(a)(3).

f) All applications and orders to employ attorneys, accountants or any other professional on behalf of the debtor-in-possession.

g) Any order entered by the Bankruptcy Court appointing an unsecured creditors' committee and any orders authorizing the committee to employ attorneys, accountants or other professionals.

h) Any motions filed by secured creditors seeking stay relief or sequestration of cash collateral or agreements that have been approved by the Bankruptcy Court with respect to same.

i) All real property leases upon which the Debtor operates and any agreements with landlords and motions with respect to real property leases that have been filed.

j) Any plan of reorganization that has been prepared and/or filed.

k) All Debtor-in-Possession reports (i.e., reports that are routinely required to be filed with the Bankruptcy Court or the United States Trustee periodically, usually every month, addressing all financial activity within that time period) as well as all other materials required to be provided to the United States Trustee during the Bankruptcy Case.

A. Debtor shall be responsible to have a Motion for Order (i) Approving Post-Petition Factoring Agreement, (ii) Granting Security Interest and Superpriority Administrative Expense Treatment and (iii) Approving Sun Capital HealthCare, Inc.'s Fees and Costs (the "Motion"), duly served, filed and noticed for hearing with the Bankruptcy Court, which Motion and the proposed Factoring Order shall be in form and substance satisfactory to Factor.

B. Debtor shall cause each of the following documents to be signed and delivered to Factor's counsel prior to the filing of the Motion:

1. The Motion and the proposed Factoring Order.

2. Any other documents Factor may reasonably require, including a post-petition budget of the Debtor.

3. Section 4.4 of the Master Agreement entitled "Information Relating to Collections on Accounts; Payment of Deferred Purchase Price and Non-Purchased Account Amount" is supplemented by adding the following:

4

Debtor shall furnish to Factor: (a) reports relating to the creation of Accounts as may reasonably be required by Factor; (b) quarterly financial statements within 45 days after the end of each fiscal quarter of the Debtor; (c) annual financial statements within 90 days after the end of each fiscal year of the Debtor; and (d) any other financial or accounting reports or statements as Factor may reasonably request from time to time.

4.     Section 7 of the Master Agreement entitled "Representations and Warranties of the Provider" is amended by (a) modifying subsection (a)(v) to (i) exclude the Bankruptcy Case and all actions, suits, proceedings and investigations that may have existed prior to the Petition Date and (ii) delete the representation that "[t]he Provider is solvent and will not be rendered insolvent by the transactions contemplated by this Agreement," and (b) modifying the representation in subsection (b)(ii) to state that there is "no recording or filing against the Provider, as debtor, covering or purporting to cover, any interest of any kind in any Account except (w) as has been released by each party holding such interest or lien in the Account, (x) to Equicare Portfolio I, LLC, (y) alleged judicial liens arising out of citations to discover assets, and (z) in favor of Purchaser."

5.     Section 8 of the Master Agreement entitled "Covenants of Provider" is amended as follows:

(i)     subsection (h) is limited in all respects by the disclosure requirements applicable in Bankruptcy Cases, and no act of disclosure by the Debtor during the Bankruptcy Case that is reasonably necessary or appropriate to the Chapter 11 process shall be deemed a violation of subsection (h); and

(ii)     subsections (l) and (n) are deleted during the pendency of the Bankruptcy Case.

6.     Section 9 of the Master Agreement entitled "Security Interest" is amended by deleting subsection (a) in its entirety and inserting the following: (a)(i) "Subject Property " (sometimes referred to herein as "Collateral") means all of the Provider's right, title and interest in, to and under any and all of the following, whether arising prior to, on or after the Petition Date: inventory, equipment, chattel paper, documents, instruments, general intangibles, and accounts receivable (whether offered for purchase or not, and whether purchased or not, unless released as described in section 8(a) of this Agreement), including without limitation, all Accounts, representing any and all of Provider's rights to payment, whenever arising, together with all accounts, chattel paper, documents, instruments, letter of credit rights, supporting obligations, deposit accounts, and general intangibles arising from or related thereto, all rights, remedies, guarantees, security interests and liens in respect of any of the foregoing, all records (other than patient medical records to the extent protected from disclosure by law) and other information necessary or relevant to the collection of such Collateral, whether now owned or existing or hereafter created, acquired or arising and wherever located, and all of the proceeds, products, and offspring of the foregoing (all of such terms, as applicable, are presently or hereafter defined in the Uniform Commercial Code), including but not limited to (i) all rights to payment under any agreements with all Third Party Obligors, (ii) all cash deposited with Purchaser or that Purchaser is entitled to retain or otherwise possess as collateral pursuant to the provisions of this Factoring Agreement, and (iii) any and all cash and non-cash proceeds of the

5

foregoing (including, but not limited to, any claims to any items referred to in this definition and any claims against third parties for loss of, damage to or destruction of any or all of the Collateral or for proceeds payable under or unearned premiums with respect to policies of insurance) in whatever form.

(a)(ii)  Subject to Permitted Liens, the Purchaser is granted a first priority security interest in and to the Collateral to secure the repayment of all amounts advanced to or for the benefit of the Provider and all other amounts due or owing to the Purchaser by the Provider [;provided, however, that the Debtor's inventory and equipment shall secure the repayment only of (i) amounts advanced to or for the benefit of the Provider on or after the Petition Date and (ii) all other amounts that become due or owing to the Purchaser by the Provider on or after the Petition Date with respect to such advances, including all "Reimbursable Expenses" under section 13 of this Bankruptcy Rider incurred by the Purchaser on or after the Petition Date.

7.     Section 11 of the Master Agreement entitled "Term; Termination is hereby amended by deleting subsection (b) and inserting the following:  (b) The Provider may terminate its obligation to offer to sell Accounts to the Purchaser pursuant to this Agreement upon no less than thirty (30) days prior written notice to the Purchaser.

8.     Section 11 of the Master Agreement entitled "Term; Termination" is supplemented by adding the following Termination Events after subsection (c)(iii):

(iv)    any non-avoidable lien or encumbrance is granted, is discovered, or attaches to any of the Collateral, except the liens and security interests in favor of Factor, and Permitted Liens (as set forth on the attachment hereto entitled "Permitted Liens"), without the express written consent of Factor;

(v)     any administrative expense claim is allowed and is senior to or pari passu with the Factor's claims or if any lien shall be granted in the Bankruptcy Case with respect to any of the Collateral (other than those granted with the written consent of Factor or as authorized by this agreement); however, Debtor is not prohibited from paying ordinary and routine operating expenses, United States Trustee fees and other professional fees and costs;

(vi)    the Debtor makes any disposition of assets outside the ordinary course of Debtor's business without the express written consent of Factor;

(vii)   the Debtor fails to pay timely any statutory fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6);

(viii)  any representation or warranty made by the Debtor to Factor is or becomes incorrect in any material respect;

(ix)    the Bankruptcy Case is dismissed or converted to a Chapter 7 Bankruptcy Case, or a Chapter 11 trustee or an examiner with expanded powers is appointed in the Bankruptcy Case;

6

CHIC_3542381.3

(x)     the Factoring Order approving the Factoring Agreement is stayed, amended, modified, reversed or vacated;

(xi)    a plan of reorganization is confirmed that fails to provide for termination of the Factoring Agreement and payment in full, in cash, of Debtor's obligations under the Factoring Agreement on the effective date of the plan unless the plan adopts the exact terms of the Factoring Agreement, as approved by the Bankruptcy Court, or Factor agrees, in writing, to a modification or different treatment and affirmatively votes in favor of the plan;

(xii)   the Bankruptcy Court enters an order granting relief from the automatic stay to any creditor with respect to any claim in an amount equal to or exceeding $10,000.00 in the aggregate; provided, however, that it shall not be a Termination Event if the automatic stay is lifted solely for the purpose of allowing a creditor to liquidate its claim against the Debtor or seek payment from an insurance policy, or the Debtor files a document with the Bankruptcy Court acknowledging that such property is not necessary to an effective reorganization;

(xiii)  Debtor's current principals cease to actively manage and be involved in the operations of the Debtor and replacements reasonably acceptable to the Factor shall not be retained or the principal(s) of the Debtor become deceased, incompetent or incarcerated, notwithstanding Bankruptcy Rule 1016;

(xiv)   an order is entered in the Bankruptcy Case authorizing the sale or other disposition of all, or substantially all, of the assets of Debtor, unless such order provides for payment in full, in cash, of Debtor's obligations under the Factoring Agreement upon consummation of the sale; or

In addition, subsection (c)(ii) of section 11 of the Master Agreement is amended so that said subsection is deemed inapplicable during the pendency of the Bankruptcy Case and until such time as a plan of reorganization is confirmed.

9.      [Intentionally Omitted].

10.     Section 11 of the Master Agreement entitled "Term; Termination" is supplemented by adding the following: Unless Factor agrees in writing, at its sole discretion, to extend the term of the Factoring Agreement, or until a Termination Event, the obligations due the Factor under the Factoring Agreement are to be paid in full within 15 days after the date of the entry of any order confirming a plan of reorganization unless the Debtor assumes the terms of the Factoring Agreement in its entirety without modifications; or, the Debtor and Factor agree to other treatment under the plan. (The confirmation order shall not provide for a discharge or otherwise affect in any way any of the obligations of the Debtor or any Guarantors as those obligations are detailed in agreements approved by the Bankruptcy Court).

7

Termination of the Factoring Agreement shall not terminate, extinguish, or remove any liens or security interests granted to Factor until Debtor has fully paid and discharged all of its obligations to Factor.

11.    Section 13 of the Master Agreement entitled "Controlling Law" is supplemented by adding the following: ";provided, however, that during the Bankruptcy Case, federal bankruptcy law shall be controlling to the extent it may be inconsistent with Florida law."

12.    Section 14 of the Master Agreement entitled "Waiver of Jury Trial, Jurisdiction and Venue" is modified to provide that during the pendency of the Bankruptcy Case, the Bankruptcy Court shall have sole and exclusive jurisdiction to determine any and all disputes arising under or relating to the Factoring Agreement or any of the other documents delivered and to be delivered pursuant thereto.

13.    The Master Agreement is supplemented with a new section 16 entitled "Reimbursable Expenses," which reads as follows:  Factor shall be entitled to use its own internal auditors when possible; otherwise it shall be entitled to engage an outside auditor or professional to perform audit or investigative services of the Debtor's financial condition or with respect to the Collateral.  Factor shall be entitled to be reimbursed all of its post-petition, pre-plan confirmation reasonable attorneys' fees and costs (including without limitation, all reasonable attorneys' fees and costs incurred in (i) the preparation and negotiation of this Bankruptcy Rider, the Factoring Order, any cash collateral agreements or orders, and related documents and instruments, (ii) the exercise of the rights of Factor and the enforcement of Debtor's obligations under the Factoring Agreement, the Factoring Order, and any cash collateral agreements or orders, and (iii) Factor's participation in and monitoring of such other matters as may arise in or in connection with the Bankruptcy Case), in accordance with the following procedure:  Factor, or its counsel, shall transmit a copy of its monthly statements for fees and costs to the United States Trustee, counsel for any unsecured creditors' committee and Debtor's counsel for their review each month.  Unless a written objection (specifying the line item of the bill objected to, the reason for the objection and a proposed resolution of the objection) is received by Factor's counsel with 10 days after submission of the monthly statement to the above stated parties, Factor shall automatically be entitled to charge Debtor's account or demand payment.  All obligations (as referenced in this section) of the Debtor to the Factor shall likewise be secured by a senior, first priority lien pursuant to § 364(d)(1) of the Bankruptcy Code, and payable forthwith.

14.    The Master Agreement is supplemented by the addition of a new section 17 entitled "Bankruptcy Provisions," which reads as follows:

(a)    Debtor shall at all times fully comply with all substantive and procedural requirements of the Bankruptcy Court, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and all other applicable local rules of court, including any administrative orders.

(b)    Debtor shall permit the Factor or a professional retained by the Factor, to (i) inspect the Debtor's books and records at reasonable times, (ii) to discuss the Debtor's affairs, finances and accounts with its professionals, officers, and employees, (iii) to obtain from

8

the Debtor copies of the Debtor's records, and (iv) furnish all information reasonably requested by the Factor.

(c)   Debtor shall keep financial statements in accordance with the standard known as Generally Accepted Accounting Principles or GAAP, as GAAP is applicable to similar entities operating under Chapter 11.

(d)   Debtor shall cause to be promptly delivered to Factor's counsel all pleadings, motions, applications, financial information, DIP reports and other documents filed by or against Debtor in the Bankruptcy Court or that may be distributed to any official committee appointed in the Bankruptcy Case.

(e)   Debtor shall timely pay all post-petition taxes and other obligations including those required under 28 U.S.C. § 1930(a)(6).

(f)   Debtor shall notify the Factor immediately of any Termination Event as defined in section 11 of the Master Agreement or in this Bankruptcy Rider.

(g)   Debtor acknowledges that under § 506(a) of the Bankruptcy Code, the value of Sun Capital's claims against Debtor is fully secured.

(h)   Except as expressly provided herein, Debtor hereby waives any and all rights of the debtor-in-possession: (a) to recover from Sun Capital or from the Collateral costs and expenses of preserving or disposing of the Collateral or any other costs, expenses, or claims, whether such rights would arise under § 506(c) of the Bankruptcy Code or otherwise; and (b) to subordinate any or all of Sun Capital's claims, liens or security interests to any other claims, liens or security interests under § 510(c) of the Bankruptcy Code or otherwise.

(i)   .Debtor hereby acknowledges that Sun Capital has perfected, first priority, enforceable, unavoidable liens on and security interests in the Collateral (including the Cash Collateral and the Lockbox Bank Accounts), with priority over all other liens, and agrees that Debtor, as debtor-in-possession, shall not be permitted to assert against Sun Capital any of the avoiding powers under the Bankruptcy Code, including such powers arising under §§ 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code.

(j)   Debtor hereby acknowledges that the transfer of title from Debtor to Sun Capital of each Purchased Account is a true sale, not subject to recharacterization, and that Sun Capital owns all right, title and interest in and to all Purchased Accounts, free and clear of all liens, claims, encumbrances and interests (other than liens and security interests of Sun Capital).

(k)   The terms and conditions of the Factoring Agreement (and any extensions or renewals thereof): (a) may not be modified through any plan of reorganization or plan of liquidation without Sun Capital's prior written consent obtained after the Bankruptcy Court approves the Factoring Agreement; and (b) be binding upon any trustee appointed

9

in this Chapter 11 Bankruptcy Case or any Chapter 7 case to which this Chapter 11 Bankruptcy Case may be converted.

(l)   Debtor agrees that, in consideration of Sun Capital's entering into the Factoring Agreement, Sun Capital shall be excused from compliance with any requirement that Sun Capital take any additional actions or file, record or serve any additional instruments, documents or notices to perfect or enforce its liens on or security interests in any Collateral (including the Cash Collateral and the Lockbox Bank Accounts), including the filing of a notice pursuant to Bankruptcy Code § 546(b) or the filing of a motion for sequestration or any other motion, and that Sun Capital's liens on and security interests in the Collateral (including the Cash Collateral and the Lockbox Bank Accounts) shall be deemed automatically perfected as of the Petition Date without any further notice or action or order of the Bankruptcy Court.

(m)   The parties to the Factoring Agreement have been represented and advised by counsel with respect to the Factoring Agreement, and have entered into it freely and voluntarily. The Factoring Agreement is intended to be enforceable according to its written terms, is an integrated agreement, and there are no promises, oral agreements, or expectations of the parties to the contrary.  The Bankruptcy Court may enter an order enforcing any of the terms and conditions of the Factoring Agreement after notice and opportunity for a hearing to Debtor, Sun Capital, the United States Trustee, and any other party in interest.

(n)   In the event that the Factoring Agreement is not approved by the Bankruptcy Court for any reason, then both the Factoring Agreement and this Bankruptcy Rider shall be null and void and of no further force and effect, and no action or procedure taken, and no statement made in connection with the negotiation, preparation, formulation, or seeking approval thereof, shall be referred to by any entity in connection with any proceeding or action.

(o)   Whenever the Factoring Agreement requires Debtor or Sun Capital to deliver a writing to, or serve a writing upon the other, such writing shall be delivered or served upon each of the following:

If to Sun Capital:

Howard B. Koslow, President
SUN CAPITAL HEALTHCARE, INC.
999 Yamato Road, Third Floor
Boca Raton, Florida 33431
Phone:  (800) 880-1702
Fax:    (561) 998-9043

and

Mary H. Rose, Esq.
BUCHALTER NEMER
A Professional Corporation

10

1000 Wilshire Blvd., Suite 1500
Los Angeles, California 90017-2457
Phone:  (213) 891-5727
Fax:     (213) 630-5629
mrose@buchalter.com

If to Debtor:

Paul R. Tuft, President
MICHAEL REESE MEDICAL CENTER CORPORATION
6720 North Scottsdale Road, Suite 275
Scottsdale, Arizona 85253
Phone:  (480) 348-1099
Fax:     (480) 948-7104

and

Edward J. Green, Esq.
FOLEY & LARDNER LLP
321 North Clark Street, Suite 2800
Chicago, Illinois 60610
Phone:  (312) 832-4375
Fax:     (312) 832-4700
egreen@foley.com

(p)   This Bankruptcy Rider may be executed in counterparts, all of which taken together shall
constitute a single document.

(q)   The headings in this Bankruptcy Rider are inserted for convenience and are not a part of
this Bankruptcy Rider.

(r)   The Factoring Agreement shall be binding on and inure to the benefit of the parties'
respective successors and assigns, including any trustee appointed under the Bankruptcy
Code.

(s)   The terms and conditions set forth in the Factoring Agreement and the Factoring Order
approving same shall not affect in any way the obligations of any person or entity that
guaranteed or is otherwise liable in any way on Debtor's obligations to Sun Capital.

(t)   The Factoring Agreement is the product of negotiation among the parties hereto and
represents the jointly conceived, bargained-for and agreed upon language mutually
determined by the parties to express their intention in entering into the Factoring
Agreement.  Any ambiguity or uncertainty in the Factoring Agreement shall be deemed
to be caused by, or attributable to, all parties hereto collectively.  In any action or
proceeding to enforce or interpret the Factoring Agreement, the Factoring Agreement
shall be construed in a neutral manner, and no term or condition of the Factoring

11

Agreement, or the Factoring Agreement as a whole, shall be construed more or less favorably to any one party, or group of parties, to the Factoring Agreement.

15.    As to any terms of the Master Agreement displaced by or inconsistent with this Bankruptcy Rider, this Bankruptcy Rider shall govern; otherwise, the terms of the Master Agreement shall remain unaffected and in full force and effect.

[END OF TEXT]

12

IN WITNESS WHEREOF, the parties hereto have executed this Bankruptcy Rider as of the date first above written.

MICHAEL REESE MEDICAL CENTER
CORPORATION, a Delaware corporation, debtor
and debtor-in-possession

By: _Paul M Tuft_____
Name: _Paul R. Tuft_____
Title: _____

The foregoing is acknowledged, accepted and agreed to:

SUN CAPITAL HEALTHCARE, INC.,
a Florida corporation

By: _____
Name: _____
Title: _____

13

## Permitted Liens

The following are "Permitted Liens":

1.  Liens and security interests of the following parties, to the extent valid, perfected, unavoidable and existing as of the Petition Date, in equipment of the Debtor:

    a.   Tygris Asset Finance, Inc.

    b.   Xtria, LLC; and

    c.   General Electric Capital Corp.

# EXHIBIT A-1

## MASTER PURCHASE AND SALE AGREEMENT

MASTER PURCHASE AND SALE AGREEMENT dated as of the __6__ day of __March__, 2008, between **Sun Capital HealthCare, Inc.**, located at 999 Yamato Road, Third Floor, Boca Raton, Florida 33431 (the "Purchaser") and **Michael Reese Medical Center Corporation** located at 2929 South Ellis Avenue, Chicago, Illinois (the "Provider") relating to the sale, from time to time, of certain third-party payable accounts receivable of the Provider.

1.    **Accounts to be Offered.**  On the terms and subject to the conditions set forth in this Agreement, during a period of one (1) year subject to the provisions of Section 11 hereof (the "**Offer Period**") from the date hereof the Provider shall offer, to sell to Purchaser, free and clear of all liens, claims, encumbrances, and rights of any other person or entity, third party payable accounts receivable (the "**Accounts**"), owing to the Provider arising out of the delivery of medical, surgical, diagnostic, or other  healthcare related goods or services, of which a portion of (or all of) such Accounts are payable by commercial insurance companies, not-for-profit insurance companies (such as Blue Cross and Blue Shield entities) issuing health, personal injury, workers' compensation, or other types of insurance, employers or unions that self-insure for employee or member health insurance, prepaid  healthcare organizations, preferred provider organizations, health maintenance organizations or other similar entities, Medicare, Medicaid, governmental bodies or other similar entities, or any third-party intermediary with respect to any of the foregoing (each a "**Third Party Obligor**"), together with all accounts, chattel paper, and general intangibles related thereto, all rights, remedies, guarantees, security interests, and liens in respect of any of the foregoing, all records (other than patient medical records to the extent protected from disclosure by law), and other information necessary or relevant to the collection of the Accounts, and all proceeds of any of the foregoing. Accounts for which the Third Party Obligor is the United States of America or any state or any agency or instrumentality thereof or any state that is obligated to make any payments with respect to Medicare or Medicaid Accounts, or representing amounts owing under any other program established by a federal or state law that provides for payments for healthcare goods or services to be made to the Provider are hereinafter referred to as "**Governmental Accounts**"; all other Accounts are sometimes hereinafter referred to as "**Non-Governmental Accounts.**" The Purchaser shall have the right, in its sole discretion for any or for no reason, to purchase, or not purchase, any of the Accounts as are acceptable to it, but shall in any event have a lien and security interest, upon (i) all accounts owned by and payable to the Provider by any Third Party Obligor and (ii) all accounts owned by and payable to the Provider by any patients directly (each a "**Patient Obligor**").

2.    **Initial Down Payment and Purchase Price.**

(a)    Upon Purchaser's receipt and acceptance of each Purchase Schedule (Exhibit A), or any portion thereof, Purchaser may advance to the Provider up to eighty-five percent (<u>85%</u>) of the expected Net Collectible Amount (as hereinafter defined) of the Accounts therein described (the "**Initial Down Payment**"), subject to Purchaser's right to maintain a Reserve Account. The Reserve Account shall be an account maintained on Purchaser's books, and Purchaser shall not be obligated to: (i) maintain cash or other funds in such account; or (ii) segregate funds or other amounts held in or credited to the Reserve Account from other funds held by Purchaser.  The

Provider shall not be entitled to any interest or income on amounts credited to the Reserve Account. All checks received shall be deemed credited to the Reserve Account not less than two (2) days after receipt. The Reserve Account shall mean an amount sufficient to cover, among other things, returns, allowances, deductions, reductions in the unpaid balance of an Account, and disputes and/or charge backs including any charge back Purchaser anticipates might arise in the future, as security for the payment of the Provider's obligations to Purchaser. Purchaser may, upon notice to Provider, increase or decrease the amount of the Reserve Account as Purchaser may deem necessary to protect Purchaser's interests. Subject to Purchaser's right to withhold funds with respect to the Reserve Account, on each Friday (or if such Friday is a bank holiday in the State of Florida, on the next business day that is not such a bank holiday) of the week in which all Purchased Accounts (as hereinafter defined) set forth on the applicable Purchase Schedule have been collected in good funds (other than as to any Purchased Account not collected as a result of a discharge in bankruptcy or insolvency of the applicable Third Party Obligor), Purchaser will pay to the Provider the amount of the Purchase Price minus (i) the Initial Down Payment, (ii) the Purchaser's discount fees, (iii) all returns, allowances, deductions, reductions, and discounts calculated upon shortest or longest selling terms, at Purchaser's option, on any alternative terms of sale offered by the Provider to Third Party Obligor, and (iv) (subject to an advanced notification period of 10 business days) all other unpaid sums charged or chargeable to the Provider, which shall include, but not be limited to, reasonable costs and expenses (including attorneys' fees), of any kind and nature, Purchaser may incur including notice, audit, lien searches and title examinations, and including protecting and preserving its interests under or in connection with this Agreement.

(b)     Purchaser's discount fee as to each Purchased Account shall be a percentage of the Net Collectible Amount (as hereinafter defined) of each Purchased Account based on the number of days elapsed between the Closing Date (as defined below) relating to such Purchased Account and the date on which Purchaser shall have received collections in an amount equal to the Initial Down Payment for such Purchased Account.

| Days Elapsed | Percentage of Net Collectible Amount |
|---|---|
| 1-150 | .05% per day |
| Over 150 | 10% |

(c)     The purchase price for each Account (the "**Purchase Price**") a percentage of the NCA as determined by the Purchaser and the Provider.

(d)     As used herein the term "**Net Collectible Amount ("NCA")**" with respect to an Account means the gross amount billed to the applicable Third Party Obligor, less those anticipated contractual allowances, all discounts taken, available, or extended by the Third Party

*Master Purchase and Sale Agreement*
*Sun Capital Healthcare, Inc. and*
*Michael Reese Medical Center Corporation*
*Page 3*

Obligor, and credits or deductions of any kind allowed or granted to or taken by the Third Party Obligor, all of which shall be determined in the Purchaser. The Net Collectible Amount of a Purchased Account is the amount reasonably expected by the Purchaser, in consultation with the Provider, to be collected on such Purchased Account from Third Party Obligors (excluding any amount to be collected from Patient Obligors) and is based on actual collection experience and other relevant factors.  Provider shall promptly provide Purchaser with supporting documentation as to Provider's calculation of the Net Collectible Amount of any Account upon Purchaser's request.

(e) As referenced in paragraph 2(a) above, any Initial Down Payment is in Purchaser's sole discretion, in accordance with the terms of this Agreement, and all Initial Down Payments are subject to:  (1) Accounts that are in dispute; (2) Accounts that are not payable by a Third Party Obligor; (3) rejected Accounts pursuant to the terms of this agreement; and (4) any fees, actual or estimated, that are chargeable to the Reserve Account.

3.    **Procedures for Offers, Purchases and Payments.** During the Offer Period, the Provider shall offer its Accounts to the Purchaser at the Purchase Price by sending Purchaser (a) a Purchase Schedule (in the form of Exhibit A hereto) signed by the Provider (an "**Offer Notice**") with respect to each Account then being offered and (b) any other information or documentation, including all required Uniform Commercial Code (the "UCC") releases or financing statements the Purchaser may need in order to identify the Accounts purchased from the Provider and obtain payment from the respective Third Party Obligors thereon, and by simultaneously therewith sending to the servicer, currently Sun Capital Healthcare, Inc., including its successors and assigns and any substitute servicers appointed by Purchaser (the "**Servicer**") of Accounts purchased by the Purchaser, a complete set of claim documentation, all in the form submitted to the Third Party Obligor, for each Account offered for sale to the Purchaser, together with copies of invoices, which may include, but are not limited to, Form UB-82/92, HCFA 1500, transmission reports, electronic media such as on-line access or such other forms approved by Purchaser and/or any Third Party Obligor, all shipping or delivery receipts, eligibility cards, insurance verification forms, nurses' notes, treatment authorization requests, and such other proof of sale and delivery or performance as Purchaser may, at any time or from time to time, require.   Within seventy-two (72) hours following its receipt of an Offer Notice (or, if the day on which the seventy-two (72nd) hours occurs is a Saturday, Sunday, or a bank holiday in the State of Florida, upon the next succeeding business day that is not such a bank holiday), the Purchaser will advise the Provider which if any of such Accounts it will purchase by delivering to the Provider a list of the Accounts it desires to purchase (the "**Purchased Accounts**").  All such Purchased Accounts shall be sold to the Purchaser, and title to such Purchased Accounts shall pass to Purchaser on the day on which the Purchaser sends such list to the Provider (each such date of title transfer being hereinafter referred to as the "**Closing Date**").  Notwithstanding the foregoing, any Offer Notice received by the Purchaser after 5:00 p.m. Eastern Standard Time on any day (and any Offer Notice received by the Purchaser on a day that is a Saturday, Sunday, or a day that is a bank holiday in the State of Florida), will be deemed to have been received by the Purchaser on the next day that is not a Saturday, Sunday or bank holiday in the State of Florida.

Purchaser shall pay to the Provider the Initial Down Payment for the applicable Purchased Accounts on the Closing Date. At Purchaser's option, Purchaser may pay some or all of such payment for a Purchased Account (or some or all of any other amounts payable by Purchaser to the Provider) by netting against amounts otherwise payable to Purchaser by the Provider (Providing Purchaser provides Provider notice of such event.). Except with respect to Purchased Accounts that are Governmental Accounts, all invoices or other statements to Third Party Obligors concerning Accounts shall clearly state, in language satisfactory to Purchaser, that each such Account has been sold and assigned to Purchaser and is payable to Purchaser and to Purchaser only. Copies of such invoices and statements shall also bear such language.

3.1    **Effect of Purchase.**   Upon each Weekly Closing Date, all of the Provider's right, title, and interest in and to all Accounts listed in the applicable list of Purchased Accounts and in any proceeds of such Accounts shall automatically vest in the Purchaser, which shall thereby be and become the sole and absolute owner of all such Purchased Accounts and all of the Provider's rights and remedies with regard to such Purchased Accounts (including, without limitation, rights to payment from the respective Third Party Obligors on such Accounts) and all of the Provider's rights under all guarantees, assignments and securities, if any, with respect to each such Purchased Account. Subject to the terms of this Agreement, Provider will retain (i) the right to receipt of payment on Purchased Accounts that are Governmental Accounts and (ii) all rights to demand or otherwise make any claim upon applicable Governmental Third Party Obligors.   Notwithstanding the foregoing, to the extent not prohibited by applicable law, Purchaser shall be entitled from time to time to obtain and enforce orders and injunctions from one or more courts directing one or more Third Party Payors (including without limitation Medicare and Medicaid programs) to make payments on Purchased Accounts directly to Purchaser and its designee.

3.2    **Liabilities Not Assumed by the Purchaser.** The Provider hereby represents, warrants, covenants and agrees that the Purchaser shall not be deemed by anything contained in this Agreement to have assumed any liabilities whatsoever relating to, or arising out of, any Account, including, without limitation, the following:

(a)    any liability of the Provider to any person or entity, the existence of which constitutes a breach of any representation, warranty, covenant or agreement of the Provider contained in this Agreement;

(b)    any liability of the Provider for any federal, state, municipal, local or foreign taxes, assessments, additions to tax, interest, penalties, deficiencies, duties, fees, and/or any other governmental charges or impositions of each and every kind or description, whether measured by properties, assets, wages, payroll, purchases, value added, payments, sales, use, business, capital stock, surplus, or income with respect to ownership of any of the Purchased Accounts or with respect to the sale of any Purchased Accounts;

(c)      any liability or obligation (contingent or otherwise) of the Provider to any person or entity arising out of any litigation, claim, arbitration, or other proceeding;

(d)      any liability or obligation of any kind whatsoever relating to any action or inaction by any person or entity, including, without limitation, any of the Provider's officers, directors, shareholders, employees, agents, representatives, or independent contractors relating in any way to the services rendered by any of them, including without limitation by similarity or otherwise, any liability or obligation for claims of medical or other malpractice in connection with any of the Accounts or the servicing of any of the Accounts in the case of such servicing;

(e)      any liability or obligation (contingent or otherwise) of the Provider arising out of defects in or mislabeling of, or damages to persons or entities or property arising out of defects or mislabeling of products (including, without limitation, prescription medications) manufactured, sold, or prescribed by the Provider in connection with any of the Accounts;

(f)      any liability or obligation of the Provider to compensate any person or entity, including, without limitation, any agent, licenser, supplier, distributor, or customer of the Provider, in respect of any services rendered or products manufactured, sold, or prescribed in connection with the Accounts;

(g)      any recapture, set-off, recoupment, or other claim made by any Third Party Obligor against any of the Accounts;

(h)      any liability of the Provider for any overpayments including (without limitation) any penalties imposed or sought to be imposed by any Third Party Obligor, including, but not limited to, Medicare or Medicaid programs; and

(i)      any liability of the Provider arising out of any activities that are prohibited under federal Medicare and Medicaid statutes, federal CHAMPUS statutes, or the regulations promulgated pursuant to such statutes or any other federal or state or local statutes or regulations or that are prohibited by rules of professional conduct, including but not limited to: (i) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment; (ii) knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment; (iii) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment; (iv) knowingly and willfully soliciting or receiving any remuneration (including without limitation any kickback, bribe, or rebate), directly or indirectly, overtly or covertly, in cash or in kind, or offering to pay such remuneration: (A) in return for referring an individual to a person or entity for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare, Medicaid, or any federal healthcare program or other governmental healthcare program, or (B) in return for purchasing, leasing, or ordering or arranging for or recommending the purchasing, leasing, or ordering of any good, facility, service, or item for

which payment may be made in whole or in part by Medicare, Medicaid, or any federal healthcare program or other governmental healthcare program; or (v) making prohibited referrals. For purposes hereof, a **"federal healthcare program"** shall mean any plan or program that provides health benefits, whether directly, through insurance, or otherwise, that is funded, in whole or in part by the United States Government.

    **3.3    Further Information.** From time to time on and after any Closing Date, the Provider shall use it best efforts to immediately provide the Purchaser or the Servicer, as the case may be, with any and all additional information that the Purchaser or the Servicer may request in order to assure that the Purchaser can exercise any and all rights of the Provider to collect, record, track, and take all actions to obtain collections with respect to each Purchased Account.

    **3.4    Further Assurances.** From time to time on and after each Closing Date, the Provider shall use its best efforts to (a) immediately execute and deliver to the Purchaser or, if requested, the Servicer, such instruments of sale, transfer, conveyance, assignment, and delivery, consents, assurances, powers of attorney, and other instruments as may be requested by the Purchaser or the Servicer in order to evidence the fact that the Purchaser has purchased all right, title, and interest of the Provider in and to the Purchased Accounts, and (b) take such other actions as the Purchaser or the Servicer may request in order to carry out the purpose and intent of this Agreement.

    **3.5    Applicability of Representations and Warranties.** Every representation, warranty, covenant, and agreement of the Provider in this Agreement shall also apply to every Purchased Account irrespective of when purchased, and shall survive the closing of the purchase and sale of each Purchased Account.

    **4.    Lockbox Agreement; Collection of Purchased Accounts.**

    **4.1    Lockbox Agreement.** Simultaneously herewith, if permitted by Bank the Purchaser will assume the Provider's current Bank of America lock box accounts, and shall enter into Agreements with Bank of America for control and direction of funds., Bank of America, as agent for the Purchaser and the Provider, shall rent two separate post office boxes to receive checks, drafts, money orders, or any other negotiable instrument or order for the payment of money (and the proceeds thereof) payable to the Provider or the Purchaser as the case may be (collectively **"Items"**) from (i) Non-Governmental Third Party Obligors (the **"Purchaser Lockbox"**) and (ii) Governmental Third Party Obligors (the **"Provider Lockbox"**; the Purchaser Lockbox and the Provider Lockbox being referred to collectively as **"Lockboxes"**). The Lockbox Bank shall deposit all Items received (i) in the case of the Purchaser Lockbox to a dedicated bank account for all Non-Governmental Accounts (the **"Purchaser Lockbox Bank Account"**), and (ii) in the case of the Provider Lockbox to a dedicated bank account for all Governmental Accounts (the **"Provider Lockbox Bank Account"**; the Purchaser Lockbox Bank Account and the Provider Lockbox Bank Account being referred to collectively as the **"Lockbox Bank Accounts"**).

*Master Purchase and Sale Agreement*
*Sun Capital Healthcare, Inc. and*
*Michael Reese Medical Center Corporation*
*Page 7*

**4.2    Payment Mechanics of Non-Governmental Accounts.** (a) The Provider shall take all necessary and appropriate steps, including the sending of a notice to Third Party Obligors of Non-Governmental Accounts ("**Non-Governmental Third Party Obligors**"), in the form of Exhibit C hereto or in such other form as Purchaser may at any time or from time to time provide for such purpose, to assure that all proceeds paid with respect to all Non-Governmental Accounts, together with all related Explanations of Benefits ("**EOBs**"), be sent exclusively to the Purchaser Lockbox and that all wire transfers or other electronic payments of proceeds with respect to Non-Governmental Accounts be made directly into the Purchaser Lockbox Bank Account. The Lockbox Agreement provides that the Lockbox Bank shall transfer automatically on each business day all amounts then on deposit in the Purchaser Lockbox Bank Account to a separate collection account at the Lockbox Bank in the name of Purchaser (the "**Purchaser Collection Account**").

(b)    The Provider hereby covenants and agrees that, on and after the date hereof all invoices to be sent to Non-Governmental Third Party Obligors (and return envelopes if supplied currently, which shall, in each instance, be furnished by the Provider) shall set forth only the address of the Purchaser Lockbox as a return address for payment of Non-Governmental Accounts and delivery of related EOBs and only the Purchaser Lockbox Bank Account as a receiving account with respect to wire transfers and other electronic transfers for payment of Non-Governmental Accounts. The Provider hereby further covenants and agrees to instruct and notify each of the members of the Provider's accounting and collections staff to provide identical information in communications with all Non-Governmental Third Party Obligors with respect to Non-Governmental Accounts and related collections, wire transfers and EOBs.

**4.3    Payment Mechanics of Governmental Accounts.**

(a) The Provider shall instruct the Lockbox Bank to: (i) transfer and deposit automatically on the close of business on each business day all checks and other items received in the Provider Lockbox into the Provider Lockbox Bank Account; and (ii) transfer automatically on each business day all amounts then on deposit in the Provider Lockbox Bank Account to the Purchaser Collection Account. The Provider shall have no right, title, or interest in any Purchaser Collection Account. Provider agrees to provide Purchaser with at least twenty-one days prior written notice of any change of automatic transfer instructions set forth in this Section 4.3(a). Provider shall not change or cancel such automatic transfer orders at any time, or, without the prior written consent of the Purchaser, change the identity of the Provider Lockbox Account or the Provider Lockbox Bank Account or the instructions, if any, to any Third Party Obligor of a Purchased Account to make its payments to such Provider Lockbox or Provider Lockbox Bank Account.

(b) The Provider shall take all necessary and appropriate steps, including without limitation the sending of a notice to all Third Party Obligors of Governmental Accounts ("**Governmental Third Party Obligors**"), in the form of Exhibit D hereto or in such other form as Purchaser may at any time or from time to time provide for such purpose, to assure that all proceeds paid with respect to all Governmental Accounts, together with all related EOBs, be sent

exclusively to the Provider Lockbox and that all wire transfers or other electronic transfers of proceeds with respect to Governmental Accounts be made directly into the Provider Lockbox Bank Account. All wire or EFT transfers will be credited on the date received in the Purchaser Collection Account and all checks, drafts, money orders or any other negotiable instruments shall be credited within two (2) business days after received into the Purchaser Collection Account.

(c) The Provider hereby covenants and agrees that on and after the date hereof, all invoices to be sent to Governmental Third Party Obligors or their respective fiscal intermediaries (and return envelopes if currently provided, which shall, in each instance, be furnished by the Provider) shall set forth only the address of the Provider Lockbox as a return address for payment of Governmental Accounts and delivery of related EOBs and only the Provider Lockbox Bank Account as a receiving account with respect to wire transfers and other electronic transfers for payment of Governmental Accounts. The Provider hereby further covenants and agrees to instruct and notify each of the members of the Provider's accounting and collections staff to provide identical information in communications with all Governmental Third Party Obligors and their respective fiscal intermediaries with respect to Governmental Accounts and related collections, wire transfers and other electronic transfers and EOBs.

(d) The Provider shall maintain the Provider Lockbox Bank Account solely and exclusively for the receipt of payments from Governmental Third Party Obligors. The Provider shall take all actions necessary to ensure that no payments from any Non-Governmental Third Party Obligor or any other entity or person shall be deposited into, and that no withdrawals, other than in accordance with the Lockbox Agreement, shall be made from, the Provider Lockbox or the Provider Lockbox Bank Account. The Provider shall not have any other account (other than the Provider Lockbox Bank Account) or post office box (other than the Provider Lockbox) into which proceeds from any Account payable by a Governmental Third Party Obligor purchased by Purchaser shall be deposited.

**4.4 Information Relating to Collections on Accounts; Payment of Deferred Purchase Price and Non-Purchased Account Amount.** (a) On or about each Wednesday and Friday, Purchaser shall cause the Lockbox Bank to deliver, by Federal Express or other recognized overnight courier, (Purchaser agrees to work with provider in allowing additional methods of delivery of EOB documents such as email, PDF or fax) to each of the Provider, the Purchaser, and the Servicer, with respect to the period since the close of business on the most recent day covered by a previous delivery: (i) copies of (A) each Item, EOB and other documents or other communication received in the Purchaser Lockbox and (B) advices of each wire transfer or other electronic transfer received in the Purchaser Lockbox Bank Account; and (ii) copies of (A) each Item, EOB and other document or other communication received in the Provider Lockbox, and (B) advices of each wire transfer or other electronic transfer received in the Provider Lockbox Bank Account. The Provider shall cause the Lockbox Bank to include any corrections or adjustments in respect of any such delivery promptly after discovery of the need therefor.

(b)   Not more frequently than once a week, the Provider shall send by facsimile or approved electronic transmission to the Servicer and the Purchaser a report in form and

substance satisfactory to the Purchaser, signed by an authorized representative of the Provider (an **"Activity Payment Report"**), which shall set forth for all Items received in the Lockbox Bank Accounts during the period covered by such report.

(c)     Unless Provider is in default under the terms of this Agreement, promptly, but not later than the second (2nd) business day after the Purchaser shall have received notice of Servicer's approval of any Activity Payment Report (or amended Activity Payment Report), and on the fourth (4th) business day after the Purchaser shall have received an Activity Payment Report (or amended Activity Payment Report) for which the Servicer shall not have delivered notice of its approval (or valid reasons for its non-approval), the Purchaser shall transfer the Deferred Purchase Price (less any amounts owed to Purchaser by Provider), and the Non-Purchased Account Amount (less any amounts owed to Purchaser by Provider (subject to any notification period), as each is reflected on such Activity Payment Report or amended Activity Payment Report to a business checking account established by the Provider with Bank of America and specified in writing by Provider to Purchaser at least two (2) days prior to any such transfer (the **"Provider Operating Account"**). The Purchaser shall transfer such Deferred Purchase Price and Non-Purchased Account Amount, if any, to the Provider Account prior to the Weekly Closing Date following the date that is one (1) business day after receipt by the Servicer of any Activity Payment Report.

**"Non-Purchased Account Amount,"** with respect to any Account other than a Purchased Account, means the excess, if any, of (i) the aggregate amount of collections on such account received by the Purchaser over (ii) the amount of such collections applied by Purchaser to pay amounts owed by Provider to Purchaser pursuant to this Agreement, to pay amounts owed by Purchaser or Provider to the Lockbox Bank pursuant to the Lockbox Agreement, or to reimburse Purchaser for amounts paid by Purchaser (directly or indirectly, including without limitation by a debit to a bank account) to the Lockbox Bank pursuant to the Lockbox Agreement.

**"Target Amount"** means, with respect to a Purchased Account, the sum of (a) the Initial Down Payment for such Purchased Account plus (b) the amount of Purchaser's discount fees accrued with respect to such Purchased Account through the date on which Purchaser has received collections on such Purchased Account in an amount at least equal to the Initial Down Payment for such Purchased Account.

(d)     The amounts of all Deferred Purchase Prices and Non-Purchase Account Amounts transferred to the Provider Operating Account as described above are subject to collection.

5.     **Misdirected Payments; EOBs.** Any payment with respect to an Account, whether in the form of check or other instrument, cash or wire transfer, received by the Provider but that, pursuant to Section 4 hereof, should have been sent to either the Purchaser Lockbox or the Purchaser Lockbox Bank Account or the Provider Lockbox or the Provider Lockbox Bank Account shall be deemed a **"Misdirected Payment."** In the case of any Misdirected Payment, the Provider, at its sole cost and expense, shall promptly take all necessary steps described in

paragraphs (a) through (d) of this Section 5 and, pending the delivery of any such payments as so provided, shall: (i) hold all such payments in trust for the Purchaser and (ii) segregate all such payments and not deposit the same in the account of any other person or entity other than as provided below nor commingle the same with the funds of the Provider or the funds of any other person or entity.

        (a)    In the event that the Provider receives a Misdirected Payment from a Third Party Obligor in the form of a check or other instrument, the Provider shall, as applicable, either: (i) in the case of Non-Governmental Accounts, immediately deliver to the Purchaser Lockbox such check or other instrument, duly endorsed over to the Purchaser, together with the related EOB and the envelope in which such payment was received; or (ii) in the case of Governmental Accounts, immediately deliver to the Provider Lockbox such check or other instrument, together with the related EOB and with best efforts the envelope in which such payment was received. In the event that the Provider receives a Misdirected Payment in the form of cash or wire transfer or other electronic transfer, the Provider shall immediately wire transfer the full amount of the Misdirected Payment directly into the Purchaser Lockbox Bank Account and shall simultaneously therewith send all related EOBs to the Purchaser Lockbox. All Misdirected Payments and EOBs shall be so deposited or wire transferred not later than the Provider's close of business on the first business day following its receipt of such Misdirected Payment or EOB.

        (b)    If the Provider does not deposit or wire transfer a Misdirected Payment into the applicable Lockbox or the applicable Lockbox Bank Account, as applicable, in accordance with paragraph (a) above, then the Provider shall pay interest on such Misdirected Payment to the Purchaser, from such date until and including the date such Misdirected Payment is received in such Lockbox or Lockbox Bank Account, as the case may be, at a rate equal to eighteen percent (18%) per annum or the maximum rate legally permitted if less than such rate (the "**Additional Charge**"). Such interest shall be payable on demand or, at the option of the Purchaser, in accordance with paragraph (c) below. For purposes of the foregoing, if a Misdirected Payment is in the form of a check or other instrument, the Provider shall be deemed to have received such Misdirected Payment on the date that is five (5) business days after the postmark date on the envelope from the Third Party Obligor enclosing such check or instrument (or, if no such envelope is deposited in the applicable Lockbox, on the date that is five (5) business days after the date of such check or other instrument).

        (c)    The Purchaser shall have the right, to set-off or recoup the full amount of all Misdirected Payments, upon written notice (plus interest thereon accrued or accruing in accordance with paragraph (b) above) against any amounts payable from time to time to the Provider pursuant to this Agreement.

        (d)    The Provider hereby agrees and consents that the Purchaser or Servicer, as the case may be, shall have the right to take such actions as are deemed by either of them to be necessary or appropriate to ensure that future payments from the Third Party Obligor of a Misdirected Payment shall be made in accordance with the notice previously delivered to such Third Party Obligor pursuant to paragraph 4.2 or 4.3 of this Agreement, including, without

limitation by: (i) the Purchaser or Servicer executing on the Provider's behalf and delivering to such Third Party Obligor a new notice and (ii) the Purchaser or the Servicer contacting such Third Party Obligor by telephone to confirm the instructions previously set forth in the notice to such Third Party Obligor. Upon request, the Provider shall promptly (and, in any event, within one (1) business day from such request) take such actions as the Purchaser or Servicer may reasonably request.

6. **Ineligible Accounts.** A Purchased Account shall be an "**Ineligible Account**" if one of the following has occurred: (i) there has been a breach of any representation or warranty contained herein relating to such Purchased Account; (ii) Purchaser has not received collections with respect to such Purchased Account in an amount at least equal to the Target Amount for such Purchased Account within 150 days from the date of the invoice or bill was issued relating to such Purchased Account (other than as a result of the bankruptcy or insolvency or receivership of the applicable Third Party Obligor), or (iii) Purchaser reasonably has determined prior to the end of such 150 day period (other than a result of the bankruptcy or insolvency or receivership, or anticipated bankruptcy or insolvency or receivership, of the applicable Third Party Obligor) that such Third Party Obligor will not pay, by the end of such 150 day period, an amount on such Purchased Account equal to not less than the Target Amount for such Purchased Account. The Provider shall cure such breach or repurchase each such Ineligible Account from the Purchaser at a price equal to the Repurchase Price within ten (10) business days of the earlier of notification to, or discovery by, the Provider or Purchaser of the breach or failure of Purchaser to receive payment of the Target Amount as described above. The "**Repurchase Price**" for an Ineligible Account (a "**Repurchased Account**") shall be equal to (i) the sum of the Initial Down Payment for such Account plus the amount of Purchaser's discount fees for such Account accrued through the date of Provider's repurchase of such Account, less (ii) any amount collected by the Purchaser with respect to such Ineligible Account. The Repurchase Price shall be payable by check or wire transfer, at the option of the Purchaser. Upon receipt by the Purchaser of the Repurchase Price, the Provider shall be deemed to have repurchased, and the Purchaser shall be deemed to have resold to the Provider, the Ineligible Account without any representation, warranty, or recourse whatsoever and, thereupon, the Purchaser shall have no obligation whatsoever to the Provider with respect to such Repurchased Account and such Account shall cease to be a Purchased Account. Notwithstanding any other provision of this Agreement to the contrary, and in addition to all other rights and remedies available to Purchaser under this Agreement or at law or in equity, the Purchaser may offset against or recoup from any amounts it may owe to the Provider any and all amounts due to the Purchaser with respect to Repurchased Accounts. If, after receipt of any payment of all or any part of the Repurchase Price for any Repurchased Account, the Purchaser is required to surrender such payment to any person or entity because such payment is determined to be void or voidable as a preference, impermissible set-off, diversion of trust funds, or for any other reason, this Agreement shall continue in full force (except, at the Purchaser's option, with respect to any obligation it may be deemed to have to purchase any additional Accounts from the Provider) and the Provider shall be liable to the Purchaser for, and shall indemnify and hold the Purchaser harmless against, the aggregate amounts of all such surrendered payments.

7.    **Representations and Warranties of the Provider.**  The Provider represents and warrants to the Purchaser, each of which representation and warranty shall be deemed material and relied upon by the Purchaser, as follows:

(a)    With respect to the Provider, as of the date hereof and as of the date of each purchase of Accounts:

(i) If a corporation or a partnership or a limited liability company, the Provider is duly organized, validly existing, and in good standing as such under the laws of the jurisdiction of its organization; is qualified to do business and is in good standing under the laws of each state where the failure to so qualify would have a material adverse effect on the business and operations of the Provider; and has all the power and authority necessary to: (A) operate its business as it is now being conducted, including the sale of Accounts; (B) execute, deliver, and perform this Agreement, including all obligations contemplated hereby; (C) execute and deliver and perform its obligations under all other documents now or hereafter executed in connection herewith (all such documents to be included within the definition of Agreement); and (D) convey good and marketable title and ownership of the Purchased Accounts to the Purchaser. The execution, delivery, and performance by the Provider of this Agreement have been duly authorized by all appropriate action on behalf of the Provider. If a sole proprietorship, the Provider has the necessary power and capacity under applicable law to operate its business as it is now being conducted and to execute, deliver, and perform all its obligations as provided for in this Agreement.

(ii) This Agreement is the legal, valid, and binding obligation of the Provider, enforceable against the Provider in accordance with its terms except as may be limited by bankruptcy or law. Upon the filing of financing statements setting forth the collateral described on **Exhibit E** hereto in all appropriate jurisdictions, any security interest in favor of the Purchaser granted pursuant to this Agreement will be a fully enforceable first priority security interest validly perfected whether or not the Third Party Obligors have been notified of the sale of Accounts to the Purchaser.

(iii) To the best of Providers knowledge the execution, delivery, and performance of this Agreement does not and will not violate any provision of law, regulation, or any order or decree of any court or governmental agency, or violate any provision of the Provider's organizational documents (if a corporation or partnership or limited liability company) or any agreement to which the Provider is a party or by which it or any of its assets are bound, and does not and will not, with the giving of notice, the passage of time, or otherwise, conflict with, result in a breach of, or constitute a default under, any such agreement or result in the creation of any lien or security interest upon any of the Provider's assets, except in favor of the Purchaser.

(iv)    The Provider has all permits, licenses, provider numbers, accreditations, certifications, authorizations, approvals, consents, and agreements of all Third Party Obligors, governmental agencies, and instrumentalities, accreditation agencies and any other person or entity necessary or required for the Provider to own the assets that it now owns, to carry

on its business as now conducted, to execute, deliver, and perform this Agreement, including any other documents contemplated hereby, and to receive payments from the Third Party Obligors; and the Provider has not been notified by any such Third Party Obligor, governmental agency or instrumentality, accreditation agency or any other person or entity that any such Third Party Obligor, agency, instrumentality or other person or entity has rescinded or not renewed, or intends to rescind or not renew, any such permit, license, provider number, accreditation, certification, authorization, approval, consent, or agreement granted by it to the Provider or to which it and the Provider are parties.

(v) To the best of Providers knowledge there are no actions, suits, proceedings or investigations pending or threatened against the Provider before any court, governmental agency, or other tribunal that at this time could affect its ability to perform under this Agreement, and the Provider is not currently subject to, and has no intention of commencing, any bankruptcy or insolvency proceeding. The Provider is solvent and will not be rendered insolvent by the transactions contemplated by this Agreement. The Provider does not have any intent to hinder, delay, or defraud any of its creditors in connection with the transactions contemplated by this Agreement.

(vi) To the best of Providers knowledge neither the Provider nor any persons who provide professional services under agreements with the Provider have engaged in any activities that are prohibited under federal Medicare and Medicaid statutes, federal CHAMPUS statutes, or regulations promulgated pursuant to such statutes or any other federal or state or local statutes or regulations or that are prohibited by rules of professional conduct, including but not limited to: (A) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment; (B) knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment; (C) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment on its own behalf or on behalf of another; (D) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe, or rebate), directly or indirectly, overtly or covertly, in cash or in kind, or offering to pay such remuneration: (xx) in return for referring an individual to a person or entity for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare, Medicaid, or any federal healthcare program or other governmental healthcare program or (yy) in return for purchasing, leasing, or ordering or arranging for or recommending the purchasing, leasing, or ordering of any good, facility, service, or item for which payment may be made in whole or in part by Medicare, Medicaid or any federal healthcare program or other governmental healthcare program, or in connection with making prohibited referrals.

(vii) The Provider has valid business reasons for selling the Purchased Accounts.

(b)    With respect to each Account, as of the date such Account is purchased and continuing thereafter so long as the Provider shall have any obligations remaining hereunder:

*Master Purchase and Sale Agreement*
*Sun Capital Healthcare, Inc. and*
*Michael Reese Medical Center Corporation*
*Page 14*

(i) All documents and agreements relating to each Purchased Account that are necessary to collect such Purchased Account have been delivered to the Purchaser and all such documents and agreements are true, correct, and complete; the Provider has billed the applicable Third Party Obligor and the Provider has delivered or caused to be delivered to such Third Party Obligor all requested supporting claim documents with respect to such Purchased Account; all information set forth in the bill and supporting claim documents is true, correct, and complete, and, if any error has been made, the Provider will promptly correct the same and, if necessary, rebill or, if requested by the Purchaser or Servicer, cooperate to rebill such Purchased Account.

(ii) Each Account is exclusively owned by the Provider (immediately prior to the sale of such Account to Purchaser pursuant to this Agreement) and there is no security interest or lien in favor of any third party, and no recording or filing against the Provider, as debtor, covering or purporting to cover, any interest of any kind in any Account, except (x) as has been released by each party holding such interest or lien in the Account and (y) in favor of Purchaser. Upon the Weekly Closing Date with respect to a Purchased Account all right, title and interest of the Provider with respect thereto automatically shall be vested in the Purchaser, free and clear of any lien, security interest, claim or encumbrance of any kind, and the Provider agrees, at its sole cost and expense, to defend the same against the claims of all persons and entities.

(iii) Each Purchased Account: (A) is payable, in an amount not less than and in a manner consistent with the assumptions underlying the determination of its expected Net Collectible Amount, by the Third Party Obligor identified by the Provider as being obligated to do so; (B) is based on an actual and bona fide rendition of services or sale of goods to the patient by the Provider in the ordinary course of its business; (C) is denominated and payable only in lawful currency of the United States; (D) is an account or general intangible within the meaning of the UCC of the state in which the Provider has its principal place of business or is a right to payment under a policy of insurance or similar agreement or the proceeds thereof, and is not evidenced by any instrument; and (E) is calculated to be paid by the Third Party Obligor in an amount equal to the Net Collectible Amount within one hundred fifty (150) days after the related goods are provided or services are invoiced to Third Party Obligor by the Provider unless such Obligor, at such 150th day, is the subject of bankruptcy, insolvency, or receivership proceedings. There is no payor other than the Third Party Obligor identified by the Provider as the payor primarily liable on any Purchased Account.

(iv) Each Purchased Account is not subject to any action, suit, proceeding or dispute (pending or threatened), set-off, recoupment, counterclaim, defense, abatement, suspension, deferment, deductible, reduction or termination or the like by any Third Party Obligor. The Weekly Closing Date relating to a Purchased Account is not later than 60 days after the date of service giving rise to such Account.

(v) The Provider does not have any guaranty of, letter of credit providing credit support for, or collateral security for, any Purchased Account, other than any such guaranty, letter of credit, or collateral security that has been assigned and delivered to the Purchaser, and

any such guaranty, letter of credit, or collateral security is not subject to any lien in favor of any other person or entity.

(vi) The goods provided or services rendered giving rise to each Purchased Account were furnished by Provider in the ordinary course of its business and were medically necessary for the patient; the fees charged for such goods or services were the usual, customary, and reasonable fees charged by other providers in the Provider's community and the community in which such patient resides for the same or similar goods and services; the fees for goods and services relating to the Purchased Accounts that are subject to limitations imposed by workers' compensation regulations or by contracts for reimbursement from Third Party Obligors do not exceed the limitations so imposed and each Purchased Account relating to goods and services the fees for which are so restricted has been clearly identified by the Provider to Purchaser as being subject to such restriction; the patient received such goods or services and the medical insurance coverage or other coverage by the responsible Third Party Obligor with respect thereto was effective at the time of treatment. Each patient signed a patient consent form in connection with all Purchased Accounts and such consent form is sufficient to allow the Provider to deliver to the Purchaser and Servicer with respect to each such Purchased Account, and for the Provider, the Purchaser, and the Servicer to deliver to the Third Party Obligor with respect to each such Purchased Account, information or documents necessary for the performance of servicing obligations with respect to such Purchased Accounts without violating any patients' privacy rights.

(vii) The expected payment by the applicable Third Party Obligor for the goods or services constituting the basis for each Purchased Account is consistent with the usual, customary, and reasonable fees charged by other similar medical service providers in the Provider's community for the same or similar services.

(viii) To the best of Providers knowledge the Third Party Obligor with respect to each Purchased Account is: (A) not, as of the date such Account is purchased, the subject of any bankruptcy, insolvency, or receivership proceeding, nor, as of the date such Account is purchased, is it generally unable to make payments on its obligations when due; (B) located in the United States; and (C) one of the following: (i) an entity that in the ordinary course of its business or activities agrees to pay for healthcare services received by individuals, including, without limitation, commercial insurance companies and not-for-profit insurance companies (such as Blue Cross and Blue Shield entities) issuing health, personal injury, workers' compensation, or other types of insurance, employers or unions that self-insure for employee or member health insurance, prepaid healthcare organizations, preferred provider organizations, health maintenance organizations or any other similar entity; or (ii) Medicare, Medicaid, governmental bodies, or another Third Party Obligor of the type described in the definition of Governmental Accounts.

(ix) The proceeds of the sale of the Purchased Accounts will be used for the business and commercial purposes of the Provider. The sale of the Purchased Accounts pursuant to this Agreement is made in good faith and without actual intent to hinder, delay, or defraud